1   WILLARD K. TOM
    General Counsel
2
    JOHN D. JACOBS, Bar No. 134154
3   jjacobs@ftc.gov, (310) 824-4343 (tel.)
    Federal Trade Commission
4   10877 Wilshire Boulevard, Suite 700
    Los Angeles, CA 90024
5   (310) 824-4343 (tel.)
    (310) 824-4380 (fax)
6
    MARK MORELLI
7   mmorelli@ftc.gov, (202) 326-2601 (tel.)
    ELIZABETH TUCCI
8   etucci@ftc.gov, (202) 326-2402 (tel.)
    ZACHARY V. HUNTER
9   zhunter@ftc.gov, (202) 326-3235 (tel.)
    Federal Trade Commission
10  600 Pennsylvania Avenue, NW, Rm. 2122
    Washington, DC 20004
11  (202) 326-2558 (fax)

12  ATTORNEYS FOR PLAINTIFF
    FEDERAL TRADE COMMISSION
13
14              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
15
16  **FEDERAL TRADE**               CV-07-4880 ODW (AJWx)
    **COMMISSION**,
                                    **Exhibits – Volume III**
17                    Plaintiff,
                                    **To Memoranda in Support of**
18           v.                     **Federal Trade Commission's**
                                    **Application For An Order to Show**
19  **EDEBITPAY, LLC, et al.,**     **Cause Why Defendants Should Not**
                      Defendants.   **Be Held in Contempt**
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**VOLUME I**:                    **Exhibits**

Exhibit 1                    FTC Complaint against Defendants – Jul. 30, 2007

Exhibit 2                    Order signed by Defendants  – Jan. 15, 2008

Exhibit 3                    Order signed by Hon. Otis D. Wright II – Jan. 22, 2008

Exhibit 4                    Defendants' Affidavits of Receipt of Order

Exhibit 5                    Declaration of Dr. Kenneth H. Kelly, CFA

Attachments to Exhibit 5:

Attachment A                 Curriculum Vitae of Dr. Kenneth H. Kelly, CFA
Attachment B                 Catalog vs. Retail Price Comparisons

Exhibit 6                    Declaration of Naomi Parnes


**VOLUME II**:

Exhibit 7                    Declaration of Ronald D. Lewis

Attachments to Exhibit 7:

Attachment A                 NV Sec. of State records – EDebitPay, LLC
Attachment B                 CA Sec. of State records – Platinum Online Group, LLC
Attachment C                 Website capture (snake) – StarterCreditDirect.com
                             (manually filed)
Attachment D                 Website printout – StarterCreditDirect.com
Attachment E                 Website printout – StarterCreditDirect.com Terms & Conditions

i

Attachment F                         Website printout – Century Platinum Terms &
                                     Conditions
Attachment G                         Website screenshot – StarterCreditDirect.com (top)
Attachment H                         Website screenshot – StarterCreditDirect.com (bottom)

**VOLUME III**:

Attachment I                         Website screenshot - StarterCreditDirect.com (Terms &
                                     Conditions pop-up)
Attachment J                         Website video (camtasia) – ePlatinumDirect.com
                                     (manually filed)
Attachment K                         Camtasia screenshot – ePlatinumDirect.com (collapsed)
Attachment L                         Camtasia screenshot – ePlatinumDirect.com (expanded)
Attachment M                         Website printout – ePlatinumDirect.com Terms &
                                     Conditions
Attachment N                         Website printout and screenshots -
                                     YourSupportDepartment.com
Attachment O                         Website capture (camtasia) –
                                     YourSupportDepartment.com (manually filed)
Attachment P                         Website capture (snake) – EDebitPay.com (manually
                                     filed)
Attachment Q                         Relevant portions from the FTC's Oct. 23, 2009 CID to
                                     Insite Marketing Group, LLC
Attachment R                         Relevant portions of the response from Insite Marketing
                                     Group, LLC to the FTC's Oct. 23, 2009 CID

Exhibit 8                              Declaration of Elizabeth Tucci

<u>Attachments to Exhibit 8:</u>

Attachment A                          Deposition Notice

Attachment B                          Wilson excerpts

Attachment C                          Cleveland excerpts

Attachment D                          Defs' certification

# ATTACHMENT I



# ATTACHMENT J

# (manually filed)

# ATTACHMENT K



# ATTACHMENT L

**EXHIBIT 7, ATT. L**
**-175-**



EXHIBIT 7, ATT. L
-176-

# ATTACHMENT M

## Terms and Conditions

**Cardholder Agreement**

**IMPORTANT -- PLEASE READ CAREFULLY**

**1. Terms and Conditions for the NetSpend Visa Prepaid Debit Card Program.**

This document constitutes the agreement ("Agreement") outlining the terms and conditions under which the NetSpend Visa Prepaid Debit Card Program has been issued to you. By accepting and using this Card, you agree to be bound by the terms and conditions contained in this Agreement. In this Agreement, "Card" means the NetSpend Visa Prepaid Debit Card issued to you by MetaBank. "You" and "your" means the person or persons who have received the Card and are authorized to use the Card as provided for in this Agreement. "We," "us," and "our" mean MetaBank, our successors, affiliates or assignees. The Card will remain the property of MetaBank and must be surrendered upon demand. The Card is nontransferable, and it may be canceled, repossessed, or revoked at any time without prior notice subject to applicable law. Please read this Agreement carefully and keep it for future reference.

**2. Definitions**

The Card is a Prepaid Debit Card. The Card allows you to access funds you place on the Card. The Card does not constitute a checking, savings or other bank account and is not connected in any way to any other account you may have. The Card is not a credit card. You will not receive any interest on your funds on the Card.

**Authorized Users:** You may request an additional Card for another person. You may also permit another person to have access to your Card or Card number. However, if you do, you are liable for all transactions made with the Card or Card number by those persons. You must notify us to revoke permission for any person you previously authorized to use your Card. You are responsible for all transactions and fees incurred by you or any other person you have authorized. If you tell us to revoke another person's use of your Card, we may revoke your Card and issue a new Card with a different number. You are wholly responsible for the use of each Card according to the terms of this Agreement. Each cardholder and visitor to the www.netspend.com site agrees to these terms and conditions, as amended from time to time. If you do not agree to these terms and conditions, please do not use www.netspend.com or the NetSpend Visa Prepaid Debit Card. In order to become a cardholder, you must be an individual who can lawfully enter into and form contracts under applicable law. By participating in the NetSpend Visa Prepaid Debit Card program, You warrant factual representation of the required information, including, but not limited to, your real name, valid US mailing address and residential address (if different), social security number, age, and telephone number are accurate. If you falsify, misrepresent, or fail to provide requested information, we may cancel your NetSpend Visa Prepaid Debit Card. In addition, funds tied to potentially illicit or illegal activity may be subject to both internal and potentially Federal investigation, which may delay their immediate access.

**Personal Identification Number ("PIN"):** We may, at our option, give you a Personal Identification Number ("PIN"). If we give you a PIN, you may use your Card, (i) to obtain Cash from any Automated Teller Machine ("ATM") or (ii) at any Point-of -Sale (POS) device which requires entry of a PIN, that bears the Visa, PULSE, or Interlink brand. All ATM transactions are treated as Cash withdrawal transactions. You should not write or keep your PIN with your Card. If you believe that anyone has gained unauthorized access to your PIN, you should advise us immediately, following the procedures in the paragraph labeled "Your Liability for Unauthorized Transfers."

**Loading Your Card:** You may add funds to your Card, called "value loading", at any time. (There is no limit on the number of times you may value load your Card.) However, the maximum value load you may place on your Card when aggregated with any other Cards you have authorized is restricted. You agree to present the Card and meet identification requirements to complete load transactions.

**Using Your Card:** You may use your Card to purchase or lease goods or services wherever the Card is honored as long as you do not exceed the value available on your Card. You are responsible for all transactions initiated by use of your Card. If you permit someone else to use your Card we will treat this as if you have authorized such use and you will be responsible for any transactions made subject to such use. If you do not have enough value loaded on your Card you can instruct the merchant to charge a part of the purchase to the Card and pay the remaining amount with cash or another card. These are called "split transactions". Some merchants do not allow cardholders to conduct split transactions. Some merchants will only allow you to do a split transaction if you pay the remaining amount in cash.

If you use your Card number without presenting your Card (such as for a mail order or telephone purchase), the legal effect will be the same as if you used the Card itself. For security reasons, we may limit the amount or number of transactions you can make on your Card. Your Card cannot be redeemed for cash. You may use your Card to access cash at an Automated Teller Machine (ATM). You may not use your Card for online gambling. You may not use your Card for any illegal transactions.

**EXHIBIT 7, ATT. M**
**-178-**

You should keep track of the amount of value loaded on Cards issued to you. You may call us at the Customer Service number shown on your Card and listed below at any time to obtain the current value on your Card. To reach us, call toll-free at 1-86-NETSPEND (1-866-387-7363) for the balance. Hours of operation are Monday through Friday, 8 a.m. to 10 p.m. CST, Saturday and Sunday 8 a.m. to 8 p.m. excluding holidays.

Each time you use your Card, you authorize us to reduce the value available on your Card by the amount of the transaction plus applicable fees. You are not allowed to exceed the available amount on your Card through an individual transaction or a series of transactions. Nevertheless, if a transaction exceeds the balance of the funds available on your Card (creating a "shortage") you shall remain fully liable to us for the amount of the transaction and any applicable fees or charges. You agree to pay us promptly for the shortage and any applicable shortage fees. We also reserve the right to cancel this Card should you create one or more shortages with your Card.

You do not have the right to stop payment on any purchase transaction originated by use of your Card. If you authorize a transaction and then fail to make a purchase of that item as planned, the approval may result in a hold for that amount of funds . Please note that we have no control over when a merchant settles a previously authorized transaction. When you use your Card to rent a vehicle, hotel room, or to make other purchases, the merchant may initiate a authorization hold on your funds. Merchants may initiate authorization holds for many reasons, including (without limit) to satisfy "security deposit" requirements or to ensure available funds when you complete your transaction. Funds, loaded onto the NetSpend Visa Prepaid Debit Card, subject to a authorization hold will not be available to pay for other purchases or ATM withdrawals.

### 3. Returns and Refunds

If you are entitled to a refund for any reason for goods or services obtained with your Card, you agree to accept credits to your Card for such refunds. The amounts credited to your Card for refunds may not be immediately available. While merchant refunds post as soon as they are received, please note that we have no control over when a merchant sends a credit transaction and the refund may not be available for a number of days after the date the refund transaction occurs.

### 4. Foreign Transactions

If you obtain your funds (or make a purchase) in a currency other than the currency in which your Card was issued, the amount deducted from your funds will be converted by Visa into an amount in the currency of your Card. Visa will establish a currency conversion rate for this convenience using a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable central processing date which may vary from the rate Visa itself receives, or the government-mandated rate in effect for the applicable central processing date, in each instance, plus or minus any adjustment determined by the Issuer.

### 5. Receipts

You should get a receipt at the time you make a transaction or obtain cash using your Card. You agree to retain your receipt to verify your transactions.

### 6. Periodic Statements

A continuously updated account statement, in electronic format, is available on the NetSpend website www.netspend.com. The statement will be made available free of charge and regardless of whether or how often you use your account. You may choose to have a paper statement mailed to you. However, there is a fee for this service.

### 7. Fees and Charges

*Refunds are at par. None of the fees listed are assessed by Inter National Bank N.A., MetaBank or the Card Association. International ATM withdrawals may be subject to varying daily limits at the ATM owner's discretion.

| Pay-As-You-Go Customers | |
| --- | --- |
| Monthly Service Fee | $9.95, billed on accountholder's cycle date |
| Signature Purchase Convenience Fee | $1.00 |
| PIN Purchase Convenience Fee | $2.00 |
| Card Fulfillment (Shipping & Handling) | $9.95 |
| FeeAdvantage Customers | |
| Monthly Service Fee | $9.95, billed on accountholder's cycle date |
| Signature Purchase Convenience Fee | FREE |

**EXHIBIT 7, ATT. M**
**-179-**

| | |
|---|---|
| PIN Purchase Convenience Fee | FREE |
| Card Fulfillment (Shipping & Handling) | $9.95 |
| **Other Fees** | |
| Adding or withdrawing funds to your account at local distributors | Convenience fee determined by distributor |
| Account-to-Account Transfer -- Via Internet | FREE |
| Account-to-Account Transfer -- Via Toll Free Number | $4.95 |
| Non-Monetary Transactions -- Via Internet | FREE |
| Non-Monetary Transactions -- Via Toll Free Number | Up to $0.50 |
| Non-Monetary Transactions -- at ATM | Up to $0.50 |
| Account Maintenance (waived if account has debit or credit transaction and/or balance inquiry within 90 days) | $5.95 per month |
| Check or Additional Statement Mailing Fee | $5.95 |
| Domestic ATM Cash Withdrawal / Cash Withdrawal at Distributor | Up to $2.00 per withdrawal, plus ATM owner fees, if any |
| International ATM Cash Withdrawal | $4.95 per withdrawal plus ATM owner fees, if any |
| Lost or Stolen Card Replacement Fee | Up to $9.95 |

**8. Confidentiality**

We may disclose information to third parties about your Card or the transactions you make:

1. Where it is necessary for completing transactions;
2. In order to verify the existence and condition of your Card for a third party, such as merchant;
3. In order to comply with government agency, court order, or other legal reporting requirements;
4. If you give us your written permission, or;
5. To our employees, auditors, affiliates, service providers, or attorneys as needed.

**9. Our Liability for Failure to Complete Transactions**

In no event will we be liable for consequential damages (including lost profits), extraordinary damages, special or punitive damages. We will not be liable, for instance:

1. If, through no fault of ours, you do not have enough funds available on your Card to complete the transaction;
2. If a merchant refuses to accept your Card;
3. If an ATM where you are making a cash withdrawal does not have enough cash;
4. If an electronic terminal where you are making a transaction does not operate properly, and you knew about the problem when you initiated the transaction;
5. 
6. If access to your Card has been blocked after you reported your Card lost or stolen;
7. If there is a hold or your funds are subject to legal process or other encumbrance restricting their use;
8. If we have reason to believe the requested transaction is unauthorized;
9. If circumstances beyond our control (such as fire, flood or computer or communication failure) prevent the completion of the transaction, despite reasonable precautions that we have taken;
10. Any other exception stated in our Agreement with you.

