WILLARD K. TOM
General Counsel

JOHN D. JACOBS, Bar No. 134154
jjacobs@ftc.gov, (310) 824-4343 (tel.)
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024
(310) 824-4380 (fax)

MARK MORELLI
mmorelli@ftc.gov, (202) 326-2601 (tel.)
ELIZABETH TUCCI
etucci@ftc.gov, (202) 326-2402 (tel.)
ZACHARY V. HUNTER
zhunter@ftc.gov, (202) 326-3235 (tel.)
Federal Trade Commission
600 Pennsylvania Avenue, NW, Rm. M-8102B
Washington, DC 20580
(202) 326-2558 (fax)

ATTORNEYS FOR PLAINTIFF
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **EDEBITPAY, LLC, et al.,** <br><br> Defendants. | CV-07-4880 ODW (AJWx) <br><br> **FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS APPLICATION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT** <br><br> Hearing Date: July 12, 2010 <br> Time: 1:30 pm <br> Courtroom 11 <br> Judge: Hon. Otis D. Wright II |

# TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Original Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Parties to the Current Action:  Defendants . . . . . . . . . . . . . . . . . . . . 3

        1.    EDP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    Dale Paul Cleveland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        3.    William Richard Wilson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Defendants' Business Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    Starter Credit Direct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            a.    The Offer:  Credit Line . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            b.    The Fine Print:  Shopping Club . . . . . . . . . . . . . . . . . . . 6

            c.    The Reality:  Consumer Experience . . . . . . . . . . . . . . . . 8

        2.    "NO COST" Prepaid Debit Cards . . . . . . . . . . . . . . . . . . . . . . 10

III.   LEGAL DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    The Court has the Authority to Grant the Requested Relief . . . . . . . 11

    B.    Named Defendants EDebitPay, Cleveland, and Wilson Are Bound by the Final Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    Clear and Convincing Evidence Establishes that Defendants Violated the Final Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.    Defendants Made Material Misrepresentations Regarding Starter Credit Direct and "NO COST" Prepaid Debit Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

i

2.    Defendants Failed to Make Clear and Conspicuous

Disclosures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

a.    Defendants Failed to Clearly and Conspicuously Disclose

Material Attributes of Starter Credit Direct  . . . . . . . . . 15

b.    Defendants Failed to Clearly and Conspicuously Disclose

All Fees for Starter Credit Direct  . . . . . . . . . . . . . . . . . 17

c.    Defendants Failed to Clearly and Conspicuously Disclose

the Fees for "NO COST" Prepaid Debit Cards  . . . . . . 18

3.    Defendants Failed to Obtain Consumers' Express Informed

Consent Prior to Debiting Their Bank Accounts for Starter

Credit Direct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

D.    Defendants Should Pay Compensatory Sanctions  . . . . . . . . . . . . . 20

IV.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ii

1

## TABLE OF AUTHORITIES

2

3

## CASES

4 *FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) . . . . . . .. . . . . . . . . . . . .11

5 *FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004)  . . . . . . . . . . . . . . . . . . . . . . . 20

6

7 *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 31 S. Ct. 492,
55 L. Ed. 797 (1911)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8

9 *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S. Ct. 497,
93 L. Ed. 599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

10

11 *Morgan v. Heckler*, 779 F.2d 544 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 12

12

13 *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000)  . . . . . . . . . . . . . . . . . 15, 17

14 *Shillitani v. United States*, 384 U.S. 36, 86 S. Ct. 1531,
15 16 L. Ed. 2d 622, 627 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16 *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677,
17 91 L.Ed. 884 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18

19 *Vuitton et Fils, S.A. v. Carousel Handbags* 592 F.2d 126 (2d Cir. 1979) . . . . . . . 21

20

21

## STATUTES

22 Fed. R. Civ. P. 65(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23

24 FTC Act, 15 U.S.C. § 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

25

26

27

28

# I.    INTRODUCTION

The Federal Trade Commission ("FTC" or "Commission") returns to Court to enforce a 2008 Stipulated Final Order for Permanent Injunction and Monetary Relief ("Order").  Defendants have violated core provisions of the Order by trapping cash-strapped consumers in a web of false promises and hidden disclosures.  Specifically, Defendants EDebitPay, LLC ("EDP"); Dale Paul Cleveland ("Cleveland"); and William Richard Wilson ("Wilson") (collectively, "Defendants") marketed a "$10,000 credit line" to consumers that was, in fact, not credit at all.  Instead of receiving a credit line, consumers paid $114 plus monthly fees for membership in an online shopping club.  Moreover, consumers did not even receive credit for purchases in the shopping club; rather, the shopping club required "down payments" that typically exceeded the full market price of the goods.  Defendants buried the truth in fine print and on separate terms and conditions webpages.  Defendants' conduct violated the Order's requirements that they not make material misrepresentations, that they clearly and conspicuously disclose material aspects of their product, and that they obtain express informed consent prior to billing consumers.  Defendants similarly violated the Order's key terms when they marketed a "NO COST" prepaid debit card that was laden with hidden fees.  Accordingly, the FTC asks the Court to hold Defendants in civil contempt and order compensatory relief for consumers harmed by their contumacious conduct.