**10. Your Liability for Unauthorized Transfers**

Tell us AT ONCE if you believe your Card has been lost or stolen. Telephoning toll-free at 1-86-NETSPEND (1-866-387-7363) is the best way of keeping your possible losses down. **IF YOU BELIEVE THAT YOUR CARD HAS BEEN STOLEN, OR THAT SOMEONE HAS TRANSFERRED OR MAY TRANSFER MONEY FROM YOUR CARD WITHOUT YOUR PERMISSION, CALL US TOLL FREE AT 1-86-NETSPEND (1-866-387-7363). WE WILL CANCEL THE CARD AND WILL REIMBURSE YOU FOR THE REMAINING VALUE STILL ON THE CARD AS OF THE TIME YOU NOTIFY US. IF YOU NOTIFY US WITHIN TWO (2) BUSINESS DAYS OF THE LOSS OR THEFT, AND SOMEONE HAS USED YOUR CARD WITHOUT YOUR PERMISSION, WE WILL ALSO REIMBURSE YOU FOR ANY FUNDS TAKEN FROM THE CARD WITHOUT YOUR PERMISSION. IF YOU ARE GROSSLY NEGLIGENT OR HAVE ENGAGED IN FRAUDULENT CONDUCT, YOU COULD LOSE ALL THE MONEY IN YOUR ACCOUNT. A TRANSACTION IS UNAUTHORIZED IF IT IS NOT INITIATED BY YOU, YOU DID NOT GIVE PERMISSION AND YOU DO NOT BENEFIT FROM THE TRANSACTION IN ANY WAY. IF YOU DO NOT NOTIFY US WITHIN TWO (2) BUSINESS DAYS AFTER YOU LEARN OF THE LOSS OR**

**THEFT OF YOUR CARD AND WE CAN PROVE THAT WE COULD HAVE STOPPED SOMEONE FROM USING YOUR CARD WITHOUT YOUR PERMISSION IF YOU HAD PROMPTLY NOTIFIED US, YOU COULD LOSE AS MUCH AS $500.** Also, if your statement shows transactions that you did not make, tell us at once. If you do not tell us within 60 days after the statement was made available to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If your Card has been lost or stolen, we will close your Card to keep losses down. We reserve the right to investigate any claim you may make with respect to a lost or stolen Card, and you agree to cooperate with such investigation.

**11. Other Terms**

Your Card and your obligations under this Agreement may not be assigned. We may transfer our rights under this Agreement. Use of your Card is subject to all applicable rules and customs of any clearinghouse or other association involved in transactions. We do not waive our rights by delaying or failing to exercise them at anytime. If any provision of this Agreement shall be determined to be invalid or unenforceable under any rule, law, or regulation of any governmental agency, local, state, or federal, the validity or enforceability of any other provision of this Agreement shall not be affected. This Agreement will be governed by the law of the State of South Dakota except to the extent governed by federal law.

**12. Amendment and Cancellation**

We may amend or change the terms of this Agreement at any time. You will be notified of any change in the manner provided by applicable law prior to the effective date of the change. However, if the change is made for security purposes, we can implement such change without prior notice.

We may cancel or suspend your Card or this Agreement at any time. You may cancel this Agreement by calling 1-86-NETSPEND (1-866-387-7363) or following the procedures set forth in the "Request Funds" section found at www.netspend.com. Your termination of this Agreement will not affect any of our rights or your obligations arising under this Agreement prior to termination.

**13. Information About Your Right to Dispute Errors**

In case of errors or questions about your Card transactions, call 1-86-NETSPEND (1-866-387-7363) or write to:

NetSpend
Customer Service
PO Box 2136
Austin, TX 78768-2136

If you think your statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt contact Customer Service immediately. You must contact us no later than sixty (60) days after electronic statement becomes available on which the problem or error appeared.

1.  Provide your name and Card number (if any);
2.  Describe the error or the transaction you are unsure about, and explain why you believe it is an error or why you need more information;
3.  Provide the dollar amount of the suspected error.

If you provide this information orally, we may require that you send your complaint or question in writing within ten (10) business days. We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we ask you to put your complaint or question in writing and you do not provide it within ten (10) business days, we may not credit your Card.

For errors involving new Cards, point-of-sale, or foreign-initiated transactions, we may take up to ninety (90) days to investigate your complaint or question. We will tell you the results within three (3) business days after completing the investigation. If we decide that there was no error, we will send you a written explanation.

**Privacy and Data Protection**

(i) Information We Collect ("Cardholder Information"):

* (a) Information about purchases made with the Card, such as date of purchase, amount and place of purchase
* (b) Information you provide to us when you apply for a Card, or for replacement Cards or when you contact us with customer service issues, such as name, address, phone number.

**EXHIBIT 7, ATT. M**

**-181-**

(ii) Information Security: Only those persons who need it to perform their job responsibilities are authorized to have access to Cardholder Information. In addition, we maintain physical, electronic and procedural security measures that comply with federal regulations to safeguard Cardholder Information.

(iii) Disclosure: We may use Cardholder Information to provide customer services, to process claims for lost or stolen Cards, to develop marketing programs, to help protect against fraud and to conduct research and analysis. In addition, it is often necessary for us to disclose Cardholder Information for the same purposes to companies that work with us. For example, we may provide certain Cardholder Information to companies that perform business operations or services, including marketing services, on our behalf. We may also provide certain Cardholder Information to others as permitted by law, such as government entities or other third parties in response to subpoenas.

**16. Telephone Monitoring/Recording**

From time to time we may monitor and/or record telephone calls between you and us to assure the quality of our customer service or as required by applicable law.

**17. No Warranty Regarding Goods and Services**

We are not responsible for the quality, safety, legality, or any other aspect of any goods or services you purchase with your Card.

**18. Arbitration**

(a) Purpose: This Arbitration Provision sets forth the circumstances and procedures under which claims (as defined below) may be arbitrated instead of litigated in court.

(b) Definitions: As used in this Arbitration Provision, the term "Claim" means any claim, dispute or controversy between you and us arising from or relating to the Card or this Agreement as well as any related or prior agreement that you may have had with us or the relationships resulting from this Agreement, including the validity, enforceability or scope of this Arbitration Provision or the Agreements. "Claim" includes claims of every kind and nature, including but not limited to initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity. The term "Claim" is to be given the broadest possible meaning that will be enforced and includes, by way of example and without limitation, any claim, dispute or controversy that arises from or relates to (i) your Card, or the Cards of any Additional Cardholders designated by you; (ii) the amount of Available Funds on the Cards; (iii) advertisements, promotions or oral or written statements related to the Cards, goods or services purchased with the Cards; (iv) the benefits and services related to the Cards; and (v) your enrollment for any Card. We shall not elect to use arbitration under the Arbitration Provision for any Claim that you properly file and pursue in a small claims court of your state or municipality so long as the Claim is individual and pending only in the court.

As used in the Arbitration Provision, the terms "we" and "us" shall for all purposes mean the Bank, wholly or majority owned subsidiaries, affiliates, licensees, predecessors, successors, and assigns; and all of their agents, employees, directors and representatives. In addition, "we" or "us" shall include any third party using or providing any product, service or benefit in connection with any Cards (including, but not limited to merchants who accept the Card, third parties who use or provide services, debt collectors and all of their agents, employees, directors and representatives) if, and only if, such third party is named as a co-party with us (or files a Claim with or against us) in connection with a Claim asserted by you. As solely used in this Arbitration Provision, the terms "you" or "yours" shall mean all persons or entities approved by us to have and/or use a Card, including but not limited to all persons or entities contractually obligated under any of the Agreements and all Additional Cardholders.

(c) Initiation of Arbitration Proceeding/Selection of Administrator: Any Claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration Provision and the code of procedures of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed. Claims shall be referred to either the National Arbitration Forum ("NAF"), Judicial Arbitration and Mediation Services ("JAMS"), or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of one of these organizations is unacceptable to you, you shall have the right within 30 days after you receive notice of our election to select either of the other organizations listed to serve as arbitrator administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact them as follows: (i) the NAF at P.O. Box 50191, Minneapolis, MN 55404; website at www.arbitration-forum.com; (ii) JAMS at 1920 Main Street, Suite 300, Los Angeles, CA 92614; website at www.jamsadr.com; (iii) AAA at 335 Madison Avenue, New York, NY 10017; website at www.adr.org.

(d) Significance of Arbitration: IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO ENGAGE IN DISCOVERY EXCEPT AS PROVIDED FOR IN THE CODE OF PROCEDURES OF THE NAF, JAMS, OR AAA, AS APPLICABLE (THE "CODE"). FURTHER, YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND

**EXHIBIT 7, ATT. M**

**-182-**

BINDING. NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

(e) Restrictions on Arbitration: If either party elects to resolve a Claim by arbitration, that Claim shall be arbitrated on an individual basis. There shall be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardholders or other persons similarly situated. The arbitrator's authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator's authority to make awards is limited to you and us alone. Furthermore, Claims brought by you against us or by us against you may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless otherwise agreed to in writing by all parties.

(f) Location of Arbitration/Payment of Fees: Any arbitration hearing that you attend shall take place in the federal judicial district of your residence. At your written request, we will consider in good faith making a temporary advance of all or part of the filing administrative and/or hearing fees for any Claim you initiate as to which you or we seek arbitration. At the conclusion of the arbitration (or any appeal thereof), the arbitrator (or panel) will decide who will ultimately be responsible for paying the filing, administrative and/or hearing fees in connection with the arbitration (or appeal). If and to the extent you incur filing, administrative and/or hearing fees in arbitration, including for any appeal, exceeding the amount they would have been if the Claim had been brought in the state or federal court which is closest to your billing address an would have had jurisdiction over the Claim, we will reimburse you to that extent unless the arbitrator (or panel) determines that the fees were incurred without any substantial justification.

(g) Arbitration Procedures: This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16, as it may be amended (the "FAA"). The arbitration shall be governed by the applicable Code, except that (to the extent enforceable under the FAA) this arbitration Provision shall control if it is inconsistent with the applicable Code. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statutes of limitations and shall honor claims of privilege recognized at law and, at the timely request of either party, shall provide a brief written explanation of the basis for the decision. In conducting the arbitration proceeding, the arbitrator shall not apply the Federal or any state rules of civil procedure or rules of evidence. Either party may submit a request to the arbitrator to expand the scope of discovery allowable under the applicable Code. The party submitting such a request must provide a copy to the other party, who may submit objections to the arbitrator with a copy of the objections provided to the request party, within fifteen (15) days of receiving the requesting party's notice. The granting or denial of such request will be in the sole discretion of the arbitrator who shall notify the parties of his/her decision within twenty (20) days of the objecting party's submission. The arbitrator shall take reasonable steps to preserve the privacy of individuals, and of business matters. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA. However, any party can appeal that award to a three-arbitrator panel administered by the same arbitration organization, which shall consider anew any aspect of the initial award objected to by the appealing party. The appealing party shall have thirty (30) days from the date of entry of the written arbitration award to notify the arbitration organization that it is exercising the right of appeal. The appeal shall be filed with the arbitration organization in the form of a dated writing. The arbitration organization will then notify the other party that the award has been appealed. The arbitration organization will appoint a three-arbitrator panel which will conduct an arbitration pursuant to its Code and issue its decision within one hundred twenty (120) days of the date of the appellant's written notice. The decision of the panel shall be by majority vote and shall be final and binding.

(h) Continuation: This Arbitration Provision shall survive termination of your Card as well as voluntary payment of the debt in full by you, any legal proceeding by us to collect a debt owed by you, and any bankruptcy by you or us. If any portion of this Arbitration Provision is deemed invalid or unenforceable under any principle or provision of law or equity, consistent with the FAA, it shall not invalidate the remaining portions of this Arbitration Provision, the Agreement or any prior agreement you may have had with us, each of which shall be enforceable regardless of such invalidity.

# ATTACHMENT N

Customer Service Center                                         Page 1 of 1

 # CUSTOMER SERVICE CENTER

"WE ARE HERE TO HELP YOU!"

 **3 WAYS TO CONTACT US**    E-MAIL    LIVE CUSTOMER SERVICE REPRESENTATIVE  LIVE MESSAGE OPERATOR

We support our customers with various products and services ordered strictly online/internet. To better serve you, we are dedicated to providing the best and fastest possible answers to any questions or concerns you may have regarding your online orders, including the status of your online order as well as the best ways to use your product or service.

**Office Hours:**
Monday–Friday
9:00 a.m.–5:00 p.m. PST
(Closed Weekends
& Federal Holidays)

 **FOR YOUR INFORMATON**

**CLICK HERE for The Benefits of Your Online Order!**

**About Us**

Tips for you on "**How to safely order online**"

Cardholder "**Getting Started Guide**"

Find answers to your questions **FAQ's**

*Thank you for visiting our customer support site. We look forward to assisting you.*

© 2009, All rights reserved.

3 Ways to Contact Us | E-mail | Live Customer Service Representative | Live Message Operator | About Us
How to Order Safely Online | Getting Started Guide | FAQs | The Benefits of Your Online Order

http://www.yoursupportdepartment.com/                         11/13/2009

**EXHIBIT 7, ATT. N**
**-185-**



EXHIBIT 7, ATT. N
-186-









**Thank you.**

**Below you will find some of the benefits of the product/service you had ordered online:**

**What are the advantages of the Prepaid Debit Card you ordered?**

- The order you submitted online was to get a loadable prepaid debit card.
- The benefits of this prepaid debit card you ordered is it allows you to put in your own money and use it as an alternative way of making payments via a loadable prepaid debit card.
- Once you load it you can use it where ever the logo is accepted. You will have several loading options to work with (i.e. employer direct deposit)
- It is an alternative to your traditional plastics.
- You don't have to worry about interest rates, ruining your credit, paying money back as you control the value and budget your spending.
- After you load your prepaid debit card you will be able to use it online or offline to go shopping or paying bills.
- We know you will enjoy working with your prepaid debit card.