## II.   STATEMENT OF FACTS

### A.   The Original Action

On July 30, 2007, the FTC initiated its action against Defendants and three related entities[1] for violating Section 5 of the FTC Act, 15 U.S.C. § 45, in their online marketing of financial products to consumers in the subprime market. (Ex. 1, at 3-5 ¶¶ 1, 5-7, 10.)[2] According to the Complaint, Defendants required consumers to provide personally identifiable information, such as their social security number and bank account information, when they applied for Defendants' products. (*Id.* at 6-7 ¶ 17.) The FTC alleged, however, that Defendants did not adequately disclose that they would use such information to deduct a $159.95 processing and application fee from consumers' bank accounts. (*Id.* at 7-8 ¶¶ 21-27.) In addition to the failure to make this disclosure, the FTC alleged that Defendants made material misrepresentations and debited consumers' bank accounts without first obtaining their express informed consent. (*Id.* at 7, 14-16 ¶¶ 23, 49-60.)

On January 22, 2008, this Court entered a stipulated Order that, *inter alia*, permanently enjoined Defendants from: (1) misrepresenting any fact material to a consumer's decision to apply for or purchase a product or service; (2) failing to clearly and conspicuously disclose the material attributes of any product or service;

---

[1]The other entities, EDP Reporting, LLC, EDP Technologies Corp., and Secure Deposit Card, Inc., stipulated to the 2008 Order but subsequently dissolved. (Ex. 8, Att. C at 261-63 (Deposition of Paul Cleveland ("Cleveland Dep.") at 24:10-16, 25:15-19, 26:14-21).)

[2]The citation format used herein provides the exhibit number, the page number(s) (with all of the exhibits consecutively paginated) and, if applicable, a more specific citation such as a paragraph number(s) of a declaration. For depositions, the citation also includes the name of the deponent and the relevant page and line number.

(3) failing to clearly and conspicuously disclose costs, fees, or charges to obtain any prepaid card or debit card in close proximity (and without hyperlinks) to statements representing that such cards can be obtained for free or without obligation; and (4) debiting consumers' bank accounts without first obtaining express informed consent.  (Ex. 3 at 48-50.)  Pursuant to the Order, Defendants paid $2,258,258 in consumer redress.

### B.    Parties to the Current Action:  Defendants

#### 1.    EDP

EDP is a Nevada limited liability company with its principal place of business in Sherman Oaks, California.  (Ex. 7 at 126-27 ¶ 3; *id.*, Att. A at 135, 143.)  EDP markets various financial products on the Internet.  (Ex. 8, Att. B at 243-45 (Deposition of Bill Wilson ("Wilson Dep.") at 106:4-108:25).)

#### 2.    Dale Paul Cleveland

Dale Paul Cleveland owns 56% of EDP and is its Chief Executive Officer.  (Ex. 8, Att. C at 260, 267 (Cleveland Dep. at 16:15-16, 37:12-13); Ex. 7 at 126-27 ¶ 3; *id.*, Att. A at 143.)  He resides in Beverly Hills, California.  (Ex. 8, Att. C at 273 (Cleveland Dep. at 105:3-6).)

#### 3.    William Richard Wilson

William Richard Wilson founded EDP and owns 44% of the company.  (Ex. 8, Att. B at 236-37 (Wilson Dep. at 17:10-12, 17:24-18:1); Ex. 7, Att. A at 136.)  Wilson is EDP's President and heads its sales and marketing efforts.  (Ex. 8, Att. B at 236 (Wilson Dep. at 17:10-15).)  He resides in West Hollywood, California.  (*Id.* at 249 (Wilson Dep. at 163:19-20).)

### C.    Defendants' Business Practices

EDP marketed various financial products on the Internet, including payday loans, auto loans, shopping club memberships, and prepaid cards.  (*Id.* at 243-45

1  (Wilson Dep. at 106:4-108:25).)  When consumers applied for one of EDP's

2  products, EDP attempted to induce them to buy other products, such as shopping

3  clubs, by transferring consumers to the online application page of another

4  EDP-hosted website.  (*Id.* at 238-39, 241 (Wilson Dep. at 92:20-93:7, 95:17-19).)

5  EDP did not inform consumers that they were being transferred to a different

6  website.  (*Id.* at 240-41, 246 (Wilson Dep. at 94:24-95:15, 153:3-12).)