3 Ways to Contact Us | E-mail | Live Customer Service Representative | Live Message Operator | About Us
How to Order Safely Online | Getting Started Guide | FAQs | The Benefits of Your Online Order

Visited and printed 11/3/09 UAB

# ATTACHMENT O

# (manually filed)

# ATTACHMENT P

# (manually filed)

# ATTACHMENT Q



United States of America
Federal Trade Commission

## CIVIL INVESTIGATIVE DEMAND

**1. TO**

Insite Marketing Group LLC
c/o Laughlin Associates, Inc.
2533 North Carson St., Suite 5541
Carson City, NV 89706

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

**2. ACTION REQUIRED**

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | DATE AND TIME OF HEARING OR DEPOSITION |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS MUST BE AVAILABLE

NOV 1 2 2009

**3. SUBJECT OF INVESTIGATION**

See attached resolution.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Elizabeth Tucci, Custodian/William Burton, Deputy Custodian<br>Federal Trade Commission<br>600 Pennsylvania Ave., N.W., Mailstop NJ-2122<br>Washington, DC 20580 | Elizabeth Tucci, Federal Trade Commission<br>600 Pennsylvania Ave., N.W., Mailstop NJ-2122<br>Washington, DC 20580<br>202-326-2402 |

| DATE ISSUED 10/23/09 | COMMISSIONER'S SIGNATURE |
|---|---|

**INSTRUCTIONS AND NOTICES**

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

**PETITION TO LIMIT OR QUASH**

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

**YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS**

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

**TRAVEL EXPENSES**

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

FTC Form **144** (rev 2/08)

EXHIBIT 7, ATT. Q
-194-

# Form of Certificate of Compliance*

I/We do certify that all of the documents and information required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to such interrogatory or uncompleted portion and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____    _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

FTC Form **144-Back** (rev. 2/08)

**EXHIBIT 7, ATT. Q**
**-195-**

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      William E. Kovacic, Chairman
                    Pamela Jones Harbour
                    Jon Leibowitz
                    J. Thomas Rosch

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN A NON-PUBLIC INVESTIGATION OF POTENTIAL VIOLATIONS OF ADMINISTRATIVE OR FEDERAL COURT ORDERS IN ACTIONS BROUGHT BY THE FEDERAL TRADE COMMISSION OR ON ITS BEHALF**

File No. 0823164

Nature and Scope of Investigation:

To determine whether unnamed persons, partnerships, corporations, or others subject to an administrative or federal court order in an action brought by the Federal Trade Commission or on its behalf have engaged or are engaging in violations of any such order, or in deceptive or unfair acts or practices in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended. The investigation is also to determine whether Commission action to obtain monetary relief, including consumer redress, disgorgement, or civil penalties, would be in the public interest. *Provided, however*, that an order resolving a complaint based on unfair methods of competition shall not be included in the scope of this resolution.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation for a period not to exceed five (5) years from the date of issuance of this resolution. The expiration of this five-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the five-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the five-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq.*, and supplements thereto.

By direction of the Commission.

*Donald S. Clark*

Donald S. Clark
Secretary

Issued: May 7, 2008

# I. DEFINITIONS

As used in this Civil Investigative Demand, the following definitions shall apply:

A. **"And,"** as well as **"or,"** shall be construed both conjunctively and disjunctively, as necessary, in order to bring within the scope of any specification in the Schedule all information that otherwise might be construed to be outside the scope of the specification.

B. **"Any"** shall be construed to include **"all,"** and **"all"** shall be construed to include the word **"any."**

C. **"CID"** shall mean this Civil Investigative Demand, the attached Resolution, and the accompanying Schedule, including the Definitions, Instructions, and Specifications.

D. **"Company,"** shall mean Insite Marketing Group, LLC, d/b/a Insite Marketing, Inc., Insite Marketing Group, and Century Platinum, its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, employees, agents, consultants, and other persons working for or on behalf of the foregoing. The term shall include any descriptor used by the Company in its business practices.

E. **"Document"** shall mean the complete original and any non-identical copy (whether different from the original because of notations on the copy or otherwise), regardless of origin or location, of any written, typed, printed, transcribed, taped, recorded, filmed, punched, computer-stored, or graphic matter of every type and description, however and by whomever prepared, produced, disseminated or made, including but not limited to any advertisement, book, pamphlet, periodical, contract, correspondence, file, invoice, memorandum, note, telegram, report, record, handwritten note, working paper, routing slip, chart, graph, paper, index, map, tabulation, manual, guide, outline, script, abstract, history, calendar, diary, agenda, minute, code book, electronic mail, and computer material (including print-outs, cards, magnetic or electronic tapes, discs and such codes or instructions as will transform such computer materials into easily understandable form).

F. **"Each"** shall be construed to include **"every,"** and **"every"** shall be construed to include **"each."**

G. **"FTC"** or **"Commission"** shall mean the Federal Trade Commission.

H. **"Identify"** or **"the identity of"** shall be construed to require identification of (a) natural persons by name, title, present business affiliation, present business address and telephone number, or if a present business affiliation or present

Civil Investigative Demand to Insite Marketing

EXHIBIT 7, ATT. Q
-197-

business address is not known, the last known business and home addresses; and (b) businesses or other organizations by name, address, identities of natural persons who are officers, directors or managers of the business or organization, and contact persons, where applicable.

I.   **"Referring to"** or **"relating to"** shall mean discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting, evidencing, constituting, setting forth, considering, recommending, concerning, or pertaining to, in whole or in part.

J.   **"You"** and **"Your"** shall mean the person or entity to whom this CID is issued and includes the "Company".

K.   **"Complaints"** shall mean formal and informal complaints from consumers (including but not limited to refund requests), the Better Business Bureau, and any state or federal agency. When providing copies of complaints, include each consumer's name, address, telephone number and email address, if available, but *redact* the following information wherever applicable: 1) Social Security number; 2) date of birth; 3) driver's license number, other state identification number, or foreign country equivalent; 4) passport number; 5) financial account number; and 6) credit or debit card number.

## II.   INSTRUCTIONS

A.   **Sharing of Information:** The Commission often makes its files available to other civil and criminal federal, state, local, or foreign law enforcement agencies. The Commission may make information supplied by you available to such agencies where appropriate pursuant to the Federal Trade Commission Act and 16 C.F.R. § 4.11 (c) and (j). Information you provide may be used in any federal, state, or foreign civil or criminal proceeding by the Commission or other agencies.

B.   **Applicable time period:** Unless otherwise directed in the specifications, the applicable time period for the request shall be from January 18, 2008 until the date of full and complete compliance with this CID.

C.   **Claims of Privilege:** If any material called for by this CID is withheld based on a claim of privilege or any similar claim, the claim must be asserted no later than the return date of this CID. In addition, pursuant to 16 C.F.R. § 2.8A(a), submit, together with the claim, a schedule of the items withheld, stating individually as to each item:
1.   the type, specific subject matter, and date of the item;
2.   the names, addresses, positions, and organizations of all authors and recipients of the item; and
3.   the specific grounds for claiming that the item is privileged.

**EXHIBIT 7, ATT. Q**
**-198-**

If only some portion of any responsive material is privileged, all non-privileged portions of the material must be submitted. A petition to limit or quash this CID shall not be filed solely for the purpose of asserting a claim of privilege. 16 C.F.R. § 2.8A(b).

D.    **Document Retention:**  You shall retain all documentary materials used in the preparation of responses to the specifications of this CID. The Commission may require the submission of additional documents at a later time during this investigation. Accordingly, you should suspend any routine procedures for document destruction and take other measures to prevent the destruction of documents that are in any way relevant to this investigation during its pendency, irrespective of whether you believe such documents are protected from discovery by privilege or otherwise. *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519.

E.    **Petitions to Limit or Quash:**  Any petition to limit or quash this CID must be filed with the Secretary of the Commission no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date. Such petition shall set forth all assertions of privilege or other factual and legal objections to the CID, including all appropriate arguments, affidavits, and other supporting documentation. 16 C.F.R. § 2.7(d).

F.    **Modification of Specifications:**  If you believe that the scope of the required search or response for any specification can be narrowed consistent with the Commission's need for documents or information, you are encouraged to discuss such possible modifications, including any modifications of definitions and instructions, with Elizabeth Tucci at 202-326-2402. All such modifications must be agreed to in writing. 16 C.F.R. § 2.7(c).

G.    **Certification:**  You or a responsible corporate officer shall certify that the response to this CID is complete. This certification shall be made in the form set out on the back of the CID form, or by a declaration under penalty of perjury as provided by 28 U.S.C. § 1746.

H.    **Scope of Search:**  This CID covers documents in your possession or under your actual or constructive custody or control including, but not limited to, documents in the possession, custody, or control of your attorneys, accountants, directors, officers, and employees, whether or not such documents were received from or disseminated to any person or entity.

I.    **Document Production:**  You shall produce the documentary material by making all responsive documents available for inspection and copying at your principal place of business. Alternatively, you may elect to send all responsive documents to Elizabeth Tucci, Federal Trade Commission, 600 Pennsylvania Ave., N.W., Mailstop NJ-2122, Washington, DC 20580. Because postal delivery to the

Civil Investigative Demand to Insite Marketing

**EXHIBIT 7, ATT. Q**
**-199-**

Commission is subject to delay due to heightened security precautions, please use a courier service such as Federal Express or UPS. Notice of your intention to use the alternative method of compliance shall be given by telephone to Elizabeth Tucci at 202-326-2402 at least five days prior to production.

J.    **Document Identification:**  Documents that may be responsive to more than one specification of this CID need not be submitted more than once; however, your response should indicate, for each document submitted, each specification to which the document is responsive. If any documents responsive to this CID have been previously supplied to the Commission, you may comply with this CID by identifying the document(s) previously provided and the date of submission. In addition, number by page all documents in your submission and indicate the total number of documents in your submission.

K.    **Production of Copies:**  Unless otherwise stated, legible photocopies may be submitted in lieu of original documents, provided that the originals are retained in their state at the time of receipt of this CID. Further, copies of original documents may be submitted in lieu of originals only if they are true, correct, and complete copies of the original documents; provided, however, that submission of a copy shall constitute a waiver of any claim as to the authenticity of the copy should it be necessary to introduce such copy into evidence in any Commission proceeding or court of law; and provided further that you shall retain the original documents and produce them to Commission staff upon request.

L.    **Submission of Electronically Stored Information (ESI):**  The following guidelines refer to any ESI You submit. But, before submitting any ESI, You must confirm with the FTC that the proposed formats and media types that contain such ESI will be acceptable to the government.

1.    Magnetic and other electronic media types accepted:
   a.    CD-R CD-ROMs formatted to ISO 9660 specifications;
   b.    DVD-ROM for Windows-compatible personal computers; and
   c.    IDE and EIDE hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data.

   Note:  Other types of tape media used for archival, backup or other purposes such as 4mm & 8mm DAT and other cassette, mini-cartridge, cartridge, and DAT/helical scan tapes, DLT or other types of media will be accepted only with prior approval.

2.    File and record formats:
   a.    E-mail:  The FTC accepts MS Outlook PST files, MS Outlook MSG files, and Lotus Notes NSF files.  Any other electronic submission of email accepted only with prior approval.
   b.    Scanned Documents:  Image submissions accepted with the

Civil Investigative Demand to Insite Marketing                                    Page 4 of 10

**EXHIBIT 7, ATT. Q**
**-200-**

understanding that unreadable images will be resubmitted in original, hard copy format in a timely manner.  Scanned Documents must adhere to the following specifications:

    (1)    All images must be multi-page, 300 DPI - Group IV TIFF files named for the beginning bates number.

    (2)    If the full text of the Document is available, that should be provided as well.  The text should be provided in one file for the entire Document or email, named the same as the first TIFF file of the Document with a *.TXT extension.

Note:  Single-page, 300 DPI – Group IV TIFF files may be submitted with prior approval if accompanied by an acceptable load file such as a Summation or Concordance image load file which denotes the appropriate information to allow the loading of the images into a Document management system with all Document breaks (document delimitation) preserved.  OCR accompanying single-page TIFF submissions should be located in the same folder and named the same as the corresponding TIFF page it was extracted from, with a *.TXT extension.

c.    Other ESI files:  The FTC accepts word processing Documents in ASCII text, WordPerfect version X3 or earlier, or Microsoft Word 2003 version or earlier.  Spreadsheets should be in MS Excel 2003 (*.xls) version or earlier.  Database files should be in MS Access 2003 or earlier.  PowerPoint presentations may be submitted in MS PowerPoint 2003 or earlier.  Other proprietary formats for PC files should not be submitted without prior approval.  Files may be submitted using the compressed ZIP format to reduce size and ease portability.  Adobe Acrobat PDF (*.pdf) may be submitted where the normal business practice storage method is PDF.

Note:  Database files may also be submitted with prior approval as delimited ASCII text files, with field names as the first record, or as fixed-length flat files with appropriate record layout.  For ASCII text files, field-level documentation should also be provided and care taken so that delimiters and quote characters do not appear in the data.  The FTC may require a sample of the data to be sent for testing.

3.    Security

a.    All submissions of ESI to the FTC must be free of computer viruses.  In addition, any passwords protecting Documents or files must be removed or provided to the FTC.

b.    Magnetic media shall be carefully packed to avoid damage and must be clearly marked on the outside of the shipping container:

**EXHIBIT 7, ATT. Q**
**-201-**

**MAGNETIC MEDIA – DO NOT X-RAY**
**MAY BE OPENED FOR POSTAL INSPECTION.**

M.    **Sensitive Personally Identifiable Information:**  If any material called for by these requests contains sensitive personally identifiable information of any individual, please contact us before sending those materials to discuss whether it would be appropriate to redact the sensitive information.  If that information will not be redacted, contact us to discuss encrypting any electronic copies of such material with encryption software such as SecureZip and provide the encryption key in a separate communication.

For purposes of these requests, sensitive personally identifiable information includes: an individual's Social Security number alone; or an individual's name or address or phone number in combination with one or more of the following: date of birth, Social Security number, driver's license number or other state identification number, or a foreign country equivalent, passport number, financial account number, credit card number, or debit card number.

N.    **Information Identification:**  Each specification and sub-specification of this CID shall be answered separately and fully in writing under oath.  All information submitted shall be clearly and precisely identified as to the specification(s) or sub-specification(s) to which it is responsive.

O.    **Submission of Documents in lieu of Interrogatory Answers:**  Previously existing documents that contain the information requested in any written Interrogatory may be submitted as an answer to the Interrogatory.  In lieu of identifying documents as requested in any Interrogatory, you may, at your option, submit true copies of the documents responsive to the Interrogatory, provided that you clearly indicate the specific Interrogatory to which such documents are responsive.

P.    **Certification of Records of Regularly Conducted Activity:**  A Certification of Records of Regularly Conducted Activity is attached as Exhibit A.  While the Company is not legally obligated to complete this certification, it will aid in establishing the admissibility of the documents as evidence, if necessary, and may reduce the need to subpoena the Company to testify at future proceedings.