7  This contempt action involves Defendants' marketing of two products:  the

8  Starter Credit Direct "credit line" and a "NO COST" prepaid debit card.

9      **1.  Starter Credit Direct**

10      **a.  The Offer:  Credit Line**

11  Until at least November 2009, EDP hosted a website,

12  http://www.StarterCreditDirect.com.  Consumers who ended up[3] at the landing

13  page of the Starter Credit Direct website were prominently invited to "Get an

14  Immediate Guaranteed $10,000 Credit Line[1]."  (Ex. 7, Att. G at 165.)  The top one-

15  third to one-half of the immediately-viewable homepage appears as follows:

16

17

18

19

20

21

22  ────────────────

23     [3]As noted above, EDP involuntarily transferred consumers who applied for
   one EDP product to another EDP website.  (Ex. 8, Att. B at 238-41 (Wilson Dep. at

24  92:20-94:7, 95:17-19).)  Although Defendant Wilson claimed not to know whether
   EDP involuntarily transferred consumers to Starter Credit Direct (*id.* at 241-42

25  (Wilson Dep. at 95:17-96:3)), many consumers who were charged for Starter

26  Credit Direct complained that they thought they were applying for a loan, payday
   loan, cash advance, or credit card.  (Ex. 6 at 123 ¶ 7.)

27

28                                4

This part of the webpage[4] alone contained the words "credit line" three times and emphasized the credit aspect in a bold checklist:

✔ **Guaranteed $10,000 Credit Line**

✔ **Instant $2,500 Account Advance**

✔ **NO Job Requirements**

✔ **NO Credit Checks**

(*Id.*)

Below the offer, the webpage included an online application on the left and a "privacy policy" on the right.  (Ex. 7, Att. D at 151.)  The application requested the consumer's name, address, telephone number, and email address.  (*Id.*)  This application included two additional offers for auto loans and credit repair services.  (*Id.*)  Consumers who provided the information and checked a box agreeing to the

_____

[4]A printout of the referenced webpage is appended at Ex. 7, Att. D at 151-53. To view an electronic copy of www.startercreditdirect.com, which FTC captured as described at Ex. 7 at 127-28 ¶ 6, see the manually filed Ex. 7 Att. D.  The contents may be viewed by first clicking on the "src" folder, then clicking the "contents" file, and finally clicking on the link marked "Starter Credit Direct."

company's privacy policy moved to "Step 2," in which the consumer was asked to provide his or her social security number, date of birth, and bank account information. (*Id.*) In this second phase of the application, two more unrelated offers appeared. (*Id.* at 152.) Below those offers was a check box, which stated that Starter Credit Direct would debit the consumer's checking account for $99, that an entity called "Century Platinum"[5] would debit the same account for a $14 monthly membership fee, and that the consumer has read and agreed to the "Terms & Conditions." (Ex. 7, Att. H at 167.) The terms and conditions were not printed on the webpage; instead, consumers had to click on a hyperlink to view them. (Ex. 7, Att. D at 151, 153.) The final sentence of the check box ended with the repeated promise of a "**$10,000 credit line**," bolded and in red. (Ex. 7, Att. H at 167.)

### b.     The Fine Print:  Shopping Club

In reality, Defendants never fulfilled their promise of a "credit line." Instead, they were merely offering a membership in an online shopping club. Consumers, at best, received the right to finance the purchase of goods from Century Platinum's online shopping catalog, not the promised general credit line. (Ex. 7, Att. F at 158; *id.*, Att. H at 169.) However, even this limited store credit was illusory.  Remarkably, because of the shopping club's down payment requirements, consumers on average had to pay up front, via money order or cashier's check, (Ex. 7 Att. F at 159), 57 percent more than the full market price for catalog items.[6] (Ex. 5 at 76 ¶ 13.) The only part of the purchase for which

_____

[5]Century Platinum, operated by Insite Marketing Group, LLC ("Insite"), served as the online shopping club for Starter Credit Direct members. (Ex. 7, Att. F at 157.)

[6]FTC economist Dr. Kenneth Kelly compared the Century Platinum catalog price for 97 randomly selected brand-name items to the lowest available price on Google Shopping and Amazon.com. (Ex. 5 at 74-75 ¶ 6-7.) He found that, on

6

Defendants "extended credit" was for a portion of the cost above the normal retail sales price. (*Id.*)  In essence, consumers paid $114 in initial processing fees ($99 to EDP and $15 to Century Platinum) plus $14/month for the opportunity to pay, via money order or cashier's check, substantially more than the market price for catalog items and pay the remaining balance at a later time.