**EXHIBIT 7, ATT. Q**
**-202-**

III.   **SPECIFICATIONS: REQUESTS FOR DOCUMENTS**

A.   Provide a copy of any and all contracts between the Company and EDebitPay, LLC; EDP Reporting LLC; and/or EDP Technologies Corp., (collectively, "EDP"), including any attachments, modifications, and recisions;

B.   Provide a copy of any and all correspondence, e-mails, or other written or electronic communications between the Company and EDP relating to:

   1.   any and all contracts between the Company and EDP or the creation, modification, or termination thereof;

   2.   any and all notices received from EDP regarding the Stipulated Order entered on or about January 18, 2008, in Federal Trade Commission v. EDebitPay, LLC (CV 07-4880 ODW) (C.D. Calif.) (hereinafter "EDP Order")(attached hereto as Exhibit B), including but not limited to any written notice that failing to comply with Section I of the Stipulated Order will result in the immediate termination of EDP's agreement with the Company and the forfeiture of all monies earned or owed;

   3.   any and all acknowledgments provided by the Company in which the Company (a) acknowledges receipt of the EDP Order; (b) expressly agrees to distribute a copy of the Order to the Company's owners, managers, and division heads; and (c) expressly agrees to comply with Section I of the EDP Order;

   4.   any and all steps taken by EDP to ensure the Company's compliance with Section I of the EDP Order;

   5.   any and all steps taken by the Company to ensure its compliance with Section I of the EDP Order; and

   6.   any and all complaints as defined in Section I(K) above.

C.   Provide a copy of any and all complaints, as defined in Section I(K) above; any responses thereto; and any documents related to such complaints and any resolution thereof, including but not limited to correspondence, e-mails, or refunds; relating to:

   1.   the Century Platinum shopping club, accessible via www.centuryplatinum.com and described therein as a "members only on-line merchandise shopping service" (hereinafter "Century Platinum");

   2.   www.startercreditdirect.com; and

   3.   the Company's affiliation, if any, with EDP.

D.   Provide a copy of the terms and conditions for membership in Century Platinum. To the extent the terms and conditions have materially changed at any time since January 18, 2008, provide representative copies of each version.

E.   Provide a copy of the online catalog of all products or services offered to persons who are or were members of Century Platinum at any time since January 18, 2008

(hereinafter "Century Platinum consumers").  To the extent the catalog has materially changed at any time since January 18, 2008, provide representative copies of each version of the catalog.

F.    For Century Platinum consumers who joined Century Platinum via www.startercreditdirect.com, provide screen shots (i.e., graphic depictions of the screen's content, including browser address) of each screen viewable by the consumer, from initially landing on the www.startercreditdirect.com through confirmation of membership in Century Platinum.  Include screen shots of all screens available by clicking on hyperlinks.  To the extent that any screen shots have changed since January 18, 2008, provide representative copies of each version.

G.    For Century Platinum consumers who joined Century Platinum via www.startercreditdirect.com, provide evidence of said consumers' express informed consent for the debit, charges, and fees associated with applying for and continuing membership in Century Platinum.

H.    Provide representative copies of all regularly sent emails, "welcome packages" and billing statements sent to consumers, whether via email or regular mail.  To the extent such regularly sent communications have changed since January 18, 2008, provide representative copies of each version.

I.    Provide copies of any initial pleadings, charging documents, plea agreements, settlements, or final orders in lawsuits or law-enforcement actions (civil or criminal) instituted against the Company in connection with Century Platinum or EDP.

## IV.    SPECIFICATIONS: INTERROGATORIES

A.    Describe in detail the relationship, if any, between EDP and the Company, including a full description of any and all services provided by either EDP and the Company and a complete explanation of how EDP or the Company derive revenue from the business relationship.

B.    Provide the total number of Century Platinum consumers (as defined in Section III.E above).

C.    Provide the name, address, telephone number, and email address of each Century Platinum consumer.

D.    For each Century Platinum consumer, provide:
1.    the starting and ending (if applicable) date(s) of membership;
2.    whether the consumer signed up for Century Platinum via www.startercreditdirect.com;

Civil Investigative Demand to Insite Marketing                                    Page 8 of 10

**EXHIBIT 7, ATT. Q**
**-204-**

3.  whether the Company paid a lead or other fee to EDP in connection with that consumer, and if so, the amount;

4.  whether EDP paid a lead or other fee to the Company in connection with that consumer and if so, the amount;

5.  whether the Company or the consumer terminated the membership, and the reason for said termination;

6.  whether the consumer obtained the full $10,000 "credit line" as advertised on www.startercreditdirect.com;

7.  the revenue, if any, that the Company derived from the consumer's payment of the initial application fee;

8.  the revenue, if any, that the Company derived from the consumer's payment of the monthly membership fee;

9.  the revenue if any, that the Company derived from the consumer's purchase of merchandise from Century Platinum;

10.  whether the Company sold any information regarding the consumer to EDP;

11.  whether the Company sold any information regarding the consumer to any third parties;

12.  if the Company sold consumer information pursuant to question 11 above, identify each third party and provide the revenue the Company received from each such party;

13.  whether the consumer received the $2,500 "advance" as advertised on www.startercreditdirect.com and if so, whether Century Platinum required the consumer to repay the "advance" through subsequent billing statements;

14.  the amount, if any, that:

    a.  the consumer paid for merchandise sold through the Century Platinum merchandise;

    b.  the consumer paid on "down payments" for said merchandise;

    c.  the consumer paid in subsequent monthly payments for said merchandise;

    d.  the consumer paid in shipping costs for said merchandise;

    e.  the consumer paid in fees for returned checks or debits; and

15.  whether Century Platinum pursued legal action against the consumer regarding delinquent accounts.

E.  Provide the total amount of funds, if any, paid by the Company to EDP since January 18, 2008.

F.  Provide the total amount of funds, if any, paid by EDP to the Company since January 18, 2008.

# ATTACHMENT R

United States of America
Federal Trade Commission


To:    Elizabeth Tucci, Esq.
       Federal Trade Commission
       600 Pennsylvania Ave., N.W., Mailstop NJ-2122
       Washington, D.C.20580


_____    )
                                        )
                                        )
In the Matter of Insite Marketing Group LLC    )
                                        )
                                        )
                                        )
_____    )


## RESPONSES AND OBJECTIONS TO THE CIVIL INVESTIGATIVE DEMAND FOR REQUESTS FOR DOCUMENTS AND ANSWERS TO INTERROGATORIES

Insite Marketing Group, LLC ("Insite"), through its attorneys, hereby submits its responses and objections to the Civil Investigative Demand for Answers to Requests for Documents (the "Requests") and Interrogatories (the "Interrogatories") [collectively, the "Demands") propounded by the Federal Trade Commission, (the "Propounding Party"), as follows:


### PRELIMINARY STATEMENT

Insite responds to the Demands based upon the investigation conducted in the time available since service of the Demands.  As of the date of these responses, Insite's responses are based upon information now known to Insite and that Insite believes to be relevant to the subject

{00097792;1}

1

**EXHIBIT 7, ATT. R**
**-207-**

matter covered by the Demands.  In the future, Insite may acquire additional information, or discover information currently in its possession, bearing upon the Demands and Insite's responses.  Insite reserves the right to make subsequent revisions or amendments to these responses based upon any information, documents or evidence that may be subsequently discovered, or the relevance of which may be subsequently discovered.  Insite incorporates this Preliminary Statement into each response as if fully set forth in the response.

<div align="center">

**GENERAL OBJECTIONS**

</div>

Insite objects to the Demands to the extent that they seek to impose burdens on Insite that are inconsistent with, or in addition to, the Federal Rules of Civil Procedure.  Insite will respond consistent with its discovery obligations pursuant to the Federal Rules of Civil Procedure.

Insite objects to the Demands as unduly burdensome to the extent that they seek to impose on Insite the obligation to identify facts that are not known to Insite or Insite's personnel. Insite will not undertake to ascertain facts that are not reasonably within Insite's knowledge and control.

Insite objects to the Demands to the extent that any of them call for "all," "each," "any," or "every," on the grounds they are overly broad and unduly burdensome.  It is impossible to represent, even after a reasonable and diligent search that all, each, or every bit of information falling within a description can be or has been assembled.  Information or documents may be known by many people and may be kept in a myriad of locations and files.  Insite cannot warrant or represent that each or all or every bit of information requested has been provided, only that Insite has disclosed that information which it could gather in response to the Propounding Party's Demands after a reasonable and diligent investigation.

{00097792;1}

**EXHIBIT 7, ATT. R**

**-208-**

Insite objects to the terms "You," "Your," to the extent it requires Insite to obtain information from any person or any entity other than Insite, and any response provided is on behalf of Insite only.

Insite objects to the Demands to the extent that they seek information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, applicable regulatory privileges or any other privilege or immunity and will not produce such protected information.

Insite objects to the Demands to the extent that they seek information that is not in the possession, custody or control of Insite.

Insite objects to the Demands to the extent that they seek information that does not exist.

Insite objects to the Demands to the extent that they seek confidential, proprietary business information that belongs to Insite.

Insite objects to the Demands to the extent that they are vague and ambiguous.

Any information disclosed by Insite in response to the Demands is subject to all objections as to competence, materiality and admissibility, as well as to any other objections on any grounds that would require the exclusion of such information if it were offered into evidence, and Insite expressly reserves all such objections.

Insite incorporates these General Objections into each and every response as if fully set forth in each response.

**EXHIBIT 7, ATT. R**
**-209-**

**RESPONSE TO REQUEST FOR DOCUMENT I:**

Subject to the foregoing Preliminary Statement and General Objections, Insite responds that there are no documents responsive to this Request.

## SCHEDULE OF INTERROGATORIES

INTERROGATORY A:

Describe in detail the relationship, if any, between EDP and the Company, including a full description of any and all services provided by either EDP and the Company and a complete explanation of how EDP or the Company derive revenue from the business relationship.

RESPONSE TO INTERROGATORY A:

Subject to the foregoing Preliminary Statement and General Objections, Insite responds that EDP and the Company are completely unrelated separately incorporated entities. There does not exist any ownership relationship between EDP and the Company. The relationship between EDP and the Company was an arms length transaction wherein EDP was allowed to host the Century Platinum Shopping club offered as a bonus club offer on EDP's startercreditdirect.com site. EDP attended to all marketing and traffic generation to its startercreditdirect.com site and posted any consumers who opted-into Century Platinum to the Company's system for processing. The Company handled all of the customer service for Century Platinum while EDP handled all customer service for the startercreditdirect.com site.

INTERROGATORY B:

Provide the total number of Century Platinum consumers (as defined in Section III.E above).

{00097792;1}

8

**EXHIBIT 7, ATT. R**
**-210-**

**RESPONSE TO INTERROGATORY B:**

Subject to the foregoing Preliminary Statement and General Objections, Insite responds that documents, consisting of Excel spreadsheets, have been previously provided detailing the total number of Century Platinum consumers obtained through the startercreditdirect.com site. Moreover, additional documents, consisting of Excel spreadsheets, are being produced in order to provide the number of Century Platinum consumers that were obtained other than through EDP (See IMG 00405).

INTERROGATORY C:

Provide the name, address, telephone number, and email address of each Century Platinum consumer.

**RESPONSE TO INTERROGATORY C:**

Subject to the foregoing Preliminary Statement and General Objections, Insite responds that documents, consisting of Excel spreadsheets, have been previously provided detailing the name, address, telephone number, and email address of each Century Platinum consumers. Moreover, additional documents, consisting of Excel spreadsheets, are being produced in order to provide the number of Century Platinum consumers that were obtained other than through EDP (See IMG 00405).

INTERROGATORY D:

For each Century Platinum consumer, provide:
1. the starting and ending (if applicable) date(s) of membership;
2. whether the consumer signed up for Century Platinum via www.startercreditdirect.com;

{00097792;1}

9

**EXHIBIT 7, ATT. R**
**-211-**

3.     whether the Company paid a lead or other fee to EDP in connection with that consumer, and if so, the amount;

4.     whether EDP paid a lead or other fee to the Company in connection with that consumer and if so, the amount;

5.     whether the Company or the consumer terminated the membership, and the reason for said termination;

6.     whether the consumer obtained the full $10,000 "credit line" as advertised on www.startercreditdirect.com;

7.     the revenue, if any, that the Company derived from the consumer's payment of the initial application fee;

8.     the revenue, if any, that the Company derived from the consumer's payment of the monthly membership fee;

9.     the revenue if any, that the Company derived from the consumer's purchase of merchandise from Century Platinum;

10.    whether the Company sold any information regarding the consumer to EDP;

11.    whether the Company sold any information regarding the consumer to any third parties;

12.    if the Company sold consumer information pursuant to question 11 above, identify each third party and provide the revenue the Company received from each such party;

13.    whether the consumer received the $2,500 "advance" as advertised on www.startercreditdirect.com and if so, whether Century Platinum required the consumer to repay the "advance" through subsequent billing statements;

14.    the amount, if any, that:

     a.     the consumer paid for merchandise sold through the Century Platinum merchandise;

     b.     the consumer paid on "down payments" for said merchandise;

     c.     the consumer paid in subsequent monthly payments for said merchandise;

     d.     the consumer paid in shipping costs for said merchandise;

     e.     the consumer paid in fees for returned checks or debits; and

15.    whether Century Platinum pursued legal action against the consumer regarding delinquent accounts.

{00097792;1}

10

**EXHIBIT 7, ATT. R**

**-212-**

**RESPONSE TO INTERROGATORY D:**

Subject to the foregoing Preliminary Statement and General Objections, Insite responds to each subpart of Interrogatory D as follows:

1.  the starting and ending (if applicable) date(s) of membership;

    **RESPONSE:** Documents, consisting of Excel spreadsheets, have been previously provided detailing this information. Moreover, additional documents, consisting of Excel spreadsheets, are being produced in order to provide this information for Century Platinum consumers that were obtained other than through EDP (See IMG 00405).

2.  whether the consumer signed up for Century Platinum via www.startercreditdirect.com;

    **RESPONSE:** The consumers were generated by EDP through the startercreditdirect.com site. Documents, consisting of Excel spreadsheets, have been previously provided detailing this information. Moreover, additional documents, consisting of Excel spreadsheets, are being produced in order to provide this information for Century Platinum consumers that were obtained other than through EDP (See IMG 00405).

3.  whether the Company paid a lead or other fee to EDP in connection with that consumer, and if so, the amount;

    **RESPONSE:** The Company paid a lead to EDP of $7.00 per month per consumer that signed up for Century Platinum through EDP.

4.  whether EDP paid a lead or other fee to the Company in connection with that consumer and if so, the amount;

    **RESPONSE:** EDP did not pay a lead, or any other fee, to the Company.

5.  whether the Company or the consumer terminated the membership, and the reason for said termination;

    **RESPONSE:** The Company terminated any membership where requested to do so by the consumer, or where the account was deactivated due to nonpayment.