Consumers would not have discovered that the "credit line" was actually an online shopping club unless they scrolled down to the bottom of the page to footnote one, which was referenced (but not hyperlinked) in the initial offer to "Get an Immediate Guaranteed $10,000 Credit Line[1]," or they clicked on a "Terms & Conditions" hyperlink. (Ex. 7, Att. D at 153; *id.*, Att. F at 158.)  Notably, the footnote was positioned well below the acceptance check box, the large "APPLY NOW" button, and even the bright blue bar that appeared to frame the bottom of the webpage. (Ex. 7, Att. H at 167-68.)  In fact, the footnote appeared below the copyright notice, in small white print on a gray background. (*Id.* at 169.)  It was sandwiched in a large block of text with the heading "Online Security," between information about the IP address and the USA PATRIOT Act. (*Id.*)

Consumers were not required to click on a "Terms and Conditions" hyperlink to complete the transaction. (Ex. 8, Att. C at 268 (Cleveland Dep. at 66:10-15).)  If a consumer did happen to click on a "Terms & Conditions" hyperlink, the consumer was directed to a new page that consisted of two buttons, one (on the left) marked "Century Platinum Terms and Conditions" and another (on the right) marked "Starter Credit Direct Application & Processing." (Ex. 7, Att. I at 171.)  Clicking on the left button opened up a 3,900-word document that

---

average, Century Platinum's down payment requirements were 57 percent higher than the total competing price and that the full price for catalog items was more than three times the competing price. (*Id.* at 76 ¶ 13.)

7

revealed, *inter alia*, that Century Platinum was not a credit card; that membership merely provided access to an online catalog; and that the "small down payment" required for catalog purchases actually constituted "approximately 30-50% of the total cost, depending on the item, although higher down payments may be required." (Ex. 7, Att. F at 157-59.)  In addition, the hyperlinked document revealed that down payments had to be made through a money order or cashier's check. (*Id.* at 159.)

Even if consumers did follow a hyperlink to this 3,900-word document, Defendants buried fees within the document itself.  In particular, a one-time charge of $15 "associated with the account" did not appear with other rates in the section marked "DISCLOSURE OF COSTS, FEES AND RATES," where Defendants listed the $14 monthly membership fee and $99 initial fee. (*Id.* at 158.)  Instead, the $15 fee appeared near the end of a lengthy paragraph, printed in all-capital letters, entitled "DISCLAIMERS." (*Id.* at 157.)

Clicking on the right button led to a disclosure stating that if EDP was unable to debit $99 from the consumer's bank account because of insufficient funds, it would attempt to debit the account two more times, each time assessing a $25 fee in addition to any bank fees for insufficient funds. (Ex. 7, Att. E at 155.)

### c.   The Reality:  Consumer Experience

In light of Defendants' prominent offers of "credit" and their buried disclosures about the shopping club, many consumers did not know that they had been enrolled in a shopping club.  Only one quarter of one percent of the 34,000 consumers who paid to apply for Starter Credit Direct's "credit line" ever ordered any catalog items.[7] (Ex. 7 at 132 ¶ 21.)

---

[7]In fact, Insite, which operated the Century Platinum catalog website, conceded that it never received any revenue from catalog purchases from Starter

Consumer complaints similarly demonstrate that many consumers whom EDP debited for joining Starter Credit Direct did not understand what, if anything, they had authorized.  (Ex. 6 at 122-24 ¶ 4-5, 7; Ex. 7 at 130-31 ¶ 18-19.)  As noted above, 34,000 consumers paid to apply for Starter Credit Direct, and EDP and Insite received a combined 5,201 consumer complaints.  (*Id.*)  Of those complaints, according to both companies' own records, 2,303 indicated that the consumers did not know why they had been charged, did not authorize the charges, or believed they had applied for another product, such as a payday loan.  (*Id.*)  A significant number of consumers who contacted EDP (417) indicated that they believed they were applying for a loan, payday loan, cash advance, or credit card.  (Ex. 6 at 123 ¶ 7.)  Consumers' confusion is not surprising in light of EDP's buried disclosures and its practice of involuntarily transferring consumers from their applications on one EDP website to another EDP website.  (Ex. 8, Att. B at 238-41 (Wilson Dep. at 92:20-94:7, 95:17-19).)

Customer confusion was apparently so pervasive that the homepage of EDP's customer support website[8] featured a prominent banner stating, "CLICK Here for the Benefits of Your Online Order!"  (Ex. 7, Att. N at 185; Ex. 8, Att. C at 269-72 (Cleveland Dep. at 85:23-88:18).)  Clicking on this hyperlink led to another webpage, where consumers were asked to enter the amount charged by EDP.  (Ex. 7, Att. N at 186.)  Consumers who entered $99.00 learned that "[t]he application you submitted online was to get a membership program with a credit line you can

_____

Credit Direct members.  (Ex. 7, Att. R at 214 ¶ D.9.)  Instead, Insite derived revenue from the monthly membership fees for a service that customers never used.  (Ex. 7 at 132 ¶ 21.)

[8]To view this website, which FTC staff captured as described at Ex. 7 at 4 ¶ 9, see Ex. 7, Att. P (manually filed), open the file and click on "index."

use on an exclusive online shopping site."  (*Id.* at 187-88.)