**EXHIBIT 7, ATT. R**

**-213-**

6.  whether the consumer obtained the full $10,000 "credit line" as advertised on www.startercreditdirect.com;

    **RESPONSE:** The consumer was provided with the ability to make up to $10,000 worth of purchases on Century Platinum subject only to applicable down payment requirements.

7.  the revenue, if any, that the Company derived from the consumer's payment of the initial application fee;

    **RESPONSE:** The Company did not receive any revenue derived from the consumer's payment of the initial application fee.  All such revenue was collected and retained by EDP.

8.  the revenue, if any, that the Company derived from the consumer's payment of the monthly membership fee;

    **RESPONSE:** Documents, consisting of Excel spreadsheets, have been previously provided detailing this information.  Specifically, the Company received revenue derived from the consumer's payment of the monthly membership fee in the amount of $7.00 per consumer per month with the other $7.00 per consumer per month paid to EDP.

9.  the revenue if any, that the Company derived from the consumer's purchase of merchandise from Century Platinum;

    **RESPONSE:** The Company did not receive any revenue derived from the consumer's purchase of merchandise from Century Platinum.

10. whether the Company sold any information regarding the consumer to EDP;

    **RESPONSE:** The Company did not, at any time, sell any information regarding the consumer to EDP.

11. whether the Company sold any information regarding the consumer to any third parties;

    **RESPONSE:** The Company did not, at any time, sell any

**EXHIBIT 7, ATT. R**

**-214-**

information regarding the consumer to any third parties.

12. if the Company sold consumer information pursuant to question 11 above, identify each third party and provide the revenue the Company received from each such party;

**RESPONSE:** Not applicable.

13. whether the consumer received the $2,500 "advance" as advertised on www.startercreditdirect.com and if so, whether Century Platinum required the consumer to repay the "advance" through subsequent billing statements;

**RESPONSE:** Each consumer enrolled in Century Platinum received a $2,500 account credit to be applied to purchases on the Century Platinum site. The consumer was not required to repay that advance through subsequent billing statements. By way of example, were a consumer to purchase a $1,000 item with a $500 down payment then the remaining $500 balance could be offset with a portion of his/her $2,500 account credit.

14. the amount, if any, that:

    a. the consumer paid for merchandise sold through the Century Platinum merchandise;

    b. the consumer paid on "down payments" for said merchandise;

    c. the consumer paid in subsequent monthly payments for said merchandise;

    d. the consumer paid in shipping costs for said merchandise;

    e. the consumer paid in fees for returned checks or debits; and

**RESPONSE:** Regarding subparts 14.a-14.d, documents, consisting of Excel spreadsheets, have been previously provided detailing the items sought to be purchased by Century Platinum members and the cost thereof. Orders were placed by Century Platinum members for products during the relevant time frame. However, no actual down payments, subsequent monthly payments or shipping costs are reflected in those documents because initial payment was never effected. This was due to either insufficient funds in the member's account at the time of purchase or because the consumer attempted to use a fraudulent means of payment. Regarding subpart 14.e, the

**EXHIBIT 7, ATT. R**
**-215-**

consumer did not incur any fees for returned checks or debits.

15.     whether Century Platinum pursued legal action against the consumer regarding delinquent accounts.

**RESPONSE:** The Company did not pursue legal action against any consumer regarding delinquent accounts.

INTERROGATORY E:

Provide the total amount of funds, if any, paid by the Company to EDP since January 18, 2008.

**RESPONSE TO INTERROGATORY E:**

Subject to the foregoing Preliminary Statement and General Objections, Insite responds that the Company paid $285,061.00 to EDP since January 18, 2008.

INTERROGATORY F:

Provide the total amount of funds, if any, paid by EDP to the Company since January 18, 2008.

**RESPONSE TO INTERROGATORY F:**

Subject to the foregoing Preliminary Statement and General Objections, Insite responds that no funds were paid to the Company by EDP.

INTERROGATORY G:

Identify the relationship(s), if any, between the Company and "Electric Media" and Arthur Cohen.

{00097792;1}

**EXHIBIT 7, ATT. R**

**-216-**

**RESPONSE TO INTERROGATORY L:**

Subject to the foregoing Preliminary Statement and General Objections, Insite responds that the screen shots produced (having production numbers IMG 00393-00400) went into effect in or about January, 2008.  To the extent that any other versions exist, they would be in the exclusive possession and control of EDP.

INTERROGATORY M:

For each version of regularly sent communications provided in response to III.H, identify the dates that version was or is in effect.

**RESPONSE TO INTERROGATORY M:**

Subject to the foregoing Preliminary Statement and General Objections, Insite responds that the welcome package, identified as having production number IMG 00401, was used before November, 2009 while the welcome package, identified as having production numbers IMG 00404, was used after November, 2009.

Dated:        December 29, 2009

KLEIN ZELMAN ROTHERMEL LLP

By: _____
Sean Moynihan
485 Madison Avenue, 15th Floor
New York, New York 10022
(212) 935-6020
*Attorneys for Insite Marketing Group, LLC*

{00097792;1}

17

**EXHIBIT 7, ATT. R**

**-217-**

## CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY
### Pursuant to 28 U.S.C. § 1746

1.    I, _Arthur Cohen_, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.    I have authority to certify the authenticity and accuracy of the records produced by Insite Marketing Group, LLC, and attached hereto.

3.    The documents produced and attached hereto by Insite Marketing Group, LLC, are originals or true copies of records of regularly conducted activity that:

   a)    Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

   b)    Were kept in the course of the regularly conducted activity of Insite Marketing, Group, LLC; and

   c)    Were made by the regularly conducted activity as a regular practice of Insite Marketing, Group, LLC.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on _____12/18_____, 2009.

_____
Signature

United States of America
Federal Trade Commission
CIVIL INVESTIGATIVE DEMAND

| | |
|---|---|
| In the Matter of Insite Marketing Group LLC | ) ) ) ) ) ) ) |

**DECLARATION
OF COMPLIANCE**

### DECLARATION OF ARTHUR COHEN

I, Arthur Cohen, the undersigned, declare that:

1.      I am a member of Insite Marketing Group LLC ("Insite Marketing"), the company that was served with a Civil Investigative Demand ("CID") in the above-captioned matter on October 23, 2009.

2.      I have authority to act on behalf of Insite Marketing.

3.      A diligent search was conducted for all documents and information responsive to the CID.

4.      All of the documents and information required by and responsive to the CID which are in the custody, control or knowledge of Insite Marketing have been submitted herewith.

5.      If documents and/or information responsive to the CID have not been submitted, the objections to their submission and reasons for the objections have been stated.

{00097815;1}

**EXHIBIT 7, ATT. R**
**-219-**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December _18_, 2009.

_____

Arthur Cohen

**EXHIBIT 7, ATT. R**
**-220-**

# EXHIBIT 8

EXHIBIT 8
-221-

## DECLARATION OF ELIZABETH TUCCI
### Pursuant to 28 U.S.C. § 1746

I, Elizabeth Tucci, declare and state as follows:

1. My name is Elizabeth Tucci, I am over 18 years of age, and I am a citizen of the United States.  I am employed by the Federal Trade Commission ("FTC") as an attorney in the Enforcement Division of the Bureau of Consumer Protection.  My work address is 600 Pennsylvania Ave. NW, Washington, DC 20580, No. M-8102B.  I have worked at the FTC since 2005.  I have personal knowledge of the facts set forth herein.

2. On October 22, 2009, I served a deposition notice in the matter of *FTC v. EDebitPay, LLC, et al.,* CV-07-4880 ODW (AJWx) (C.D. Cal.).  Attached as Exhibit A to this declaration is a true and accurate copy of the deposition notice, which  noticed the depositions of Defendant EDebitPay, LLC ("EDP") pursuant to Fed. R. Civ. P. 30(b)(6) as well as the individual depositions of Defendants Dale Paul Cleveland ("Cleveland") and William Richard Wilson ("Wilson").

3. On November 17, 2009, the FTC deposed EDP, Cleveland, and Wilson.

4. Attached as Exhibit B to this declaration is a true and accurate copy of excerpts of Wilson's deposition testimony.

5. Attached as Exhibit C to this declaration is a true and accurate copy of excerpts of Cleveland's deposition testimony.

6. Attached as Exhibit D to this declaration are true and accurate copies of the certifications provided by Defendants regarding the transcripts of the above-cited depositions.

/

/

**EXHIBIT 8**
-222-

1   7.     Pursuant to Local Rule 32-1, the FTC will lodge the original deposition

2        transcripts at least ten days prior to the show cause hearing.

3

4   I declare under penalty of perjury that the foregoing is true and correct.

5

6   Executed on ___May 25___, 2010.

7                       Elizabeth Tucci

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**EXHIBIT 8**
**-223-**

# ATTACHMENT A

WILLARD K. TOM
General Counsel

RAYMOND E. MCKOWN, Bar No. 150975
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024
(310) 824-4343 (direct)
(310) 824-4380 (facsimile)
rmckown@ftc.gov

ELIZABETH TUCCI
Federal Trade Commission
601 New Jersey Avenue, NW, Rm. 2217
Washington, DC 20001
(202) 326-2402 (direct)
(202) 326-2559 (facsimile)
etucci@ftc.gov

ATTORNEYS FOR PLAINTIFF
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Federal Trade Commission,** | CV-07-4880 ODW (AJWx) |
| Plaintiff, | **Deposition Notice of EDebitPay, LLC, Dale Paul Cleveland, and William Richard Wilson** |
| v. | |
| **EDebitPay, LLC, et al.,** | |
| Defendants. | Judge Otis D. Wright II |

NOTICE IS HEREBY GIVEN that, pursuant to Section X of the Stipulated Final Order for Permanent Injunction and Monetary Relief, entered on January 17, 2008 ("Final Order"), plaintiff Federal Trade Commission will take the

1  depositions upon oral examination of defendants EDebitPay, LLC ("EDP"), Dale

2  Paul Cleveland, and William Richard Wilson, at the dates and times indicated

3  below, and continuing from day to day until completed, at the offices of the

4  Federal Trade Commission, 10877 Wilshire Boulevard, Suite 700, Los Angeles,

5  California, 90024:

6

7  | **Deponent** | **Date/Time** |
   | Deponent | Date/Time |

8  EDP                          November 17, 2009, 9 am

9  Dale Paul Cleveland          November 18, 2009, 9 am

10  William Richard Wilson  November 18, 2009, 11 am

11

12  PLEASE TAKE FURTHER NOTICE that pursuant to Fed. R. Civ. P.

13  30(b)(6), the matters for examination of EDP are set out at Schedule A.

14  PLEASE TAKE FURTHER NOTICE that the depositions will be recorded

15  by stenographic means, and may also be recorded by audio-visual means, before

16  an officer authorized to administer oaths.

17

18  Dated:  October 22, 2009

19

20  ELIZABETH TUCCI
    Federal Trade Commission
21  600 Pennsylvania, Ave., N.W.
    Mailstop NJ-2122
22  Washington, DC 20580
    202-326-2402 (direct)
23  202-326-2558 (facsimile)
    etucci@ftc.gov
24  Attorney for Plaintiff

25

26

27

28

2

**SCHEDULE A**

Matters for Examination of EDP

1. EDP's corporate structure, including but not limited to:
   (a) Identification of individuals and entities with an ownership interest in EDP;
   (b) Identification of entities in which EDP has an ownership or managerial interest;
   (c) Identification of EDP's officers and top executives; and
   (d) EDP's relationship with all codefendants in *FTC v. EDebitPay, LLC, et al.*, No. CV-07-4880 ODW (AJWx) (C.D. Calif.).

2. EDP's revenue, net income, expenses, and revenue sources since January 1, 2008.

3. EDP's compliance with the Final Order, including, but not limited to:
   (a) EDP's compliance with Paragraph I.A-G of the Final Order; and
   (b) EDP's compliance with Paragraph I.H of the Final Order.

4. EDP's Responses to the FTC's Requests for Documents and Information, sent July 23, 2009.

5. EDP's 180-Day Report, produced pursuant to Paragraph VI.B of the Final Order.

6. EDP's marketing and business activities, including but not limited to:
   (a) EDP's relationship with affiliate marketers, subaffiliate marketers, and publishers;
   (b) EDP's relationship with affiliate networks and EDP's affiliate network;
   (c) lead generation by EDP;
   (d) purchase of leads by EDP;
   (e) EDP's list management services; and
   (f) EDP's financial service products and the marketing thereof.

7. EDP's evidence of consumers' express informed consent for debits, charges, or fees assessed by EDP, affiliate marketers, subaffiliate marketers, and affiliate networks, including but not limited to EDP's practice and procedures for obtaining and retaining evidence of said consent.

8. The existence and status of any legal actions (civil or criminal) that have been filed or pending against EDP at any time since January 1, 2008.