### 2. "NO COST" Prepaid Debit Cards

EDP also hosted a webpage, http://ePlatinumDirect.com/index.asp, that, like Starter Credit Direct, offered membership in a shopping club.  (Ex. 7, Att. J.)  This webpage, however, also linked to a prominent offer for a "Prepaid Visa Card at NO COST!" (Ex. 7, Att. K at 174.), as depicted in the image below:[9]



If the consumer clicked on the "Yes" button, the offer expanded slightly to the following image:



---

[9]A Camtasia video of the referenced webpage is appended at Ex. 7, Att. J (manually filed).

10

This expanded version repeated the "NO COST" claim and included a hyperlink to "Terms & Conditions."  (Ex. 7, Att. L at 176.)

Consumers would not have discovered that the card was not, in fact "NO COST" unless they clicked on the "Terms & Conditions" hyperlink and read paragraph 7 of a 4,720-word, 18-paragraph document.  (Ex. 7, Att. M at 179-80.)  Paragraph 7 revealed that the NetSpend Visa Prepaid Debit Card charged a $9.95 shipping and handling fee, a $9.95 continuing monthly service fee, and a host of other charges for items such as "PIN Purchase Convenience," "ATM Withdrawal," and "Account-to-Account Transfer."  (*Id.*)  In addition, consumers who did not use their cards every 90 days were subject to an additional $5.95 monthly fee.  (*Id.*)

## III.   LEGAL DISCUSSION

This Court should hold Defendants in civil contempt.  This Court has authority to grant the requested relief, Defendants are bound by the Order, and there is clear and convincing evidence that Defendants violated the specific and definite requirements of the Order.  *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999).

### A.   The Court has the Authority to Grant the Requested Relief.

The FTC, as a party to the original action, may invoke the court's powers by initiating a civil contempt proceeding as part of that action.  *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444-45, 31 S. Ct. 492, 499, 55 L. Ed. 797, 807 (1911).  The district court that entered the order has the inherent power to enforce it.  *Shillitani v. United States*, 384 U.S. 364, 370, 86 S. Ct. 1531, 1535, 16 L. Ed. 2d 622, 627 (1966).  Moreover, the Court expressly retained jurisdiction of this matter for all purposes in Section XI of the Order.

11

**B.** **Named Defendants EDebitPay, Cleveland, and Wilson Are Bound by the Final Order.**

Pursuant to Federal Rule of Civil Procedure 65(d), an order is binding on a party with actual notice. EDP, Cleveland, and Wilson are all named defendants. (Ex. 1 at 3-4 ¶¶ 5-7.) All three signed the Order, (Ex. 2 at 37-38), and returned an affidavit acknowledging receipt of the Order in January 2008. (Ex. 4 at 69-70.) Thus, the Order binds each.

**C.** **Clear and Convincing Evidence Establishes that Defendants Violated the Final Order.**

Clear and convincing evidence demonstrates that Defendants violated the Order in three material respects.[10] First, they misrepresented material facts regarding Starter Credit Direct and the "NO COST" prepaid debit card, in violation of Section I.B. Second, they failed to clearly and conspicuously disclose material information to consumers, in violation of Sections I.E and I.D. Third, they debited consumers' bank accounts without obtaining consumers' express informed consent, in violation of Sections I.A and I.F.

---

[10]Although Defendants may raise an equitable estoppel defense, the FTC did not authorize the violative conduct challenged in this action. In any event, Defendants simply cannot satisfy their enormous burden for invoking equitable estoppel against the government. To prevail on their equitable estoppel defense, they would have to show that the government engaged in "affirmative misconduct going beyond mere negligence" and that "the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by the imposition of the liability." *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir. 1985). In its reply brief, the FTC will of course respond fully to any equitable estoppel arguments raised by Defendants.

### 1.   Defendants Made Material Misrepresentations Regarding Starter Credit Direct and "NO COST" Prepaid Debit Cards.

Defendants made material misrepresentations regarding Starter Credit Direct and "NO COST" prepaid debit cards, in violation of Section I.B of the Order. Section I.B enjoins Defendants from "misrepresenting . . . any fact material to a consumer's decision to apply for or purchase any product."  (Ex. 3 at 48.) "Material" means "likely to affect a person's choice of, or conduct regarding, goods and services."  (*Id.*)  Defendants violated this provision in three ways.

First, Defendants misrepresented the nature of the Starter Credit Direct "credit line."  On their website, Defendants prominently advertised a "Guaranteed $10,000 Credit Line."  (Ex. 7, Att. G at 165.)  However, consumers never actually received a general line of credit.  Instead, consumers could use the "credit line" only to purchase goods from the Century Platinum online catalog.  (Ex. 7, Att. F at 158; *id.*, Att. H at 169.)  This representation is material because it goes to the essential nature of what Defendants were offering and therefore was likely to affect a person's choice regarding whether to accept the offer for Starter Credit Direct.