3

**EXHIBIT 8, ATT. A**
**-227-**

1

2

<u>Certificate of Service</u>

3

I, Elizabeth Tucci, hereby certify that on October 22, 2009, I caused the foregoing Deposition Notice to be sent via first-class mail and e-mail to the following:

4

5

Michael Mallow
Christine M. Reilly
Loeb & Loeb, LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
<u>mmallow@loeb.com</u>
<u>creilly@loeb.com</u> (email only)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# ATTACHMENT B

# PRESIDING OFFICIAL COPY

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MATTER NO.     X070038, CIVIL ACTION NO.  CV-07-4880 ODW (AJWx)

TITLE          FTC v. EDEBITPAY, LLC

PLACE          FEDERAL TRADE COMMISSION
               10877 WILSHIRE BOULEVARD
               LOS ANGELES, CALIFORNIA

DATE           NOVEMBER 17, 2009

PAGES          1 THROUGH 179

### DEPOSITION OF BILL WILSON

---

**FOR THE RECORD, INC.**
**10760 DEMARR ROAD**
**WHITE PLAINS, MD 20695**
**(301)870-8025**

---

**EXHIBIT 8, ATT. B**
**-230-**

1

<pre>
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3

 4   Federal Trade Commission,    )
                                  )
 5              Plaintiff,        )
                                  )
 6        vs.                     )    No. CV-07-4880
                                  )       ODW (AJWx)
 7   EDebitPay, LLC, et al.,      )
                                  )
 8              Defendants.       )
                                  )
 9

10

11

12             DEPOSITION OF BILL WILSON

13

14

15   DATE & TIME:   Tuesday, November 17, 2009
                    9:11 a.m. - 2:25 p.m.
16

17   LOCATION:      10877 Wilshire Boulevard
                    Suite 700
18                  Los Angeles, California

19
     REPORTER:      Christina Kim-Campos, CSR
20                  Certificate No. 12598

21

22

23

24

25
</pre>

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. B**
**-231-**

```
 1                  UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4    Federal Trade Commission,     )
                                    )
 5               Plaintiff,         )
                                    )
 6         vs.                      )    No. CV-07-4880
                                    )       ODW (AJWx)
 7    EDebitPay, LLC, et al.,       )
                                    )
 8               Defendants.        )
                                    )
 9

10

11

12

13

14

15         DEPOSITION OF BILL WILSON, taken on behalf

16    of the Plaintiff, at 10877 Wilshire Boulevard,

17    Suite 700, Los Angeles, California, commencing at

18    9:11 a.m., and concluding at 2:25 p.m., on Tuesday,

19    November 17, 2009, pursuant to Notice, before

20    CHRISTINA KIM-CAMPOS, CSR No. 12598, a Certified

21    Shorthand Reporter, in and for the State of

22    California.

23                             ***

24

25
```

**EXHIBIT 8, ATT. B**
**-232-**

3

1    APPEARANCES:

2          For the Plaintiff:

3              FEDERAL TRADE COMMISSION
               BY:  ELIZABETH TUCCI, ESQ.
4                - & -
               BY:  ZACHARY HUNTER, ESQ.
5              601 New Jersey Avenue, NW
               Room 2217
6              Washington, D.C.  20001
               (202) 326-2402
7              etucci@ftc.gov

8              FEDERAL TRADE COMMISSION
               BY:  RAYMOND E. McKOWN, ESQ.
9              10877 Wilshire Boulevard
               Suite 700
10             Los Angeles, California  90024
               (310) 824-4325
11             rmckown@ftc.gov

12         For the Defendant:

13             LOEB & LOEB, LLP
               BY:  MICHAEL L. MALLOW, ESQ.
14               - & -
               BY:  CHRISTINE M. REILLY, ESQ.
15             10100 Santa Monica Boulevard
               Suite 2200
16             Los Angeles, California  90067
               (310) 282-2287
17
           Also Present:
18
               Paul Cleveland
19             Julie Holden

20

21

22

23

24

25

**EXHIBIT 8, ATT. B**
**-233-**

4

1                        I  N  D  E  X

2

3    WITNESS                 EXAMINATION              PAGE

4    Bill Wilson          By Ms. Tucci                  6

5    Afternoon Session    By Ms. Tucci                150

6

7                      E X H I B I T S

8    PLAINTIFF'S                                      PAGE

9    1 - Deposition Notice of EDebitPay, LLC,
         Dale Paul Cleveland, and William
10        Richard Wilson                               11

11   2 - Chart explaining how different channels
         work with EDebitPay                           21
12
     3 - One page document with diagram                77
13
     4 - Two pages from EDP website                     88
14
     5 - List of affiliate marketers and lead
15        buyers                                       110

16   6 - Data Management Agreement                     132

17   7 - List Management Agreement                     135

18   8 - Contract Agreement dated 2005                 138

19   9 - List of websites or companies                 142

20   10 - Insertion Order and Master Contract          170

21   11 - Settlement Agreement and Stipulated
          Final Order for Permanent Injunction
22        and Monetary Relief                          172

23   12 - Document for hard copy digital
          signature                                    174
24

25

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT 8, ATT. B
-234-

```
 1                           INDEX
 2                        (Continued)
 3
 4
 5         QUESTIONS INSTRUCTED NOT TO ANSWER
 6                        None.
 7
 8
 9             INFORMATION REQUESTED
10                        None.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT 8, ATT. B**
**-235-**

1      A.    I think our LLC documents would have that on

2    them.

3      Q.    And what about -- but you're not sure?

4      A.    I'm not sure.  I don't handle all the

5    administrative and billing information.  I would

6    refer to Paul for that.

7      Q.    No, that --

8      A.    So I'm not always clear of exact dates,

9    times on paper filings or exactly how legally it was

10   presented.  But I'm pretty clear.  I'm the

11   president, founder of EDebitPay, and that's what I

12   consider myself.

13     Q.    No, that's fine.

14     A.    And I wear many hats, so I will call myself

15   head of sales at times or head of marketing.

16     Q.    And as far as dates and specifics like that,

17   you know, you can tell me how specific your

18   recollection is, like you just did -- you know, you

19   think it was last week, you think it was about three

20   hours.  That's fine.  I don't want you to guess.

21          If you don't know an answer, tell me you

22   don't know, 'cause I want you to be sure of what

23   you're saying.

24          What is your ownership interest in

25   EDebitPay, if any?

EXHIBIT 8, ATT. B
-236-

18

1       A.    Approximately 44 percent ownership.

2       Q.    And has that ownership interest changed

3    since the time EDebitPay was formed?

4       A.    Approximately by 2 to 4 percent, I -- I -- I

5    think.

6       Q.    Has it gone up or down?

7       A.    Up.  Up.

8       Q.    So maybe you started around 40, and maybe

9    you've gone up to 44?

10      A.    Potentially yeah, approximately.

11      Q.    And when did that change?

12      A.    I -- three years ago, two years ago.  Again,

13   I'm not specific.  I don't know specifics.

14      Q.    And how are you compensated?

15            I'm talking about your ownership interest

16   position.  How do you get your proceeds?

17      A.    I have a salary, which is considered a draw.

18      Q.    And how often do you make that draw?

19      A.    I think it's every two weeks.

20      Q.    And is that based straight on the revenue?

21      A.    No.  It's a set -- set salary.

22      Q.    So if it's a set salary, how does it

23   constitute 44 percent of what the company is

24   bringing in?

25            MR. MALLOW:  Objection.  Vague.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. B**
**-237-**

1    will do -- describe later.

2        Q.    And I understand you don't have them now,

3    but do -- with you, but would EDebitPay have

4    examples of these pages that would appear in the

5    case of the -- would you have examples of thank you

6    pages?

7        A.    We -- we could provide.

8        Q.    Okay.

9        A.    We may have.  That's what I'm thinking.  We

10   may have provided in the box of information we

11   provided to you before.  I'm not sure.  I didn't

12   look at all of it.

13       Q.    And you're saying may have provided in

14   response to the July 23rd request; is that correct?

15       A.    Potentially.

16       Q.    Is there any other way that -- you've --

17   you've described one way in which EDebitPay

18   monetizes the consumer data, and that is via a

19   banner placed on the thank you page.

20             Is there any other way that EDebitPay

21   monetizes that consumer data?

22       A.    Yes.

23       Q.    Tell me about that.

24       A.    We may -- for example, we may pop a website.

25   For example, a person leaves the website, and we may

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. B**
**-238-**

93

1    pop auto loan website and say, hey, are you

2    interested -- not are you interested.  Just pops.

3    They're called pops, exit pops.  So that's a

4    methodology.

5        Q.    So -- so for the consumer, it's almost -- it

6    will look like they're just jumping to another page?

7        A.    Yeah.  Totally separate product.

8        Q.    And again, would the consumer receive a

9    message saying that the consumer is leaving X

10   website and going to another website?

11       A.    Some browsers will have a pop locker and ask

12   you to allow or not allow for another product to

13   pop.  So it depends on the customer's computer.

14       Q.    So -- okay.  So you're saying sometimes it

15   won't pop at all?

16       A.    Sometimes they won't -- they won't see it,

17   or because all -- all people at their web -- at

18   their computers have different situations, so in

19   general, we -- if we pop the offer, we don't say

20   this is a different -- like you said, we're not

21   saying, hey, this isn't the same offer, but we're

22   popping an offer, let's say, of an auto loan for a

23   Paydayloan.  We're popping that offer, that website

24   URL in front of the customer.

25            Some customers may have a popup window that

**EXHIBIT 8, ATT. B**
**-239-**

1    says, hey, you have a pop; do you want to allow it?

2    And then others, they'll just get the pop.

3         Q.    Right.

4               So whether they get the message or not is

5    controlled by their computer; it's not content that

6    you provide?

7         A.    Correct.

8         Q.    That message, hey, here's something new;

9    here's another website --

10        A.    I would make an assumption.  Correct.  I

11   don't control the computer so -- yeah.

12        Q.    Right.

13              But EDebitPay does not -- does not

14   intentionally communicate that to consumers, that

15   they are leaving "X" website and going to another

16   website?

17              MS. REILLY:  Objection.  Vague.

18   BY MS. TUCCI:

19        Q.    We're going -- we're going back to the same

20   scenario, where the consumer has been rejected for

21   the loans and you're popping the consumer to another

22   website.

23        A.    Mm-hmm.

24        Q.    You've talked about scenarios in which,

25   depending on that person's computer, they may or may

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. B**
**-240-**

1    not be able to see the popup.  They may want to be

2    asked if they want to view the popup.

3         What I want to talk about is what EDebitPay

4    pays does, if anything, to communicate that they're

5    going from one website to another.  They're going

6    from the thank you page or -- they're going from the

7    thank you page to the new popup.

8         Does EDebitPay tell the computer that?

9         MS. REILLY:  Objection.  Asked and answered,

10   but you can answer.

11        THE WITNESS:  We call something a general

12   pop, so if he we pop an auto loan off a cash

13   advance, we -- we don't usually.  It usually pops to

14   a whole new unique website with a whole new unique

15   URL.

16   BY MS. TUCCI:

17     Q.   And could one of the pops be

18   startercreditdirect.com?

19     A.   It could be.

20     Q.   Is that one that EDebitPay has used as a

21   pop?

22        MS. REILLY:  Objection.  Vague.

23   BY MS. TUCCI:

24     Q.   Is startercreditdirect a website that

25   EDebitPay has used as a pop, following a failed

EXHIBIT 8, ATT. B
-241-

1    application?

2        A.    Startercredit, I'm not sure about

3    startercredit, if we have.

4        Q.    And who would have that information?

5        A.    It -- it would still be me.  It would still

6    be just a matter of looking in affiliate tracking

7    software and seeing, potentially, where the offer

8    was popped from.

9        Q.    So is it -- is it information that EDebitPay

10   tracks, even though you don't know off the top of

11   your head?

12       A.    We -- we track how many visitors come to the

13   website and what the conversion rates are, what the

14   earnings per visitor are.  And at time to time we

15   pop different offers, third party product offers,

16   our offers of websites, whichever seem more relevant

17   to a customer visiting a website, whichever offers

18   do well.

19           So it it's always changing.  There's --

20   there's no consistent pop that we would place on a

21   website.

22       Q.    But it sounds -- is it correct that it's

23   automated; right?  That if the -- if the application

24   has certain features, it's -- you're going to send

25   it to one website, one popup, versus, another?

EXHIBIT 8, ATT. B
-242-

1    a message saying, "You are being directed to another

2    website"?

3        A.    On an exit pop, a general exit pop, no.

4        Q.    I'm going to stick with the same paragraph,

5    the business model paragraph on Exhibit 4, and back

6    up a couple of sentences to the one that starts with

7    "Targeted consumers."  And this sentence:

8                            "Targeted consumers are directed

9              to one of the Company's card websites

10             (landing pages) to complete an

11             application and purchase a card."

12             In this context, what is a card?

13       A.    A debit card.

14             This was written, I think, three years ago.

15       Q.    Is it still accurate today?

16       A.    I can't -- I can't say in detail 'cause I

17   haven't read all of it.

18       Q.    You can -- you can take a minute to read the

19   paragraph.

20       A.    Yeah, I can't say for sure.

21       Q.    Well, are targeted consumers still directed

22   to first -- let me strike that.

23             Does the company still have card websites?

24       A.    We have what we call catalog card websites,

25   mostly.

**EXHIBIT 8, ATT. B**
**-243-**

107

1     Q.    And is StarterCreditDirect an example of a

2     catalog website?

3     A.    Catalog website; correct.

4     Q.    Okay.  And are there other examples of

5     catalog websites?

6     A.    UltimateOffer.

7     Q.    UltimateOffer.

8           Any others?

9     A.    There's a few different brands.

10    Q.    What are the predominant ones?

11    A.    UltimateOffer is probably, and maybe

12    StarterCredit was one of them.  It's more of a brand

13    than as in just a website name -- more than the

14    catalog product itself.

15          So it may have -- the catalog product may be

16    a specific -- for example, it's a website.  We may

17    call it UltimateOffer, but the -- the card they

18    receive may be the ePlatinum program.  Membership

19    program.

20    Q.    Mm-hmm.

21    A.    But we call it a -- in this context, based

22    three years ago, they were talking about debit

23    cards.

24    Q.    Right.

25          But now you're saying what you're selling is

**EXHIBIT 8, ATT. B**

**-244-**

108

```
 1   catalog programs, catalog cards?
 2       A.   Memberships.   Memberships.
 3       Q.   Memberships and catalog?
 4       A.   Yeah.
 5       Q.   And just to recap, is it also true that
 6   targeted consumers are directed to the company's
 7   Paydayloan websites?
 8       A.   Can you be clear?
 9       Q.   Sure.
10            This says -- to back up a sentence:
11                "The company estimates that it
12            reaches 50 million unique consumers
13            per month through its network.
14            Targeted consumers are directed to
15            one of the company's card websites
16            (landing pages) to complete an
17            application and purchase a card."
18            Are all of those 50 million consumers
19   directed to catalog card offers?
20       A.   No.
21       Q.   Where else are they directed?
22       A.   Cash advance, mostly.  It could have -- and
23   again, we have the auto loan websites is an example.
24   So it could be cash advance, auto loan, card
25   websites.
```

**EXHIBIT 8, ATT. B**
**-245-**

153

1      A.   No.   To us it's the same thing.   It's just a

2   pop, and it's just an exit pop, in general.

3      Q.   And with the exit pops, is there an -- is

4   there a redirection?   Is the person redirected to

5   another site?

6      A.   On an exit pop it's -- you could call it a

7   redirect, but we call it an exit pop, which means

8   the customer, like I stated before, if they close

9   the browser or if they change a different name -- an

10   exit pop, in general, you could say redirects the

11   customer.   We call it a pop, exit pop, pops the

12   customer a different website URL and brand.

13      Q.   And so I know I'm being obtuse on this, but

14   let's say I'm working on my home, unprotected

15   consume- -- laptop that has no popup blockers or

16   anything.

17      A.   Mm-hmm.

18      Q.   And I fill out part of an application for

19   startercreditdirect.com; then I decide to go to

20   CNN.com.   The next thing I see after I put in

21   CNN.com, enter, will be the exit pop?

22      A.   Depending on the offer that you go to, not

23   all of our websites have exit pops.

24      Q.   Right.

25           But in the exit pop scenario, that's what it

EXHIBIT 8, ATT. B
-246-

154

1     would look like?

2        A.    What would happen is when you go to leave

3     the website, we would pop an offer, an exit pop,

4     meaning you're leaving the website.  You're exiting

5     the website you're looking at, and we would exit pop

6     and show you another offer.

7        Q.    And there -- but there would be no message,

8     that I was exiting the other website?

9        A.    Some websites, I think we do have where

10    we're saying, hey, we're going to show you some more

11    offers and other websites.  In general, it's just an

12    exit pop, so we don't say, hey, you're at

13    startercredit and you're leaving, and now we're

14    going to show you an auto loan website.  So now they

15    see an auto loan website.

16          It's a different brand; it's a different

17    URL.  But now it went from -- this is just an

18    example.  It would go from StarterCredit to auto

19    loan website.

20          So again, the term "exit pop" is just that

21    person exits that website and the customer gets

22    popped an offering or -- yeah, more or less a --

23    another type of product.  It could be a similar type

24    of product.

25          Like you said, CashAdvance for example,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. B**
**-247-**

155