It is clear that consumers did not understand that the offer of a "credit line" was in fact an offer of membership in an online shopping club.  The vast majority of consumers who provided billing information to EDP never used their purported credit line, which was the sole "benefit" of membership.  (Ex. 7 at 132 ¶ 21.)  Of Starter Credit Direct's 34,000 consumers, only one quarter of one percent even attempted to purchase an item from the online catalog.  (*Id.*)  This demonstrates that consumers did not understand that they were buying a membership in an online shopping club.  Similarly, EDP's own records and those of Century Platinum indicate that 2,303 consumers complained about the charges, had not

13

authorized the charges, or believed that they had applied for another product, such as a payday loan.  (Ex. 6 at 123-24 ¶ 7; Ex. 7 at 130-31 ¶¶ 18-19.)  A significant number of consumers who contacted EDP (417) indicated that they believed they were applying for a loan, payday loan, cash advance, or credit card.  (Ex. 6 at 123-24 ¶ 7.)

Second, Defendants made material misrepresentations by falsely claiming that they were offering credit at all.  As noted above, the products offered in the online catalog were on average more than three times the prices for the same products offered through other online retailers.  (Ex. 5 at 76 ¶ 13.)  In particular, the "down payment," which consumers had to provide by money order or cashier's check, was on average 57 percent higher than the full market price charged by other online retailers.  (*Id.*)  Essentially, consumers had to come up with more cash to satisfy Century Platinum's down payment requirements than they would have had to pay to cover the full price of the item elsewhere.  As a result, consumers received no real extension of credit in exchange for the $99 application fee, the $15 one-time fee, or the $14 monthly fee.  Therefore, Defendants misrepresented that consumers would receive credit.  Like the first misrepresentation, this claim is material because it goes to the essential nature of what Defendants were selling and therefore was likely to affect a person's choice regarding whether to pay to join Starter Credit Direct.

Finally, Defendants misrepresented that consumers could obtain a prepaid debit card at no cost.  Through their webpage, http://ePlatinumDirect.com/index.asp, Defendants prominently represented in red lettering that a prepaid debit card was available at "NO COST."  (Ex. 7, Att. K at 174.)  However, in fact, cardholders incurred multiple fees, including a $9.95 shipping and handling fee, a $9.95 "monthly service fee," and a $5.95 monthly

14

1  "account maintenance fee" for inactive accounts.  (Ex. 7, Att. M at 179-80.)  This

2  misrepresentation was material because it involved cost.  *Novartis Corp. v. FTC*,

3  223 F.3d 783, 786 (D.C. Cir. 2000) (noting that the cost of a product or service is

4  presumed material).  Moreover, the "NO COST" misrepresentation violates

5  Section I.B.3 of the Order, which specifically prohibits misrepresentations that a

6  consumer "will not be assessed a fee, or be charged or billed."  (Ex. 3 at 48.)

7           **2.      Defendants Failed to Make Clear and Conspicuous**

8                      **Disclosures.**

9          Defendants also violated the Order by failing to clearly and conspicuously

10  disclose:  (1) the material attributes of their Starter Credit Direct "credit line"; (2)

11  all fees associated with Starter Credit Direct; and (3) the fees associated with their

12  "NO COST" prepaid debit card.

13                  **a.      Defendants Failed to Clearly and Conspicuously**

14                          **Disclose Material Attributes of Starter Credit Direct.**

15          In their marketing of Starter Credit Direct, Defendants violated Section I.E.5

16  of the Order, which enjoins them from failing to clearly and conspicuously disclose

17  the material attributes of any good or service.  (Ex. 3 at 49.)  The Order explicitly

18  defines "clearly and conspicuously" to require that disclosures are "unavoidable"

19  (*Id.* at 47) and of a "type size and location sufficiently noticeable for an ordinary

20  consumer to read and comprehend."  (*Id.* at 46.)  As noted above, "material" means

21  "likely to affect a person's choice of, or conduct regarding, goods and services."

22  (*Id.* at 48.)  Defendants failed to clearly and conspicuously disclose two material

23  attributes of the Starter Credit Direct shopping club.

24          First, they failed to clearly and conspicuously disclose that the Starter Credit

25  Direct's purported "$10,000 credit line" was not a general credit line but instead

26  merely enabled consumers to purchase items from an online catalog.  This

27

28                                        15

restriction severely limited the utility of the "credit" and therefore likely would have influenced consumers' decisions to pay the various fees to accept Defendants' offer.  Defendants' disclosures of this material term were hardly clear and conspicuous.  In contrast to Defendants' offer of "credit" – which was clearly and conspicuously positioned in large text at the top of the landing page of the website – Defendants' disclosures that they were really providing an offer for an online shopping club were buried in two locations where consumers were unlikely to notice them:  at the bottom of the landing page and in a separate terms and conditions page.