```
 1    would -- exit pop would be the CashAdvance.
 2    CashAdvance may pop up.
 3         Q.   What percentage of -- what percentage of
 4    exits from EDebitPay hosted websites lead to exit
 5    pops?
 6         A.   Can you -- can you be a little clear?
 7         Q.   Well, I'm trying to figure out how common it
 8    is for EDP to use the exit pop.  So we're talking
 9    about -- it's my understanding that they're only
10    used on EDP hosted websites.  Maybe that's an
11    incorrect assumption right there.  I'm talking about
12    what EDP is doing, not what somebody else is doing.
13         A.   Okay.
14         Q.   So we're at an EDP website, you know, for
15    car loans, and when I exit that site after not
16    completing an application, how likely is it --
17    another way, how likely is it that I will get an
18    exit pop?
19         A.   I'm going to estimate.
20              MR. MALLOW:   You can estimate.  I mean,
21    don't guess, but estimate.
22              THE WITNESS:   Yeah, I'm going to estimate
23    that 70 percent of our websites, if we have a
24    visitor on the landing page and they shut the
25    website, that will exit pop, for example, an auto
```

**EXHIBIT 8, ATT. B**
**-248-**

1          When I went to work for hosting.com, at

2    first I was brought in as an account manager to sell

3    web hosting, and then also, to find affiliates to

4    market web hosting.

5          After a short period of time I was asked to

6    become the sales manager and build up a sales team,

7    based on my methodology of working and -- and based

8    on my methodology of finding sales and, you know,

9    basically following up -- you know, really picking

10   up the phone, calling people and -- and asking them

11   to send traffic.

12         So then I ended up managing between 15 to 20

13   account managers that managed the direct sales of

14   web hosting, and I also managed them, to help them

15   work with affiliates, to get affiliates active to

16   send traffic to the website to generate sales.

17         So it was really brick and mortar web host

18   business of affiliate marketing.

19   Q.   Where do you live?

20   A.   I live in West Hollywood.

21   Q.   And how long have you been there?

22   A.   Since 11/2005.

23   Q.   Okay.  And you're married?

24   A.   I'm married.

25   Q.   What's your spouse's name?

177

1                        --oOo--

2   Please be advised I have read the foregoing

3   deposition, and I state there are:

4   (Check one)

5                              NO CORRECTIONS

6                              CORRECTIONS ATTACHED

7

8

9                  BILL WILSON

10

11                 Date Signed

12

13

14                       --oOo--

15

16

17

18

19

20

21

22

23

24

25

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

178

1

2

3    STATE OF CALIFORNIA          )
                                  )    ss.
4    COUNTY OF LOS ANGELES        )

5

6         I, BILL WILSON, having appeared for my

7    deposition on November 17, 2009, do this date

8    declare under penalty of perjury that I have read

9    the foregoing deposition, I have made any

10   corrections, additions or deletions that I was

11   desirous of making in order to render the within

12   transcript true and correct.

13        IN WITNESS WHEREOF, I have hereunto

14   subscribed my name this        day of           ,

15   2009.

16

17

18

19

20

21                    W   I   T   N   E   S   S

22

23

24

25

**EXHIBIT 8, ATT. B**
**-251-**

```
 1
 2
 3        I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby
 5   certify:
 6            That the foregoing proceedings were taken
 7   before me at the time and place herein set forth; that
 8   any witnesses in the foregoing proceedings, prior to
 9   testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14            I further certify that I am neither
15   financially interested in the action nor a relative or
16   employee of any attorney of any of the parties.
17            IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated:  12/2/09
21
22
23
24            CHRISTINA KIM-CAMPOS, CSR
25            CERTIFICATE No. 12598
```

Maxene Weinberg Agency
(800) 640-1949

# ATTACHMENT C

# PRESIDING OFFICIAL COPY

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATTER NO.** | **X070038, CIVIL ACTION NO.  CV-07-4880 ODW (AJWx)** |
| **TITLE** | **FTC v. EDEBITPAY, LLC** |
| **PLACE** | **FEDERAL TRADE COMMISSION**<br>**10877 WILSHIRE BOULEVARD**<br>**LOS ANGELES, CALIFORNIA** |
| **DATE** | **NOVEMBER 17, 2009** |
| **PAGES** | **1 THROUGH 109** |

### DEPOSITION OF PAUL CLEVELAND

---

**FOR THE RECORD, INC.**
**10760 DEMARR ROAD**
**WHITE PLAINS, MD 20695**
**(301)870-8025**

---

EXHIBIT 8, ATT. C
-254-

1

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3

4   Federal Trade Commission,        )
                                      )
5              Plaintiff,             )
                                      )
6        vs.                          )   No. CV-07-4880
                                      )       ODW (AJWx)
7   EDebitPay, LLC, et al.,           )
                                      )
8              Defendants.            )
                                      )

9

10

11

12        DEPOSITION OF PAUL CLEVELAND

13

14

15   DATE & TIME:  Tuesday, November 17, 2009
                   2:30 p.m. - 5:18 p.m.
16

17   LOCATION:     10877 Wilshire Boulevard
                   Suite 700
18                 Los Angeles, California

19

20   REPORTER:     Christina Kim-Campos, CSR
                   Certificate No. 12598

21

22

23

24

25

**EXHIBIT 8, ATT. C**
**-255-**

2

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4     Federal Trade Commission,      )
                                      )
5               Plaintiff,            )
                                      )
6          vs.                        )     No. CV-07-4880
                                      )         ODW (AJWx)
7     EDebitPay, LLC, et al.,         )
                                      )
8               Defendants.           )
                                      )
9

10

11

12

13

14

15           DEPOSITION OF PAUL CLEVELAND, taken on

16     behalf of the Plaintiff, at 10877 Wilshire

17     Boulevard, Suite 700, Los Angeles, California,

18     commencing at 2:30 p.m., and concluding at

19     5:18 p.m., on Tuesday, November 17, 2009, pursuant

20     to Notice, before CHRISTINA KIM-CAMPOS,

21     CSR No. 12598, a Certified Shorthand Reporter, in

22     and for the State of California.

23                          ***

24

25

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

EXHIBIT 8, ATT. C
-256-

3

```
 1   APPEARANCES:

 2        For the Plaintiff:

 3            FEDERAL TRADE COMMISSION
             BY:   ELIZABETH TUCCI, ESQ.
 4              - & -
             BY:   ZACHARY HUNTER, ESQ.
 5           601 New Jersey Avenue, NW
             Room 2217
 6           Washington, D.C.  20001
             (202) 326-2402
 7           etucci@ftc.gov

 8            FEDERAL TRADE COMMISSION
             BY:   RAYMOND E. McKOWN, ESQ.
 9           10877 Wilshire Boulevard
             Suite 700
10           Los Angeles, California  90024
             (310) 824-4325
11           rmckown@ftc.gov

12        For the Defendant:

13            LOEB & LOEB, LLP
             BY:   MICHAEL L. MALLOW, ESQ.
14              - & -
             BY:   CHRISTINE M. REILLY, ESQ.
15           10100 Santa Monica Boulevard
             Suite 2200
16           Los Angeles, California  90067
             (310) 282-2287
17
         Also Present:
18
             Bill Wilson
19           Julie Holden

20

21

22

23

24

25
```

**EXHIBIT 8, ATT. C**
**-257-**

4

```
 1                        I  N  D  E  X

 2

 3    WITNESS              EXAMINATION           PAGE

 4    Paul Cleveland       By Ms. Tucci            6

 5

 6                      E X H I B I T S

 7    PLAINTIFF'S                                 PAGE

 8    13 - Form submitted to State regarding
           registration of business of EDebitPay,
 9         LLC                                    14

10    14 - EDebitPay, LLC, Profit & Loss,
           January through December 2008          30
11
      15 - EDebitPay, LLC, Profit & Loss,
12         January through September 2009         35

13    16 - EDP Lead Generation Advertiser
           Agreement, Insertion Order            40
14
      17 - EDP document regarding answer to
15         Final Order                           43

16    18 - Copy of Starter Credit Direct website 59

17    19 - Proof of Authorization for Deborah
           Baker                                 72
18
      20 - Proof of Authorization for Doretha Martin  76
19
      21 - Printout from website
20         yoursupportdepartment.com             86

21    22 - Cancellation and Refund Form          89

22

23

24

25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. C**
**-258-**

5

| | |
|---|---|
| 1 | INDEX |
| 2 | (Continued) |
| 3 | |
| 4 | QUESTIONS INSTRUCTED NOT TO ANSWER |
| 5 | None. |
| 6 | |
| 7 | |
| 8 | INFORMATION REQUESTED |
| 9 | None. |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**EXHIBIT 8, ATT. C**
**-259-**

1    with Carl Mattera.  We bought out his -- his shares

2    in 2004, 2005.

3        Q.   And what about Mr. Moore?

4        A.   We terminated.  We -- we bought him out

5    in -- this is -- July of '09.

6        Q.   Was there anything in particular that led

7    you to buy out Mr. Moore in 2009?

8        A.   Nothing.  Nothing other than -- we were

9    actually -- we were contemplating merging with

10   another company, and his -- his ownership was so

11   minute that it just clouded the issues.  So it was

12   better for us to just buy him out.

13       Q.   What was his ownership interest?

14       A.   9 out of 928 shares.

15       Q.   What is your ownership interest?

16       A.   56 percent.

17       Q.   Does -- does an LLC work as, essentially, a

18   pass through in terms of how proceeds are

19   distributed?

20           MS. REILLY:  Objection.  Vague and

21   ambiguous.

22           THE WITNESS:  Yes.

23   BY MS. TUCCI:

24       Q.   So proceeds from the company are

25   distributed.

24

1    Q.   When you say "more attuned to the mass

2    market" --

3    A.   Mm-hmm.

4    Q.   -- you mean more attuned to the mass market

5    than what?

6         (Mr. Mallow enters the room.)

7         THE WITNESS:   Than an industry directed

8    affiliate network.

9    BY MS. TUCCI:

10   Q.   I'd like to ask you about Secure Deposit

11   Card, Incorporation.   Is it correct that this was a

12   Nevada corporation?

13   A.   That's correct.

14   Q.   And that it was dissolved in or about April

15   2008?

16   A.   That's correct.

17   Q.   Okay.   Who made the decision to dissolve

18   Secure Deposit Card?

19   A.   I did.

20   Q.   And why did you do that?

21   A.   It was no longer functioning.

22   Q.   No longer functional?

23   A.   That's correct.

24   Q.   By that do you mean by that, that it was no

25   longer profitable or -- why was it not functioning?

1       A.    Secure Deposit Card was originated as -- as

2    a way to distinguish between Mastercard and Visa, as

3    far as debit cards were concerned, when we used to

4    be more involved in marketing debit cards.  And

5    since we don't really market debit cards that are

6    our own programs any longer, Secure Deposit Card was

7    no longer required, and it just cost us money to

8    keep it open.

9       Q.    At the time -- what was the financial

10   condition of Secure Deposit Card at the time of its

11   dissolution?

12      A.    Negative.

13      Q.    Who paid off its liabilities?

14      A.    EDebitPay.

15      Q.    Now, EDebitPay Technology Corporation, is it

16   correct that this was also a Nevada corporation?

17      A.    That's correct.

18      Q.    And it was also dissolved in April of 2008?

19      A.    Yes.

20      Q.    And who made the decision to dissolve EDP

21   Technologies Corporation?

22      A.    I did.

23      Q.    And why did you make that decision?

24      A.    We never -- we never actually used the

25   company.  We intended the company to be a holding

26

1    company for other profit centers, so that it -- it

2    would be -- from an accounting standpoint, it would

3    be easier and more correct.  And it just never, we

4    just never got there with operating -- Secure

5    Deposit Card, for instance, became a non-entity, so

6    we just didn't need a holding company and it cost

7    money to keep these companies open, so we just

8    dissolved it.  Made good business sense.

9       Q.   So again, it had -- its financial condition

10   was negative at the time it was dissolved?

11      A.   It was zero.

12      Q.   Zero.

13      A.   (Witness shakes head up and down.)

14      Q.   I'd like to talk to you now about EDP

15   Reporting, LLC.

16           Is it correct that this was a Nevada Limited

17   Liability Company?

18      A.   Yes.

19      Q.   And is it also correct that this corporation

20   was dissolved in August of this year, 2009?