On the landing page, Defendants' disclosure that the "credit line" was "a membership program and not a debit or credit card" was buried at the bottom of the page, well below the large "APPLY NOW" button and the blue bar that appeared to frame the bottom of the page.  (Ex. 7, Att. H at 167-69.)  It was sandwiched in the middle of five paragraphs of small font regarding online protocols and the USA PATRIOT Act, with the heading "Online Security."[11]  (*Id.* at 169.)  Thus, in violation of the Order, this disclosure was not of a "type size and location sufficiently noticeable for an ordinary consumer to read and comprehend."  Moreover, it was certainly not "unavoidable."  Consumers did not have to review this disclosure before completing their order.

The disclosure on the terms and conditions page similarly was not clear and conspicuous.  It was located on a separate terms and conditions webpage, accessible via hyperlink, and therefore was not in a "location sufficiently noticeable for an ordinary consumer to read and comprehend."  Likewise, because consumers did not have to click on this hyperlink and review the terms and

---

[11]This disclosure further stated that the "credit line" could be used "[t]o Purchase Brand Name Merchandise Exclusively From Our Online Mega-Store."

16

conditions before they completed their order, the disclosure was not "unavoidable."

Second, Defendants also failed to disclose, clearly and conspicuously, material terms and conditions that rendered worthless the "credit line" for the online shopping club.  As noted above, consumers could use the "credit line" only to purchase goods from the Century Platinum online catalog, but consumers could not fully finance even these purchases because most catalog items required a substantial down payment.  (Ex. 5 at 75-76 ¶¶ 10, 12.)  Defendants buried the down payment requirement in a footnote at the bottom of the landing page and on the terms and conditions page.  Indeed, the down payment was so high that it typically exceeded the full price of the identical product offered elsewhere online. (*Id.* at 76 ¶ 13.)  Therefore, Defendants did not clearly and conspicuously disclose consumers' obligation to pay any down payment, much less one that substantially exceeded the entire market price of the product.

### b.    Defendants Failed to Clearly and Conspicuously Disclose All Fees for Starter Credit Direct.

Defendants also violated Section I.E.1 of the Order, which enjoins them from failing to clearly and conspicuously disclose "any fee, charge, or bill assessed against consumers, their financial accounts, or their bank accounts."  (Ex. 3 at 49.)

Defendants did not clearly and conspicuously disclose that consumers would be charged a $15 initial processing fee by Century Platinum.[12]  This $15 fee was material, *Novartis*, 223 F.3d at 786, but it appeared nowhere on the homepage or application.  Instead, to discover this fee, consumers would have had to click on the hyperlink "Terms and Conditions," then click again on a Century Platinum hyperlink, and then happen to find a fleeting reference to the fee at the end of an

---

[12]This $15 processing fee was in addition to the $99 application fee (to Starter Credit Direct) and $14 monthly membership fee (to Century Platinum).

17

all-capital-letters paragraph labeled "DISCLAIMERS." (Ex. 7, Att. F at 157.) Notably, the fee did not appear on the list of fees found elsewhere in the document. (*Id.* at 158.) Because Defendants disclosed the $15 fee only through hyperlinks in a manner that was neither "unavoidable," nor of a "location sufficiently noticeable for an ordinary consumer to read and comprehend," Defendants did not clearly and conspicuously disclose the fee and, therefore, violated the Order.

> **c.    Defendants Failed to Clearly and Conspicuously Disclose the Fees for "NO COST" Prepaid Debit Cards.**

Defendants also violated Section I.D of the Order in their marketing of "NO COST" prepaid debit cards. Section I.D of the Order enjoins Defendants from failing to clearly and conspicuously disclose the costs to obtain any prepaid cards in close proximity to statements that such cards can be obtained for "free." (Ex. 3 at 49.) As noted above, the Order requires clear and conspicuous disclosures to be "unavoidable" (*id.* at 47) and in a "type size and location sufficiently noticeable for an ordinary consumer to read and comprehend." (*Id.* at 46.) In addition, the Order defines "in close proximity" to mean "on the same webpage . . . proximate to the triggering representation . . . and shall not be accessed or displayed through hyperlinks." (*Id.*)

Defendants buried their fee disclosures – that the "NO COST!" card actually cost an initial $9.95, plus $9.95 a month and a host of other fees – in the middle of a 4,720-word hyperlinked document. (Ex. 7, Att. M at 179-80.) These disclosures were neither "unavoidable" nor in a "location sufficiently noticeable for an ordinary consumer to read and comprehend." Moreover, these disclosures were not "on the same webpage" as the triggering representation of "NO COST" debit cards, in violation of Section I.D.

18

### 3. Defendants Failed to Obtain Consumers' Express Informed Consent Prior to Debiting Their Bank Accounts for Starter Credit Direct.