21      A.   That's correct.

22      Q.   Who made the decision to dissolve EDP

23   Reporting?

24      A.   I did.

25      Q.   And why did you do that?

EXHIBIT 8, ATT. C
-263-

```
 1            Okay.  And we'll have this marked as --
 2            MR. MALLOW:  You're on 14.
 3            MS. TUCCI:  14.
 4            (Plaintiff's Exhibit 14 was marked
 5            for identification by the court
 6            reporter and is attached hereto.)
 7            THE WITNESS:  I'm sorry I didn't make more.
 8            MS. TUCCI:  That's all right.
 9            THE WITNESS:  Oh, I can't mark on this
10      anymore?
11            MR. MALLOW:  She's got the official one,
12      unless you want this to be the official one
13      (indicating).
14            MS. TUCCI:  It doesn't matter.  I don't need
15      to mark on this.
16            THE WITNESS:  Now, can go back and --
17      BY MS. TUCCI:
18      Q.   Okay.
19      A.   -- start over?
20      Q.   Okay.  So we're looking at the 2008 year?
21      A.   Yes.
22      Q.   Okay.  And is it -- is this correct, that
23      it's listing the total income for the 2008 year as
24      20 -- about 23 million, 23.6 million?
25      A.   Well, to be exact, $23,683,509.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. C**
**-264-**

1    Q.    Okay.

2    A.    And 96 cents.

3    Q.    What is settlement income?

4    A.    That's income transferred to us by

5    processors that collect money from customers.

6    Q.    And when you talk about direct sales, gross

7    units sold, what is that?

8          I mean, since you don't sell widgets, what

9    do you mean by units sold?

10   A.    Well, a unit would be a customer.

11   Q.    Okay.  And what --

12   A.    And those are dollars.  Not customers.  So

13   unit dollars per customer.

14   Q.    Okay.  And then sales -- okay.

15         Tell me about these return and sales process

16   figures.  What are on-time returns?

17   A.    Within the time limit that each processor

18   allows prior to settlement, there are returns for a

19   number of reasons.  Not sufficient funds, bad bank

20   account, bad routing number, and so forth.

21         And -- and so those are the ones that we can

22   never collect on because they're returned.

23   Q.    Okay.  So that's approximately 18 out of 27

24   million.

25         And then a late return is one that occurs

35

1    sales canceled or --

2      A.   It would be under Refunds.  And --

3      Q.   Where is that?

4      A.   It's here somewhere.  Give me a moment.  Up

5    under 62102 (indicating).

6      Q.   What page are you on?

7      A.   Page 1.

8      Q.   Okay.  62101?

9      A.   101 and 102 --

10     Q.   Okay.

11     A.   -- I believe.

12     Q.   What is Recurring Direct?  Is that, again,

13   monthly fees --

14     A.   Yes.

15     Q.   -- that have been -- okay.  All right.  So

16   that is 2008.

17          And do you also have one for 2009?

18     A.   Oh, yes.

19     Q.   Excellent.  Let's take a quick look at that.

20          And this is Exhibit Number --

21          MR. MALLOW:  15.

22          (Plaintiff's Exhibit 15 was marked

23          for identification by the court

24          reporter and is attached hereto.)

25   ///

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

37

1    we haven't been marketing our own debit card for the

2    entire year.  We've -- any debit card that are

3    provided to anyone have been cards from someone

4    else's program that they would actually like us to

5    market their card but it's from someone else's

6    program.  So that's a big change.

7            We have started to generate some revenue

8    through the telemarketing channel, and that would

9    be, I assume -- I think that's in the offline column

10   here (indicating).  But it's been very minimal.  But

11   that's -- that's a change.  Mostly, as -- as -- as a

12   CEO and someone who looks at this all the time, what

13   strikes me is the reduction in revenue.

14       Q.   I understand.

15            Well, let me just ask you one other

16   question:

17            Mr. Wilson talked about, also talked about

18   shifting to catalog membership as something that

19   you're focusing on selling.

20            Is that something that is increasing in --

21   first of all, is that increasing, catalog membership

22   sales?

23       A.   I don't believe it's increasing.  I believe

24   it decreasing.

25       Q.   Okay.  And where would that show up?

**EXHIBIT 8, ATT. C**
**-267-**

attempts to debit the account and there are insufficient funds?

A. That would be in the Terms and Conditions.

Q. And can you show me where the Terms and Conditions are?

A. They're on the link under Terms and Conditions on the first page. And on the -- on the pre-application page might be a better way to describe it, and on the application page.

Q. And you have to click on those Terms and Conditions to get to that information?

A. Yes, you do.

Q. And you don't actually have to click on the Terms and Conditions to make this purchase, do you?

A. It's not required. It is required that you acknowledge that you've read the Terms and Conditions.

Q. And can you show me where it discloses that EDP will assess this insufficient fund fee multiple times?

A. I don't know that it says that. I'd have to look at the Terms and Conditions.

Q. And can you show me where EDebitPay discloses that it will refund the 99 dollar fee only if the person cancels within 5 days of receiving his

85

1    investigated?

2        A.   Yes.

3        Q.   The technology hasn't changed?

4        A.   That's correct.

5        Q.   And -- and is there --

6             (Mr. Hunter leaves the room.)

7    BY MS. TUCCI:

8        Q.   Is there a key tech person that handled that

9    at the time of the case for -- for EDP?

10       A.   That -- thank you.

11            Yes.  It's the same person.

12       Q.   Who is that?

13       A.   Loris D'Esa.

14       Q.   Loris D'Esa?  Can you spell it?

15       A.   D -- it would be D, apostrophe, e-s-a.

16   BY MS. TUCCI:

17       Q.   And Laura?

18       A.   Loris.

19       Q.   Loris.

20            L-o --

21       A.   L-o-r-i-s.

22       Q.   Okay.  Thank you.

23            I'm going to hand you what I'll ask the

24   court reporter to mark as Exhibit --

25            MR. MALLOW:   21.

**EXHIBIT 8, ATT. C**
**-269-**

86

```
 1              MS. TUCCI:  -- 21.

 2              (Plaintiff's Exhibit 21 was marked

 3              for identification by the court

 4              reporter and is attached hereto.)

 5              THE WITNESS:  Thank you.

 6    BY MS. TUCCI:

 7         Q.   Do you recognize Exhibit 21?

 8         A.   I recognize what it is, but these are not

 9    pages that I review on a regular basis.

10         Q.   That you review on a regular basis.  All

11    right.

12              Your support -- let me -- let's start with

13    the first page.

14         A.   Okay.

15         Q.   And the URL is yoursupportdepartment.com.

16              Is that an EDP site?

17         A.   Yes.

18         Q.   Okay.  And is -- did it used to be EDP

19    Reporting?

20         A.   Yes.

21         Q.   And on this page it has --

22              (Mr. Hunter enters the room.)

23    BY MS. TUCCI:

24         Q.   -- "Click here for the benefits of your

25    online order!"
```

**EXHIBIT 8, ATT. C**
**-270-**

1          Do you see that?

2     A.   Yes.

3     Q.   And then on the next page there's a -- a box

4  that popped up.  I don't mean to testify, but the --

5  sorry.  That's our investigator's notes on the

6  bottom, that he -- he printed it out on the 13th of

7  November.

8     A.   Who was that investigator?

9     Q.   William Burton.

10    A.   No, different one.  I'm sorry.  I was just

11  curious if it's one that we knew.

12    Q.   And it says:

13             "To review the benefits of the

14             product/service you ordered online

15             with us, please enter the amount of

16             the initial fee you had authorized

17             with us in the space below and click

18             the "Review Now" buttons."

19         Have you seen that before?

20    A.   No.

21    Q.   You're not aware this is on your website?

22    A.   This is on our website, but I have not seen

23  this page.

24    Q.   Okay.  And do you see on the next page it

25  has $99 entered on it?

1       A.   Yes, I see that.

2       Q.   And then on the following page, it informs

3    the consumer that he's -- he or she has joined a

4    catalog membership program?

5       A.   Yes, I see.

6       Q.   Why does EDP have to tell consumers what

7    they bought?

8       A.   That's a common question.

9            MR. MALLOW:  Objection.  Vague.

10            THE WITNESS:  That's a common question

11    that -- that people ask, is they forget what they

12    bought quite often.

13    BY MS. TUCCI:

14       Q.   It's a common question that people ask

15    EDebitPay?

16       A.   Yeah.  I don't know if they ask anyone else

17    that question, but they ask our customer service

18    people.  Once reminded, it refreshes their memory.

19            MS. TUCCI:  The last exhibit I'll give you

20    was -- I'll ask the court reporter to --

21            THE WITNESS:  Are we done with this one

22    (indicating)?

23    BY MS. TUCCI:

24       Q.   We are done.

25       A.   We are going fast.

105

1       Q.    And do you have any criminal record?

2       A.    None.

3       Q.    And you live now in the L.A. area.  Where do

4    you live?

5       A.    ███████████████        Beverly Hills, which

6    isn't really Beverly Hills.

7       Q.    It's about as good as it sounds.

8       A.    It's north of Mulholland, which is the

9    dividing line between Beverly Hills and Studio City.

10            And we're north, but the Beverly Hills Post

11   Office delivers our mail, so it's a Beverly Hills

12   address.  But it prevents us from even ordering

13   takeout or bringing in food.  Whenever you order,

14   they say, "No, you're in Beverly Hills.  We can't

15   come."

16            We're north.

17            They say, "No, you're" -- you know, anyway,

18   it's --

19      Q.    So --

20      A.    It changed our lifestyle when we moved

21   there.

22            MR. MALLOW:  You have to cook.

23            MS. TUCCI:  Okay.  I have no more questions.

24            MR. MALLOW:  Excellent.

25            MS. TUCCI:  Thank you for your patience,

EXHIBIT 8, ATT. C
-273-

107

```
 1                        --oOo--
 2    Please be advised I have read the foregoing
 3    deposition, and I state there are:
 4    (Check one)
 5                          NO CORRECTIONS
 6                          CORRECTIONS ATTACHED
 7
 8
 9               PAUL CLEVELAND
10
11               Date Signed
12
13
14                        --oOo--
15
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT 8, ATT. C**
**-274-**

108

1

2

3    STATE OF CALIFORNIA        )
                                )  ss.
4    COUNTY OF LOS ANGELES      )

5

6        I, PAUL CLEVELAND, having appeared for my

7    deposition on November 17, 2009, do this date

8    declare under penalty of perjury that I have read

9    the foregoing deposition, I have made any

10   corrections, additions or deletions that I was

11   desirous of making in order to render the within

12   transcript true and correct.

13       IN WITNESS WHEREOF, I have hereunto

14   subscribed my name this        day of           ,

15   2009.

16

17

18

19

20

21                    W  I  T  N  E  S  S

22

23

24

25

**EXHIBIT 8, ATT. C**
**-275-**

1

2

3          I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6              That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14             I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17             IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated:    12/2/09

21

22

23

24        CHRISTINA KIM-CAMPOS, CSR

25        CERTIFICATE No. 12598

Maxene Weinberg Agency
(800) 640-1949

**EXHIBIT 8, ATT. C**

**-276-**

# ATTACHMENT D



CHRISTINE M. REILLY
Attorney At Law

10100 Santa Monica Blvd.
Suite 2200
Los Angeles, CA 90067

Direct  310.282.2361
Main   310.282.2000
Fax    213.652.1830
creilly@loeb.com

**Via Federal Express**

January 5, 2010

Ms. Sara J. Vance
Production Coordinator
For The Record, Inc.
10760 Demarr Road
White Plains, MD 20695-9998

Re:   FTC v. EDebitPay
      Civil Action No., CV 07-4880 ODW (AJWx) (C.D. Calif.)
      FTC Matter No. X070038

Dear Ms. Vance:

Enclosed are the corrections to the deposition transcripts of Dale Paul Cleveland and William Wilson dated November 17, 2009 in the above referenced case.  Please call me if you have any questions.

Best regards,

Martha Ortiz
Assistant to Christine M. Reilly
Attorney At Law

Enclosures

cc:  Elizabeth Tucci, Esq.

Los Angeles   New York   Chicago   Nashville   www.loeb.com

A limited liability partnership including professional corporations

**EXHIBIT 8, ATT. D**
**-278-**

## CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

**WITNESS NAME**

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____18th_____ day of ____December____, 20_09_ and executed the above certificate in my presence.

**NOTARY PUBLIC IN AND FOR**

MY COMMISSION EXPIRES:

_____5/4/2010_____

SHIRLEY MARTHA GREGUS
Commission # 1663975
Notary Public - California
Los Angeles County
My Comm. Expires May 4, 2010

**EXHIBIT 8, ATT. D**
-279-

WITNESS: DALE PAUL CLEVELAND
DATE: 11/17/2009
CASE: CV-07-4880
ODW (AJWx)

Please note any errors and the corrections thereof on this errata sheet.   The rules require a reason for any change or correction. It may be general, such as "To correct stenographic error," or "To clarify the record," or "To conform with the facts."

| PAGE | LINE | CORRECTION | REASON FOR CHANGE |
|---|---|---|---|
| 21 | 7 | Tucci was actually Barbara Chan | Wrong person named as making the suggestion |
| 33 | 3 | use the change to need to | clarify |
| 57 | 15 | Releasing should be Policing | misunderstood my spoken word |

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. D**

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of *Los Angeles*

On *12/18/2009* before me, *Shirley Martha Gregus, Notary Public*
<span style="font-size:small">(Here insert name and title of the officer)</span>

personally appeared *Dale Paul . Cleveland .*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Shirley Martha Gregus*
Signature of Notary Public

> SHIRLEY MARTHA GREGUS
> Commission # 1663975
> Notary Public - California
> Los Angeles County
> My Comm. Expires May 4, 2010

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

*Certificate of Deponent*
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages **2** Document Date *12/18/09*

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM
*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
    ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
    ❖ Indicate title or type of attached document, number of pages and date.
    ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document.

2008 Version CAPA v12.10.07 800-873-9865 www.NotaryClasses.com

**EXHIBIT 8, ATT. D**
**-281-**

## CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____

**WITNESS NAME**

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 20___, and executed the above certificate in my presence.

_____

**NOTARY PUBLIC IN AND FOR**

_____

MY COMMISSION EXPIRES:

_____

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT 8, ATT. D**
-282-

WITNESS: William Wilson

DATE: 11/17/2009

CASE: CV-07-4880

Please note any errors and the corrections thereof on this errata sheet.  The rules require a reason for any change or correction. It may be general, such as "To correct stenographic error," or "To clarify the record," or "To conform with the facts."

PAGE   LINE      CORRECTION           REASON FOR CHANGE

EXHIBIT 8, ATT. D

-283-

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of *Los Angeles*

On *12/18/09* before me, *Shirley Martha Gregus Notary Public.*
<span style="font-size:smaller">(Here insert name and title of the officer)</span>

personally appeared *William R. Wilson*,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Shirley Martha Gregus*
Signature of Notary Public

> **SHIRLEY MARTHA GREGUS**
> Commission # 1663975
> Notary Public - California
> Los Angeles County
> My Comm. Expires May 4, 2010

(Notary Seal)

---

## ADDITIONAL OPTIONAL INFORMATION

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to the document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

**DESCRIPTION OF THE ATTACHED DOCUMENT**

*Certificate of Deponent*
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages __2__ Document Date *12/18/09*

_____
(Additional information)

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document.

**CAPACITY CLAIMED BY THE SIGNER**
- ☐ Individual (s)
- ☐ Corporate Officer
  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

**EXHIBIT 8, ATT. D**
**-284-**