Defendants also violated Sections I.A and I.F of the Order. Section I.A prohibits Defendants from debiting consumers' bank accounts or assessing any fee "without first obtaining the consumers' express informed consent." (Ex. 3 at 48.) Section I.F similarly prohibits Defendants from causing billing information to be submitted for payment unless Defendants first obtain consumers' express informed consent and clearly and conspicuously disclose all material terms. (*Id.* at 50.)

Defendants did not obtain consumers' express informed consent. Simply put, consumers did not understand what they were being charged for. Defendants prominently offered a $10,000 credit line, but, as discussed above, Defendants failed to clearly and conspicuously disclose that consumers would not receive a general line of credit and would instead be enrolled in Defendants' shopping club. Moreover, Defendants failed to clearly and conspicuously disclose material terms of the shopping club, including that they would have to pay substantial down payments that typically exceeded the market value of the goods.[13]

Evidence from Defendants and from the shopping club fulfillment company, Insite, establishes that consumers did not understand what they were buying and therefore did not provide express informed consent. As noted above, almost none of the consumers who provided billing information to EDP ever used their purported credit line, with only one quarter of one percent of Starter Credit Direct's

---

[13]Although consumers were required to check a box next to text stating that "Starter Credit Direct will electronically debit your checking account for our one-time $99.00 Application and Processing fee" (Ex. 7, Att. H at 167), the text did not include the material disclosures that would be necessary to establish the "express informed" consent required by the Order.

19

34,341 consumers ordering an item from the online catalog.  (Ex. 7 at 132 ¶ 21.)
Similarly, 2,303 consumers complained to EDP or Insite, stating that they had not
authorized the charges or believed that they had applied for another product, such
as a payday loan, cash advance, or credit card.  (Ex. 6 at 123 ¶ 7; Ex. 7 at 130-31 ¶
18-19.)[14]  This confusion is not surprising in light of EDP's buried disclosures and
its practice of taking consumers who had partially or completely filled out a loan
application at one of EDP's websites and involuntarily transferring them to the
application page for shopping catalog sites.  (Ex. 8, Att. B at 238-41, 246 (Wilson
Dep. at 92:20-93:7, 94:24-95:19, 153:3-155:2).)

## D.    Defendants Should Pay Compensatory Sanctions.

After appropriate contempt proceedings, Defendants should be ordered to
compensate consumers victimized by their contumacious acts.  Sanctions for civil
contempt can serve two purposes:  to coerce the defendant into compliance or to
compensate victims for losses sustained by the contempt.  *United States v. United
Mine Workers*, 330 U.S. 258, 303-04, 67 S. Ct. 677, 701, 91 L. Ed. 884, 918
(1947); *see also FTC v. Kuykendall,* 371 F.3d 745, 764 (10th Cir. 2004) (FTC may
seek contempt sanctions in an amount reflecting the defendants' gross receipts).

In a civil contempt action, "[t]he measure of the court's power . . . is
determined by the requirements of full remedial relief."  *McComb v. Jacksonville
Paper Co.*, 336 U.S. 187, 193-94, 69 S. Ct. 497, 501, 93 L. Ed. 2d 599, 605 (1949).
Accordingly, the court may award compensatory damages in an amount sufficient

---

[14]Indeed, Century Platinum employed a script explaining the "benefits" of
membership, apparently for the first time, to consumers who called about Starter
Credit Direct charges.  (Ex. 7 ¶ 19 at 130-31.)  Defendants also hosted a separately
website to help consumers identify what they had purchased from EDP based on
how much they had initially been debited.  (Ex. 8, Att. C at 269-72 (Cleveland
Dep. at 85:23-88:12).)  This site would not be necessary if consumers understood
what they were purchasing.

"to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed." *Vuitton et Fils, S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir. 1979).

Here, Defendants have defrauded consumers out of millions of dollars by falsely promising that they would provide a credit line to consumers and a prepaid debit card was available at "no cost." Defendants should compensate consumers for the monetary harm caused by their contumacious behavior.[15] Specifically, consumers should receive all money paid to Defendants as part of their contumacious schemes. The FTC will seek to determine the appropriate amount of compensation through discovery.[16]

---

[15]The FTC plans to file, pursuant to Federal Rule of Civil Procedure 60(b), an application to modify the 2008 Order to ban Defendants from the online marketing of financial products, including but not limited to, credit cards, debit or stored value cards, extensions of credit related to shopping club or catalog memberships, credit lines, and loan products.

[16]If the Court finds Defendants in contempt and Defendants continue to violate the Order, the FTC will seek coercive fines.

21

1

**IV.    CONCLUSION**

2          For the foregoing reasons, the FTC requests that the Court enter the

3   proposed Order to Show Cause.

4

5

6   Date Submitted: May 27, 2010          Respectfully submitted,

7

8                                         ___/s/_____

9                                         John D. Jacobs
                                          Mark Morelli
10                                        Elizabeth Tucci
                                          Zachary V. Hunter
11                                        Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                        22