EXHIBIT C

MICHAEL L. MALLOW (SBN 188745)
mmallow@loeb.com
KAREN R. THORLAND (SBN 172092)
kthorland@loeb.com
CHRISTINE M. REILLY (SBN 226388)
creilly@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067-4120
Telephone: 310-282-2000
Facsimile: 310-282-2200

Attorneys for Defendants
EDEBITPAY, LLC, DALE PAUL
CLEVELAND, and WILLIAM
RICHARD WILSON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 07-4880 ODW (AJWx) |
| Plaintiff, | Assigned to Hon. Otis D. Wright II |
| v. | |
| EDEBITPAY, LLC; EDP REPORTING, LLC; EDP TEHNOLOGIES CORPORATION; SECURE DEPOSIT CARD, INC.; DALE PAUL CLEVELAND; and WILLIAM RICHARD WILSON, | **DEFENDANTS' OPPOSITION TO THE FEDERAL TRADE COMMISSION'S APPLICATION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT** |
| Defendants. | Date: July 12, 2010<br>Time: 1:30 p.m.<br>Ctrm: 11 |
| | **[FILED UNDER SEAL]** |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .............................. 1

II.    STATEMENT OF FACTS ......................................................................... 4

    A.     Case Background ............................................................................ 4

    B.     The Starter Credit Direct Marketing ....................................... 7

    C.     The ePlatinum Debit Card Marketing ....................................... 7

III.   LEGAL STANDARD FOR ISSUANCE OF AN OSC RE CONTEMPT ............................................................................................ 9

IV.    ARGUMENT ............................................................................................ 9

    A.     Defendants Are Not In Contempt Of The Stipulated Final Order .............................................................................................. 9

    B.     The FTC Cannot Establish By Clear And Convincing Evidence That Defendants Violated The Final Order Through the Starter Credit Marketing ................................................. 10

        1.     Both the FTC and Court-Appointed Receiver Knew About the Starter Credit Marketing and Permitted it to Be Marketed While EDP was Under Their Control ........................................................................... 10

        2.     The Starter Credit Marketing Does Not Violate Section 5 of the FTC Act or the Final Order ........................... 12

        3.     Defendants Cannot Be Held in Contempt For Marketing a Third Party Product the FTC Deems "Worthless" ............................................................... 16

        4.     The FTC Failed to Produce Any Evidence that Starter Credit Consumers were Charged a $15 Fee ................. 17

    C.     The FTC Cannot Establish By Clear And Convincing Evidence That Defendants Violated The Final Order By Marketing the ePlatinum Debit Card .................................................. 18

    D.     The FTC Is Estopped and/or Barred from Bringing This Action Under the Doctrine of Official Misleading ............................. 20

V.     IN THE EVENT THE COURT ISSUES AN OSC, IT SHOULD PROVIDE SUFFICIENT TIME FOR DISCOVERY .................................... 24

VI.    CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*FTC v. Affordable Media, LLC,*
  179 F.3d 1228 (9th Cir. 1999) ............................................................................ 10

*Gen. Signal Corp. v. Donallco, Inc.,*
  787 F.2d 1376 (9th Cir.1986) ............................................................................ 9

*In re Dual-Deck Video Cassette Recorder Anti-trust Litigation,*
  10 F.3d 693 (9th Cir.1993) ....................................................................... 9-10, 20

*In United States v. Hsieh Hui Mei Chen,*
  754 F.2d 817 (9th Cir.), cert. denied, 471 U.S. 1139, 105 S.Ct. 2684, 86
  L.Ed.2d 701 (1985) ........................................................................................... 20

*Morgan v. Heckler,*
  779 F.2d 544 (9th Cir. 1985), FTC Memo., p. 12 n.10 ................................. 22-23

*People v. Chacon,*
  40 Cal. 4th 558 (2007) ...................................................................................... 21

*Raley v. Ohio,*
  360 U.S. 423 (1959) .......................................................................................... 21

*Reynolds v. Roberts,*
  207 F.3d 1288 (11th Cir. 2000) ......................................................................... 9

*U.S. v. Pennsylvania Chem. Corp.,*
  411 U.S. 655 (1973) .......................................................................................... 21

*United States v. Smith,*
  940 F.2d 710 (1st Cir. 1991) ........................................................................ 22-23

*United States v. Tallmadge,*
  829 F.2d 767 (9th Cir. 1987) ........................................................................ 20-21

*United States v. Timmins,*
  464 F.2d 385 (9th Cir. 1972) ........................................................................ 21-22

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.,*
  689 F.2d 885 (9th Cir. 1982) ....................................................................... 10, 20

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Having failed the first time, the Federal Trade Commission ("FTC") has again set out to destroy the financial and personal lives of Dale Paul Cleveland ("Cleveland"), Bill Wilson ("Wilson"), and their company, EDebitPay LLC ("EDP") (collectively "Defendants").  The FTC requests this Court to order Defendants to show cause why they should not be held in contempt for marketing the startercreditdirect.com website ("Starter Credit") that the FTC and the Court-appointed temporary receiver authorized EDP to use while EDP was under receivership; and for allegedly failing to disclose fees associated with a no-cost debit card in a marketing piece that the FTC knows is not representative of the marketing actually used by EDP.

The FTC asks this Court to initiate contempt proceedings solely on the grounds that the Starter Credit website violates the Stipulated Final Order for Permanent Injunction and Monetary Relief entered by this Court on January 17, 2008 ("Final Order") because: (1) it misled consumers into believing they would receive a general line of credit; (2) consumers did not receive credit of any type; and (3) EDP failed to disclose a $15.00 fee.  The FTC also claims Defendants violated the Final Order because they failed to disclose a fee associated with a no-cost debit card product that was marketed on some EDP marketing websites.

Nowhere in the FTC's Application or the piles of purported evidence filed in support thereof does the FTC disclose to this Court that the Court-appointed receiver, in conjunction with the FTC, allowed EDP to use the Starter Credit marketing that is the basis for the FTC's contempt application.  The FTC neglects to disclose that it specifically reviewed, tagged and copied EDP's documents related to Starter Credit during the receivership and nonetheless permitted EDP to market Starter Credit when EDP restarted operations three weeks after the TRO.  The FTC fails to disclose to this Court that during the receivership the Receiver was provided financial statements identifying the revenue generated by Starter Credit.  The FTC

1 also fails to disclose that for approximately 18 months after the Final Order, the
2 FTC failed to raise its current concerns about Starter Credit, despite contacting
3 EDP's counsel about the website.

4      The FTC also claims EDP failed to disclose a $15.00 fee that was charged to
5 consumers, but the FTC's own evidence submitted to this Court establishes that no
6 such fee was charged to consumers.

7      The FTC claims that Defendants misrepresented that a line of credit was
8 offered to consumers, but even the FTC admits that a line of credit was in fact
9 provided. The FTC's assertion is that the line of credit was illusory because the
10 price of the products offered in the Century Platinum catalogue club, when
11 compared to the best available price for the same product through Google or
12 Amazon.com, was significantly inflated. The FTC also claims that when accounting
13 for the down payment amount that Century Platinum required for certain products,
14 the down payment equaled or exceeded the price a person could have paid had that
15 person engaged in the same pricing comparison that was conducted by the FTC's
16 professional economist. Based on these assertions, the FTC argues that the
17 consumer, although receiving a line of credit to purchase products through the
18 Century Platinum catalogue club, did not really get an extension of credit because
19 they paid too much for the product. According to the FTC, this is an obvious and
20 blatant violation of the Final Order.

21      Of course, the FTC disregards the fact that EDP does not own or operate the
22 Century Platinum catalogue club that is marketed through the Starter Credit website,
23 does not have access to the pricing, does not set the down payment amount and has
24 no idea how many consumers order products through Century Platinum. Defendants
25 have not marketed Starter Credit since at least November of 2009 and would have
26 ceased marketing the website sooner except that the FTC asked EDP not to
27 terminate its relationship with the owners and operators of the Century Platinum
28 product that was marketed through the Starter Credit website.

1    The FTC also fails to disclose that the marketing piece regarding the no-cost

2 debit card that forms the second basis for its contempt application is not

3 representative of the marketing used by EDP to promote the no-cost debit card.  The

4 short form disclosure related to the no-cost debit card product that the FTC has

5 introduced to this Court was never intended to be marketed to consumers, and to the

6 extent it was publicly available, it was available for no more than a few months

7 between the end of November 2009 and the end of January 2010.  During this period

8 of time, a whooping 89 applications were submitted, generating a staggering total

9 revenue to EDP of $44.50, and there is not a shred of proof offered by the FTC that

10 a single penny has been paid by any consumer for this product.

11    Simply put, Defendants have not violated the Final Order.  To the extent the

12 FTC can successfully convince this Court that Starter Credit violated the Final

13 Order, the FTC should be estopped from seeking contempt based on its and the

14 Court-appointed receiver's authorization allowing EDP to market Starter Credit

15 during the receivership, which marketing continued after the Final Order was

16 entered.  Similarly, there is no proof that any consumer paid any money as a result

17 of the mistaken short form disclosure related to the no-cost debit card product.

18    Since the entry of the Final Order, EDP and its principals have maintained

19 productive communications with the FTC team that originally filed suit against

20 Defendants.  That FTC team is not pursuing the FTC's contempt application.

21 Rather, the application is sought by a division of the FTC that has been singularly

22 focused on finding, or in this case creating, a case for contempt; even if it means

23 casting an undeserved cloud over their own colleagues who did not share their

24 perception of Defendants' business practices.

25    It is clear now that the FTC's post-order investigation that has been going on

26 for well over a year was not intended to determine whether Defendants violated the

27 Final Order, rather it was meant to find some evidence to support the FTC's

28 predetermined decision that Defendants violated the Final Order.  Defendants have

1  fully paid their dues and this Court should reject the FTC's attempt to inflict more
2  pain on Defendants for actions that the FTC itself permitted when it had control over
3  Defendants' business.

4  **II.     STATEMENT OF FACTS**

5      **A.     Case Background**

6      On July 30, 2007, the FTC filed a complaint and *ex parte* application for a
7  temporary restraining order ("TRO") against Defendants.[1]  The TRO—issued that
8  same day without any notice to Defendants –provided for, among other things, an
9  asset freeze, appointment of a temporary receiver and immediate access to EDP's
10 business premises and documents.  The TRO ordered that a Court-appointed
11 Receiver, Howard Camhi, "assume full control" and "take exclusive custody,
12 control, and possession of all assets and documents of [the Defendants]."[2]  TRO
13 Order, Sections XVI.A & B, attached hereto as Ex. A.  The TRO authorized the
14 FTC and Receiver to inspect, copy, and review various records maintained by
15 Defendants, including "Defendants' advertising, promotion, marketing, offering for
16 sale or sale of any goods or services, including but not limited to telemarketing or
17 customer service scripts, emails, digital audio files, ***and Internet advertising***[.]"  *Id.*,
18 Section IX (emphasis added).  The Court ordered the production of "[e]ach
19 advertisement, solicitation, template, script, or copy used to sell or market any
20 product or service sold or marketed by Defendants" and "[e]ach version of any
21 script or outline used to sell or market any product or service sold by Defendants[.]"
22 *Id.*, Sections XII.C & D.

23     One of the various duties of the Receiver was to "[d]etermine and implement
24 the manner in which the Receivership Defendants will comply with, and prevent

25

26 [1] The action was also filed against EDP Reporting, LLC, EDP Technologies Corp.,
27 and Secure Deposit Card, Inc., but these entities dissolved after the stipulated
settlement agreement with the FTC.  FTC Memo., p. 2 n.1.
28 [2] The FTC drafted and submitted to the Court the language used in the TRO.

1  violations of, this Order and all other applicable laws, including but not limited to,
2  *revising sales materials* and implementing monitoring procedures[.]" *Id.*, Section
3  XVI.K (emphasis added). The Receiver was to "[c]ontinue and conduct the
4  business of the Receivership Defendants in such manner, to such extent, and for
5  such duration as the Temporary Receiver may in good faith deem to be necessary or
6  appropriate to operate the business profitably and *lawfully*, if at all" and was
7  "conditioned upon the Temporary Receiver's good faith determination that the
8  business can be *lawfully* operated…" *Id.*, Section XVI.N (emphasis added).

9      Pursuant to the TRO, the Receiver and FTC seized *all* of Defendants'
10  marketing material and documents and imaged Defendants' hard drives. Cleveland
11  Decl., ¶ 3. Both the FTC and Receiver had every single piece of EDP marketing
12  material that existed at that time, including creatives[3] for Starter Credit Direct. *Id.*;
13  First Interim Report of Federal Court Receiver dated November 2007 ("First Interim
14  Report"), pp. 3-4, attached hereto as Ex. B ("The first order of business for the FTC,
15  after securing the premises, was to have its IT staff make forensically correct and
16  secure copies of the Defendants computers, servers and other business related
17  machines. This process took several days until the FTC staff was able to copy *all of*
18  *the data from Defendants*.") (emphasis added); Mallow Decl., ¶ 3, Ex. 1.

19      Defendants' business was brought to a screeching halt on August 1, 2007
20  when the U.S. Marshal, FTC, and Receiver conducted a raid on the business
21  premises and served the TRO Order on Defendants. Cleveland Decl., ¶ 2.
22  Defendants were not permitted to engage in any business activities or transactions
23  during this time, other than to comply with the requirements and obligations of the
24  TRO Order which included, among other things, the production of *all* marketing
25  material to the FTC and Court-appointed Receiver. *Id.;* TRO Order, Section IX.

26

27
[3] "Creative" is an industry term commonly used to refer to email content, banner
28  ads and other forms of created advertising, whether HTML, text or images.

1     For approximately three to four weeks following service of the TRO,
2 Defendants, the FTC, and Receiver met on numerous occasions to discuss EDP's
3 business operations, review EDP's marketing material and to discuss ways in which
4 EDP could be run "profitably and legally." First Interim Report, pp. 6-7. The
5 "Receiver worked with the FTC and Defendants to ensure that none of the allegedly
6 misleading websites were functional or were able to process applications." *Id.*, p. 8.
7 Defendants also provided "financial documents to the Receiver's accountants in
8 order to enable them to assist the Receiver [in] carry[ing] out his duties." *Id.*, p. 9.

9     The FTC and Receiver, satisfied that EDP could operate in compliance with
10 the law, entered into a Stipulation on August 13, 2007, which allowed Defendants to
11 resume certain business operations, including the Starter Credit marketing, under the
12 watchful eye of the Receiver and FTC. *See* Stip. and Order Re Operation of the
13 Bus. Entity Defs. Under the Court's July 30, 2007 TRO Order ("Stip."), attached as
14 Ex. C hereto ("Defendants and Receiver stipulate to the authority of the Receiver to
15 continue certain operations of the business. . . . The Receiver is authorized to permit
16 individual Defendants Cleveland and Wilson to participate in certain operations of
17 EDebitPay's business under the supervision of the Receiver.").

18     Without any admission of liability or wrongdoing, and given that the FTC had
19 seized in excess of $2 million that would have cost Defendants far too much money
20 to try to get back from the FTC, Defendants settled the matter and entered into the
21 Final Order on January 22, 2008.[4]  Defendants have been very conscientious about
22 their obligations under the Final Order, often reaching out to the FTC to ensure their
23 marketing complied with the language of the Final Order. Mallow Decl., ¶ 4, Exs.
24 2-14. Defendants have been fully responsive to any and all requests for information,
25 have satisfied all reporting and notice requirements, and have been fully open and
26 transparent about their business operations. Cleveland Decl., ¶ 4. Moreover, to the
27

28 [4] The TRO was extended several times until entry of the Final Order.

1  extent possible, Defendants have implemented all suggested operational and

2  marketing changes suggested by FTC staff in order to avoid the very kind of

3  contempt action the FTC seeks here. *Id.*, ¶ 5.

4        **B.    The Starter Credit Direct Marketing**

5        StarterCreditDirect.com[5] was a website EDP used to advertise a line of credit

6  in connection with an online shopping club called Century Platinum, which was a

7  product offered by a third party, Insite Marketing Group, LLC ("Insite"). Cleveland

8  Decl., ¶ 6. Marketing for this third-party product began in July 2007 *before* the FTC

9  action was filed. *Id.* ¶ 7. In late July when the FTC action was filed, EDP's

10 operations came to a halt, but EDP was permitted to restart marketing Starter Credit

11 when EDP resumed business operations in August 2007. *Id.* EDP continued to

12 market Starter Credit while it was under the watchful eye and control of the FTC

13 and Court-appointed Receiver and after the Final Order was entered in January

14 2008. *Id.*

15       On July 23, 2009, the FTC requested information and documents to monitor

16 Defendants' compliance with the Final Order, including several inquiries regarding

17 Starter Credit. Mallow Decl., ¶ 13. Defendants voluntarily offered to discontinue

18 the marketing, in the event the FTC had any concerns with this marketing piece. *Id.*,

19 Cleveland Decl., ¶ 8. The FTC expressly requested that EDP continue marketing

20 the Century Platinum product and not sever its relationship with Insite. Mallow

21 Decl., ¶ 13, Ex. 20. With the FTC's permission, EDP ceased marketing Starter

22 Credit in November 2009, after the FTC deposed Messrs. Cleveland and Wilson.

23 Cleveland Decl., ¶ 8.

24       **C.    The ePlatinum Debit Card Marketing**

25       The ePlatinum Debit Card (the "Debit Card") is a product of Netspend, a third

26 party, and was marketed in conjunction with the ePlatinum+ catalogue membership.

27 ─────────────────────

28 [5] The FTC only takes issues with the website, not the Starter Credit marketing more generally which included the advertising of other products.

1  Cleveland Decl., ¶ 12.  Beginning in or around August 2009, this Debit Card was
2  described as "No Cost" in the creatives used by Defendants.  *Id.*  To receive the
3  physical Debit Card, a consumer pays nothing, such that the marketing materials for
4  the Debit Card accurately reflect that there is "no cost" to "get" the card itself.  *Id.*
5  In fact, at the time the card is received, the consumer is at least two steps away from
6  incurring any obligation to pay any fees.  *Id.*  The consumer must first call to
7  activate the card, and then must load the card with some specific amount of money.
8  *Id.*, ¶ 13.  The steps that a consumer must take before any costs are incurred
9  distinguishes the ePlatinum Debit Card from many other cards.  *Id.*  As the FTC is
10  well aware,[6] many debit card products are sold to consumers for a fee, i.e., fees are
11  paid just to receive the physical card with no dollar amount yet on the card. *Id.*

12  ·Additionally, the FTC's description of EDP's marketing of the Debit Card
13  also ignores a fact the FTC knows is critical to its Application and to any future
14  contempt proceeding.  The FTC offers only one example of the marketing, which it
15  knows from having conducted a post-Final Order investigation of EDP for over 18
16  months, is not representative of the disclosures EDP used when it marketed the
17  Debit Card.  *Id.*, ¶ 14; FTC Memo. at 10.  EDP believes the creative found by the
18  FTC was a draft or placeholder for the technical development of the actual,
19  marketed creative and was not intended to be marketed to consumers.[7]  Cleveland
20  Decl., ¶ 14.

21  With the possible exception of the period from November 25, 2009 to January
22  20, 2010, the marketing piece for the Debit Card included a full drop-down fee

23  _____
   [6] Fees associated with obtaining EDP's stored value debit card were the focus of the
24  initial case against EDP.  FTC Ex. 1 (Complaint), pps. 5-7, ¶¶ 10-11, 17.
25  [7] Discovery will be needed on the precise manner in which this creative came to the
   FTC's attention as well as other aspects of the FTC's investigation, including how
26  many website searches it performed before locating this version of the creative, how
   many other creatives of this product it located, how long it took the FTC to find this
27  particular creative, and why these other marketing pieces that are inconsistent with
28  the FTC's application were withheld from the Court.

1  disclosure that appeared when a consumer indicated interest in the card.[8] *See* Desa
2  Decl., ¶¶ 7-13; Exs. 2-7; Cleveland Decl., ¶ 15.  During this time, there was a total
3  of 89 applications submitted for the no-cost debit card which generated a total
4  revenue to EDP of $44.50.  Desa Decl., ¶ 14.  Most significantly, the FTC has failed
5  to submit any evidence that any consumer actually activated and loaded money on
6  one of these cards and was subsequently charged the fee the FTC claims was not
7  disclosed.

## III.   LEGAL STANDARD FOR ISSUANCE OF AN OSC RE CONTEMPT

9        This Court should issue the requested Order to Show Cause only if it is
10  satisfied that the FTC's application presents sufficient grounds for contempt.  *See*
11  *Reynolds v. Roberts*, 207 F.3d 1288, 1298, fn. 19 (11th Cir. 2000).  For all of the
12  reasons set forth bellow, the FTC has not presented sufficient grounds for contempt.

## IV.   ARGUMENT

### A.   Defendants Are Not In Contempt Of The Stipulated Final Order

15        Civil contempt "consists of a party's disobedience to a specific and definite
16  court order by failure to take all reasonable steps within the party's power to
17  comply." *In re Dual-Deck Video Cassette Recorder Anti-trust Litigation*, 10 F.3d
18  693, 695 (9th Cir.1993); *see also Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d
19  1376, 1379 (9th Cir.1986) ("Civil contempt occurs when a party fails to comply
20  with a court order.").  "[A] person should not be held in contempt if his action
21  appears to be based on a good faith and reasonable interpretation of the court's
22  order." *Dual-Deck*, 10 F.3d at 695.

23        For this reason, the Ninth Circuit has established that a party seeking
24  sanctions must show: (1) a violation of the order; (2) beyond substantial compliance;
25  (3) not based on a good faith and reasonable interpretation of the order; (4) by clear

26  _____

27  [8] The FTC does not argue that this full disclosure menu, which was based on the
Ultimate Platinum website vetted by the FTC, is inadequate or violates the Final
28  Order. *See* Mallow Decl., ¶¶ 6-10.

1 and convincing evidence. *Id.; see also Vertex Distrib., Inc. v. Falcon Foam*

2 *Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982) (finding that a defendant should not

3 be held in contempt if his action appears to be based on a good faith and reasonable

4 interpretation of the court's order). "'Substantial compliance' with the court order is

5 a defense to civil contempt, and is not vitiated by 'a few technical violations' where

6 every reasonable effort has been made to comply." *Dual-Deck*, 10 F.3d at 695

7 (quotation omitted) (vacating contempt order where, although plaintiff committed

8 three technical violations of a protective order, defendant failed to prove by clear

9 and convincing evidence that under a good faith, reasonable interpretation of the

10 protective order, defendant did not substantially comply with the order, defendant

11 diligently tried to comply with order, and violations were harmless).

12       The moving party bears the initial burden of "showing by ***clear and***

13 ***convincing*** evidence that the contemnors violated a specific and definite order of the

14 court." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999)

15 (emphasis added). "The burden then shifts to the contemnors to demonstrate why

16 they were unable to comply." *Affordable Media*, 179 F.3d at 1239. Here,

17 Defendants have made every reasonable effort to comply with the Final Order,

18 Cleveland Decl., ¶¶ 4-5, 8-9, 16. Even if a few technical violations of the Final

19 Order are found, Defendants have substantially complied and are not in contempt.

20     **B.**    **The FTC Cannot Establish By Clear And Convincing Evidence**

21             **That Defendants Violated The Final Order Through the Starter**

22             **Credit Marketing**

23         **1.**    **Both the FTC and Court-Appointed Receiver Knew About**

24             **the Starter Credit Marketing and Permitted it to Be**

25             **Marketed While EDP was Under Their Control**

26       The Starter Credit marketing forms the primary basis of the FTC's contempt

27 application, which the FTC would have this Court believe constitutes a blatant and

28 obvious violation of the Final Order. But if the Starter Credit product and marketing

10

1  was such an obvious and blatant violation of the Final Order (and Section 5 of the

2  FTC upon which the Final Order is based), then why would the FTC, having all of

3  the information related to Starter Credit in its possession and control prior to entry

4  of the Final Order fail to include this marketing in its initial enforcement action?

5  Why would the FTC knowingly allow EDP to resume marketing Starter Credit

6  during the Receivership?  Why would the Receiver, who was essentially an arm of

7  the Court and who was tasked with only allowing lawful marketing of products,

8  knowingly allow EDP to resume marketing Starter Credit?  The inevitable

9  conclusion is that neither the FTC nor the Receiver believed that Starter Credit or

10  the marketing of Starter Credit was unlawful; and it would destroy all notions of

11  fundamental fairness if the FTC could knowingly allow Defendants to market

12  Starter Credit during the Receivership, allow Defendants to continue marketing

13  Starter Credit after entry of the Final Order without indicating any concern about the

14  marketing, and then pursue contempt nearly two and half years later.

15       Starter Credit was being marketing by EDP *before* the FTC filed its

16  Complaint and TRO application.  Cleveland Decl., ¶ 7.  When the FTC action was

17  filed on July 30, 2007, Defendants produced *all* of its marketing material to the

18  FTC.  Inventory listings of material seized by the FTC created by the Receiver

19  specifically included Starter Credit "website print-outs" and "banner samples."

20  Leon Decl., ¶ 4, Ex. 20.  Consequently, any response by the FTC that it was not

21  aware of Starter Credit would be false.

22       Shortly after the Court entered its TRO, Defendants and their counsel worked

23  with the FTC and Court-appointed Receiver to modify EDP's marketing material so

24  that the Receiver and FTC would allow EDP to resume portions of its operations

25  subject to the Receiver's supervision and control.  Cleveland Decl., ¶ 3; First

26  Interim Report, Ex. C., pp. 3-4, 6-7.  On or about August 13, 2007, the FTC and

27  Receiver, with Court approval, permitted EDP to resume operations, which included

28  the continued marketing of Starter Credit.  Stip., Ex. C; Cleveland Decl., ¶ 3.  EDP

1  continued to market Starter Credit throughout the Receivership.  Cleveland Decl.,

2  ¶ 3.  EDP supplied the Receiver with financial spreadsheets that expressly identified

3  revenue being generated from the Starter Credit marketing.  Leon Decl., ¶ 3, Exs. 1-

4  19.  Moreover, an email providing a link to a Starter Credit creative was forwarded

5  to the Receiver in September 2007.  *Id.* ¶ 5, Ex. 21, pps. 2-3.  Both the FTC and

6  Receiver were well aware of the Starter Credit marketing beginning in at least

7  August 2007 and allowed it to be marketed before and after the Receivership.[9]

8             **2.    The Starter Credit Marketing Does Not Violate Section 5 of**

9                    **the FTC Act or the Final Order**

10      The FTC alleges that Defendants misrepresented the nature of the Starter

11  Credit line of credit and that the material attributes of the product were not clearly

12  and conspicuously disclosed because it offered a line of credit for a shopping

13  catalog and not a general line of credit.[10]  The Starter Credit marketing violated

14  neither Section 5 of the FTC Act nor the Final Order.[11]

15      The Starter Credit website clearly disclosed that it was offering a line of credit

16  for a shopping club.  The top of the page stated, "Get an Immediate Guaranteed

17  $10,000 Credit Line,[1]" and had a footnote prominently displayed.  Footnote 1

18  specified that the credit line was "[t]o Purchase Brand Name Merchandise

19

---

20  [9] Defendants intend to request the various communications between the FTC and

21  Receiver regarding EDP's marketing material, including the Starter Credit marketing, during discovery if the Court grants the FTC's application.

22  [10] The FTC's argument that Defendants failed to obtain expressed informed Final is

23  merely a recitation of these same arguments.  *See* FTC Memo., p. 19.

    [11] The FTC's recent campaign against online shopping catalogs, such as the one

24  offered by Insite, coincides with a change in key leadership positions at the FTC,

25  including the appointment of Jon Leibowitz to FTC Chairman in March 2009 and the appointment of David Vladeck to Director for the Bureau of Consumer

26  Protection in April 2009.  The new FTC leadership has expressly voiced objections

27  to online shopping catalogs offering a line of credit.  Mallow Decl., ¶ 15.  These appointments help explain why the FTC remained deftly silent about Starter Credit

28  for years despite its knowledge and tacit approval of EDP's marketing.

1  Exclusively From Our Online Mega-Store!...This is a membership program and not

2  a debit or credit card....Century Platinum allows account holder to make

3  merchandise purchases exclusively from its online shopping site." FTC Ex. 7, Att.

4  D, p. 153. Halfway down the page, before the request for bank account information,

5  was a box containing prominent brand names such as Samsung, LG, Sony and iPod

6  stating "Shop Major Brands and Products!" *Id.*, p. 152. Other creatives for Starter

7  Credit post-Final Order, not included with the FTC's application, also contained a

8  banner at the top of the page stating, "Finally a credit line that provides me with the

9  purchasing power towards great products." Desa Decl., ¶ 15, Exs. 8-10.[12]

10       Once a consumer signed up for Century Platinum, they received an electronic

11  notice stating, "Congratulations [name]! You are now a Century Platinum account

12  holder with a $10,000 line of credit to be used exclusively at

13  www.centuryplatinum.com." Murillo Decl., ¶ 3, Exs. 1-3. If a consumer did not

14  intend to join Century Platinum, they had the ability to immediately cancel their

15  order before it was processed. Consumers also received a welcome package by

16  regular mail. *Id.* Consumers had several days to cancel their order and receive a

17  full refund after the fee posted to their accounts. FTC Ex. 7, Att. E.

18       In support of its argument, the FTC makes much of purported evidence that

19  "2,303 consumers" complained to EDP *or Insite* that they had not authorized the

20  charges or believed they had applied for another product. FTC Memo., pp. 13, 20.

21  The "2,303 consumer" figure is misleading for a host of reasons:

22

23

---

24  [12] The FTC asserts these disclosures are inadequate. If the disclosures were so

25  clearly inadequate, why did the FTC and Receiver allow EDP to use these

     inadequate disclosures? The simple conclusion is that the prior FTC team and the

26  Receiver did not believe the disclosures to be inadequate given the totality of the

     marketing, which included a follow up notice ensuring that a consumer intended to

27  purchase the Century Platinum product and providing consumers an immediate

28  opportunity to cancel their order.

1      First, this figure consists of (1) 1,346 consumer complaints from "unique
2  consumer email addresses" sent to Insite, *not EDP* (i.e., 1,346 consumers) and (2)
3  another 957 complaints sent to EDP, from a spreadsheet containing duplicate entries
4  from the same consumer. *See* FTC Ex. 6 at 123 ¶ 7 & Ex. 7 at 130-31 ¶¶ 18-19;
5  Reilly Decl., ¶ 3, Ex. 1.  The 957 number does not represent the number of
6  *consumers*—it represents the number of complaints, many from the same
7  consumer.[13]  The 2,303 "consumer" number is therefore wrought with duplicate
8  consumer names.

9      Second, the 2,303 "consumer" figure is unreliable for yet another,
10  independent reason.  It does not take into account complaints made by the same
11  consumer who may have complained to both EDP and Insite, and therefore would
12  have appeared on the complaint list for EDP as well as the complaint list for Insite.
13  These consumers would have been counted twice and, in some instances, multiple
14  times since the EDP complaint list already contains duplicate complaints from the
15  same consumer.

16      Third, the 1,346 consumer complaints from Insite includes complaints Insite
17  received about Century Platinum *generally*, not just complaints in connection with
18  the startercreditdirect.com website at issue.  *See* FTC Ex. 7, p. 10 ¶ 18 & Ex. Q, p.
19  203 (III.C).  The startercreditdirect.com website was merely one avenue Insite used
20  to market its Century Platinum product.  Cleveland Decl., ¶ 6.

21      Fourth, nearly 60% of the complaints (2,303/1,346) the FTC seeks to use
22  against EDP in this contempt application *were **not** made to or accessible to EDP*;

23

24

_____

25  [13] It is common for the same consumer to make more than one call or
   communication regarding the same or similar complaint.  Murillo Decl., ¶ 5.  FTC's
26  own evidence emphasizes the prevalence of duplicate entries from the same
   consumer.  In one of its spreadsheets, the FTC admits that 945 complaints submitted
27  were duplicates, comprising over 25 percent of the total complaints for that data set.
28  *See* FTC Ex. 7, p. 130, ¶ 18.

1 │ they were made to Insite. Defendants had no knowledge of Insite's complaints since
2 │ they were not directed to EDP. Murillo Decl., ¶¶ 6-7

3 │     The FTC's statistics are completely unreliable and should be disregarded.
4 │ Even if the Court were to accept the FTC's highly inflated 2,303 "consumer" figure,
5 │ the number of complaining "consumers" represented would be only 6.7% of the
6 │ total alleged signups (34,340) for the Century Platinum product marketed through
7 │ all of EDP's websites (not just startercreditdirect.com) during the relevant time
8 │ period. *See* Leon Decl., ¶ 6; Reilly Decl., ¶ 4. More importantly, assuming the 957
9 │ complaints EDP received were from unique consumers and included no duplicates
10 │ entries (which we know is not the case), only 2.8% of the 34,340 signups through
11 │ EDP websites lodged such complaints with EDP.[14] The FTC's statistics do not
12 │ withstand careful scrutiny, nor do they evidence wrongdoing.[15]

13 │     Moreover, the fact that the FTC seeks to use these complaints against
14 │ Defendants now in order to obtain a contempt ruling against them is shocking in
15 │ light of the fact that the FTC refused *in writing* to produce these complaints, and
16 │ thus allow Defendants an opportunity to address them, despite Defendants'
17 │ numerous requests for their production over the course of several months. Reilly

18 │

19 │ [14] The FTC argues that "[a] significant number of consumers" who contacted EDP
    (417) thought they had applied for another product, such as a loan, cash advance, or
20 │ credit card. FTC Memo., p. 9. This figure, however, represents only 1.2% of all
    Century Platinum customers signing up through EDP-sponsored website (assuming
21 │ again that this figure did not include duplicate entries, which it most certainly does).
22 │ *See* Leon Decl., ¶ 6; Reilly Decl, ¶ 3, Ex. 1. Regardless, a certain level of confusion
    or mistake or "margin of error" can be expected with any kind of online purchase,
23 │ especially where the marketing piece offers more than one product.
24 │ [15] The FTC's argument that only .25% (34,340 "consumers" divided by 86 orders)
    of consumers "who joined the Century Platinum shopping catalog through
25 │ StarterCreditDirect.com placed an order from Century Platinum" is based on faulty
26 │ information. Only about 6,000 consumers signed up for Century Platinum through
    the startercreditdirect.com website. Leon Decl., ¶ 6. In any case, Defendants had no
27 │ prior knowledge of the percentage of consumers that were actually consuming
28 │ product since it merely marketed the product. Cleveland Decl., ¶ 6.

1  Decl., ¶¶ 5-10, Exs. 2-6.  Such underhanded behavior on the part of a government
2  agency abhors even the most basic notions of due process and fair play.

3          **3.      Defendants Cannot Be Held in Contempt For Marketing a**
4                    **Third Party Product the FTC Deems "Worthless"**

5          The FTC also alleges that Defendants failed to disclose, clearly and
6  conspicuously, that the line of credit offered by Insite was "no real extension of
7  credit" and was "worthless" because most purchases required a substantial down
8  payment that often exceeded the full price of the product offered through other
9  online retailers.  FTC Memo., pp. 14, 17.  Though the FTC acknowledges several
10  times that Century Platinum was "operated" by Insite, the FTC disregards the fact
11  that the Century Platinum online shopping club was not an EDP-product and that
12  EDP had no access to the statistics the FTC obtained from Insite in response to the
13  FTC's Civil Investigation Demand ("CID") served on Insite.  *See* FTC Memo., pp. 6
14  & 8 n.5 & 6; FTC Ex. 5, ¶ 3.

15          EDP did not own or operate the Century Platinum shopping club or products
16  sold through Century Platinum, did not set catalog prices, down payment amounts or
17  methods, or determine catalog items.  Cleveland Decl., ¶ 6; *see* FTC Ex. 7, Att. F.
18  EDP merely ***marketed*** the product for third party Insite based on the information it
19  received from Insite about the service.  Cleveland Decl., ¶ 6.  EDP did not have
20  possession of the online catalog or have access to customer activity or complaints in
21  connection with the shopping club (i.e., length of membership, membership
22  cancellation/termination, credit offered and used, products purchased, down
23  payments made, etc.).  *Id.*; FTC Ex. 7, Att. R, p. 210.  All customer-related
24  inquiries, complaints, product returns, etc. were directed to Insite.  Cleveland Decl.,
25  ¶ 6.  Further, EDP did not derive any revenue from the catalog purchases and had no
26  reason to track them.  *Id.*

27          The FTC's theory is that Defendants should be held accountable for
28  marketing a third party product that, in the estimation of the FTC, is a "bad deal" for

1  consumers.  The FTC cites absolutely no authority for this proposition.  Neither the

2  Final Order nor Section 5 of the FTC Act requires Defendants, or any other

3  marketer, to retain a professional economist to evaluate a third party product or

4  service, compare that product or service to what is otherwise available in the

5  marketplace and then analyze the specific terms and conditions to determine

6  whether the third-party's goods or services are a "good deal" for consumers before

7  marketing them.  If the FTC takes issues with the "inflated" prices and down

8  payments associated with the Century Platinum membership offered by Insite, that

9  concern is better directed at Insite, not EDP.  Tellingly, the FTC has not pursued any

10  legal action against Insite.[16]

11              **4.**  **The FTC Failed to Produce Any Evidence that Starter Credit**

12                    **Consumers were Charged a $15 Fee**

13        The FTC alleges that Defendants did not clearly and conspicuously disclose a

14  purported one-time $15 initial processing fee.  *See* FTC Ex. 7, Att. F, pp. 157-58.

15  The reason for that failure is simple to explain, ***EDP never charged Starter Credit***

16  ***consumers a $15 fee.***  Cleveland Decl., ¶ 10.  The only one-time fee charged was a

17  $99 application fee that was prominently disclosed on the website.  *Id.*; *see* FTC Ex.

18  7, Att. D, p. 151 ("Application Processing = $99.00"); FTC Ex. 7, Atts. E, F, & I,

19  pp. 155, 158, 171 (listing $99 fee).  To finish the application process, applicants

20  were required to check a box stating, "By checking this box you understand:

21  StarterCreditDirect will electronically debit your checking account for our one-time

22  $99.00 Application and Processing fee[.]" FTC Ex. 7, Att. D, pp. 152-53.

23        Not surprisingly and despite having served a CID on Insite, the FTC failed to

24  produce any evidence that EDP or Insite charged this $15 fee.  In fact, the

25  documentation submitted in support of the FTC's application demonstrates ***just the***

26  ***opposite***.  In one of its CID responses, Insite stated that it "did not receive any

27                          

[16] The FTC served Insite with a CID in order to bolster its contempt application

28  against Defendants.  FTC Ex. 7, Atts. Q & R.

1  revenue derived from the consumer's payment of the initial application fee. All
2  such revenue was collected and retained by EDP." FTC Ex. 7, Att. R, p. 214; *see*
3  *also* p. 213 ("EDP did not pay a lead, or any other fee, to [Insite]."), p. 216 ("[N]o
4  funds were paid to [Insite] by EDP."). The $14 monthly fee was split by EDP and
5  Insite. *Id.*, pps. 213-14 (responses to questions 3 and 8). Perhaps most telling is the
6  evidence the FTC produced regarding consumer complaints. ***Not one single***
7  ***consumer complained of a $15 fee.*** Murillo Decl., ¶¶ 8-9. Moreover, it would not
8  have made sense for both EDP and Insite to have each charged consumers a "one-
9  time" application fee. Cleveland Decl., ¶ 10. Had the FTC simply reviewed the
10 material in its possession, it should have realized that the purported one-time $15 fee
11 was never charged to Starter Credit consumers and that Defendants could not
12 possibly be in contempt of the Final Order for the disclosure of a fee that was never
13 charged to consumers.[17] But such a review would lead to a conclusion that is
14 inconsistent with the FTC's theory of the case, so it is not surprising the FTC did not
15 conduct such an analysis.

16            **C.     The FTC Cannot Establish By Clear And Convincing Evidence**
17                    **That Defendants Violated The Final Order By Marketing the**
18                    **ePlatinum Debit Card**

19         The FTC contends that Defendants made "material misrepresentations"
20 regarding the Debit Cards in violation of Section I.B. of the Final Order by stating
21 that consumers could obtain the Debit Card at no cost. FTC Memo. at 13-14. The
22 FTC further contends that, in violation of Section I.D, Defendants failed to "clearly

23

24 [17] Defendants believe that before Insite began marketing the Century Platinum club
25 membership with EDP, it charged consumers a one-time $15 fee. Cleveland Decl.,
   ¶ 11. When EDP began marketing the product for Insite, the one-time $15 fee paid
26 to Insite was replaced by a one-time fee of $99 paid to EDP. *Id.* The one-time fee
27 of $15 was correctly changed to $99 under the fee schedule in the Century Platinum
   Terms and Conditions, where all fees are listed, but was inadvertently not changed
28 in the Disclaimer paragraph. *Id.*; FTC Ex. 7, Att. F, pps. 157-58.

1  and conspicuously disclose" the costs to obtain the Debit Card in close proximity to

2  statements that the cards can be obtained for free.  FTC Memo. at 18.  First, there

3  was no misrepresentation or failure to clearly and conspicuously disclose because

4  there was, in fact, "no cost" to obtain the Debit Card.  Second, to the extent

5  Netspend may have charged a service fee for use of the card after it was activated

6  and loaded, EDP did disclose this in its marketing with the possible exception of a

7  period from late November 2009 to late January 2010, when an erroneous creative

8  was posted.  Defendants should not be held in contempt.

9       As set forth above, the Debit Card is issued to and obtained by a consumer for

10  no cost.  This distinguishes the Debit Card from other pre-paid debit cards where the

11  consumer pays to receive the physical card, even if the card is not yet capable of

12  use.  This fact should be the end of the analysis because the FTC's contempt claim

13  related to this marketing is based entirely on the incorrect conclusion that the Debit

14  Card is not free.  FTC Memo., p. 14.

15       Moreover, the costs that could be incurred by a consumer in the future *if* they

16  actually activated the card and *if* they actually put funds onto the card, were clearly

17  and conspicuously disclosed in text that appeared immediately below the words "no

18  cost" if the consumer indicated that they wanted the card.  In other words, these

19  disclosures were made in close proximity to the words "no cost," such that a

20  hyperlink was not required to view the costs, nor were the fee disclosures buried "in

21  the middle of a 4,720-word hyperlinked document."  FTC Memo., p. 18.  The FTC's

22  contentions otherwise are based on an anomaly, i.e., on a draft of a Debit Card

23  marketing piece that was never intended to be viewed by the public and was

24  accessible by consumers only if a consumer was specifically looking for the site

25  (like the FTC did) and then only for a very short period of time.

26       Even if some number of consumers viewed the same webpage and marketing

27  piece the FTC submitted to the Court, Defendants would have committed nothing

28  more than a harmless technical violation of the Final Order, because most

1  consumers who received marketing related to the Debit Card received a version with

2  the full fee disclosure, and those who did not receive the full disclosure version, had

3  to take several more proactive steps before they were obligated to pay any fees.

4  Cleveland Decl., ¶¶ 12-13. Thus, Defendants substantially complied with the Final

5  Order. *See In re Dual-Deck*, 10 F.3d at 695-96; *Vertex*, 689 F.2d at 891.

6      **D.    The FTC Is Estopped and/or Barred from Bringing This Action**

7          **Under the Doctrine of Official Misleading**

8          Based on its duplicity, the FTC is estopped and/or barred from bringing a

9  contempt action against EDP based on Starter Credit or the Debt card. Entrapment

10  by estoppel is a due process defense based on the constitutional consequences of

11  "official misleading." *United States v. Tallmadge,* 829 F.2d 767, 773 (9th Cir.

12  1987). The Ninth Circuit has described the defense of entrapment by estoppel as

13  follows: "Entrapment by estoppel applies when an official tells the defendant that

14  certain conduct is legal and the defendant believes the official." *Id.* (citing *In United*

15  *States v. Hsieh Hui Mei Chen,* 754 F.2d 817 (9th Cir.), cert. denied, 471 U.S. 1139,

16  105 S.Ct. 2684, 86 L.Ed.2d 701 (1985).) "None of the cases from the Supreme

17  Court or this circuit that have applied the defense of entrapment by estoppel have

18  required a showing of fraud or intentional deception." *Tallmadge,* 829 F.2d at 775

19  (holding the government agent need not intend to deceive or entrap the defendant).

20          Simply put, "the government may not actively provide assurances that

21  conduct is lawful, then prosecute those who act in reasonable reliance on those

22  assurances." *People v. Chacon,* 40 Cal. 4th 558, 568-69 (2007). The Ninth Circuit

23  has also recognized that statements made by a court support the entrapment by

24  estoppel defense. *Tallmadge,* 829 F.2d at 776. The United States Supreme Court

25  has recognized the defense despite the absence of law enforcement conduct. *Raley*

26  *v. Ohio*, 360 U.S. 423 (1959) (statement made by the Ohio Un-American Activities

27  Commission, i.e. a legislative body); *U.S. v. Pennsylvania Chem. Corp.*, 411 U.S.

28  655 (1973) (statements made by Army Corps of Engineers).

1       In *Raley v. Ohio*, 360 U.S. 423 (1959), the court reversed contempt

2 convictions where Ohio's Un-American Activities Commission apprised appellants

3 that the privilege against self-incrimination existed (or gave the impression it did

4 when it did not), which advice was contrary to Ohio law. The court stated:

> 5    After the Commission, speaking for the State, acted as it did, to sustain
> 6    the Ohio Supreme Court's judgment would be to sanction an
>    indefensible sort of entrapment by the State-convicting a citizen for
> 7    exercising a privilege which the State had clearly told him was
>    available to him.

8 *Raley*, 360 U.S. at 425-26, 79 S.Ct. at 1260. The Ninth Circuit has said that the

9 concept of unintentional entrapment by an official who mistakenly misleads a

10 person into a violation of the law was first applied by the Supreme Court in *Raley*.

11 *Tallmadge,* 829 F.2d at 773.

12       In *United States v. Timmins*, 464 F.2d 385 (9th Cir. 1972), the court

13 overturned a conviction for refusing to submit to military induction where the draft

14 board failed to correct an important misimpression of a conscientious objector, of

15 which it was fully aware, and thereby prevented or discouraged the objector from

16 fully developing his claim. The *Timmins* court found that the defendant need only

17 show that he relied on the false information and that his reliance was reasonable. *Id.*

18 at 387; *see also United States v. Smith*, 940 F.2d 710, 714 (1st Cir. 1991) (finding

19 entrapment by estoppel defense applies "when an official assures a defendant that

20 certain conduct is legal, and the defendant reasonably relies on that advice and

21 continues or initiates the conduct").[18]

22       Here, Defendants reasonably relied on the actions of the FTC and Court-

23 appointed Receiver sanctioning its Starter Credit marketing. The FTC did not object

24 to the Starter Credit marketing after it received all of the relevant documents and

---

25 [18] The FTC's reference to equitable estoppel and the test set forth in *Morgan v.*
26 *Heckler*, 779 F.2d 544 (9th Cir. 1985), FTC Memo., p. 12 n.10, is not only
27 inapposite, but a red herring. The *Morgan* case discussed the doctrine of equitable
estoppel. Defendants, however, are asserting an entrapment by estoppel defense, a
28 wholly distinct doctrine.

1  information regarding this product. To the contrary, the FTC and Court-appointed

2  Receiver allowed EDP to resume marketing Starter Credit during the receivership.

3  EDP marketed Starter Credit throughout the entire receivership, and the Receiver

4  regularly requested and was provided financial information that disclosed revenue

5  derived from Starter Credit, as well as a link directly to the site. Starter Credit

6  marketing did not meaningfully change after the Final Order was signed by the

7  Court. For approximately 22 months following entry of the Final Order, the FTC

8  voiced no concern about Starter Credit notwithstanding its knowledge that EDP

9  continued marketing the site after entry of the Final Order.

10      Numerous email correspondence demonstrates that Defendants worked

11  closely with the FTC and Receiver to make revisions to various EDP marketing

12  material (including the Ultimate Platinum website vetted by FTC staff) both during

13  and after the Receivership.[19] Cleveland Decl., ¶¶ 3, 4, 7, 9; Mallow Decl., ¶ 4, Exs.

14  2-14.[20] Since entry of the Final Order in 2008, Defendants and the FTC have also

15

16  [19] In an email to the FTC, Defense counsel proposed the following statement in
17  response to Defendants' concern regarding what they could publicly state about
    FTC staff's active involvement in reviewing their marketing material—"The
18  marketing for EDebitPay's new card products has been modified to address areas of
    concern communicated to us by the FTC." Mallow Decl., ¶ 11, Ex. 19. Defendants
19  were advised that they "cannot say that the FTC is helping with new card products,
20  or that [the FTC] is reviewing your website or that [the FTC] in any way endorses
    your products." *Id.*
21  [20] Though Defendants believe these communications are appropriate for filing in the
22  public record, Defendants have filed them under seal because they believe the FTC
    may take the position that public disclosure of this material is harmful to the FTC
23  and/or its enforcement efforts. Defendants do not mean to suggest by any means
24  that the advice and guidance provided by FTC staff was improper or unlawful.
    Defendants believe, quite the contrary, that the advice rendered was an appropriate
25  response to Defendants' conscientious efforts to comply with the directives in the
26  Final Order (not to mention very much appreciated). These communications are
    only being produced to support Defendants' defense in the face of an ill-conceived
27  and ill-motivated contempt application that was filed by the FTC's Enforcement
28  Division. *See* Mallow Decl., ¶ 5.

22

1   worked together to resolve consumer complaints specifically arising from the Starter

2   Credit website.  Mallow Decl., ¶ 14, Exs. 20-24.  ***At no time since this action began***

3   ***until approximately September 2009 did the FTC raise issues concerning the***

4   ***Starter Credit marketing or suggest or request changes to its creatives.***[21]  *Id.*  As a

5   result, Defendants had no reason or basis to believe that the Starter Credit

6   advertising posed any issue to the FTC whatsoever and are justifiably shocked by

7   the instant contempt application.  Cleveland Decl., ¶ 9.  Having knowingly allowed

8   EDP to market Starter Credit during the Receivership, if Starter Credit constitutes a

9   violation of the Final Order (which it does not), the FTC had an obligation under

10  law and under notions of fundamental fairness to inform EDP of this fact.[22]  Having

11  failed to do so, the FTC and the Receiver entrapped EDP and its principals and the

12  FTC is thus barred from pursuing a contempt proceeding against EDP for Starter

13  Credit.

14      Defendants' justifiably relied on the FTC and the Receiver, both experts in

15  consumer protection, in reaching the understanding that the Starter Credit creatives

16  were in compliance with the FTC Act and the Final Order.  If the FTC has now

17  concluded otherwise regarding these marketing activities, it, at best, mistakenly

18  mislead Defendants into what they now claim is a contemptuous violation of the

19  Final Order.

20

21  [21] In July 2009, the FTC requested information about Starter Credit, along with

22  various other products and services marketed by EDP.  Mallow Decl., ¶ 13.  The

23  FTC's communication was merely an inquiry, and no more.

23  [22] *See* TRO Order, Section XVI.K (Receiver was to "[d]etermine and implement the

24  manner in which the Receivership Defendants will comply with, and prevent

25  violations of, this Order and all other applicable laws, including but not limited to,
    revising sales materials and implementing monitoring procedures[.]"); Section

26  XVI.N (Receiver was to "[c]ontinue and conduct the business of the Receivership

27  Defendants in such manner, to such extent, and for duration as the Temporary
    Receiver may in good faith deem to be necessary or appropriate to operate the

28  business profitably and lawfully, if at all").

1    The FTC cannot take actions that reasonably lead Defendants to believe that
2    their marketing material is in compliance with the law, "lay in wait" for years and
3    then hit Defendants with a contempt proceeding.  Any objections to the Starter
4    Credit marketing by the FTC have long been waived and the FTC is now estopped
5    and/or barred from bringing the instant contempt action.

6    **V.    IN THE EVENT THE COURT ISSUES AN OSC, IT SHOULD**
7    **PROVIDE SUFFICIENT TIME FOR DISCOVERY**

8    The FTC's application is based on *approximately a year of discovery*, given
9    that the FTC first made a formal request for discovery on July 23, 2009, when it
10    requested information and documents to monitor Defendants' compliance with the
11    Final Order.  However, Defendants have had just over two weeks to address the
12    contentions made in the FTC's application.  As such, prior to any contempt hearing,
13    Defendants will need to take significant discovery to level the playing field.

14    As of this time, Defendants contemplate taking at least eight depositions in
15    advance of the hearing, including the depositions of Raymond McKown (FTC),
16    Barbara Chun (FTC), Elizabeth Tucci (FTC), Howard Camhi (Receiver), Alberto
17    Rivera-Fournier (formerly with the FTC), the Receiver's accountants,
18    representatives of Insite Marketing Group (the third party entity offering Starter
19    Credit), Netspend (the third party entity offering the Debit Card), and
20    representatives of Media Whiz (the company interacting directly with Defendants
21    with respect to the Debit Card marketing).

22    Defendants will also need to serve written discovery on the FTC, including
23    requests for the production of documents and interrogatories and need to build in
24    time for the collection of same and the discovery disputes which inevitably arise
25    whenever the FTC is asked for discovery.  Defendants also will need to subpoena
26    business records from third parties including the Receiver, Insite, Netspend and
27    Media Whiz.  Defendants will be greatly prejudiced if they are not given sufficient
28    time to complete this discovery.

1       Also worth noting is that the proposed Order for Defendants to Show Cause

2 Why They Should Not Be Held in Contempt filed by the FTC (Document 43-5),

3 requires Defendants to identify witnesses and documents Defendants anticipate

4 calling and introducing at a contempt hearing, but the order conveniently fails to

5 require the FTC to do the same.  Without a requirement that the FTC disclose its

6 anticipated witnesses and documents, Defendants will be significantly prejudiced in

7 their preparation for any hearing.  For the foregoing reasons, Defendants request

8 that, in the event the Court determines that a show cause order should issue, such

9 order set the resulting hearing for a date in or after the middle of November 2010

10 and that the order require mutual disclosure.

11 **VI.     CONCLUSION**

12       No show cause order should issue under these circumstances.

13 Dated: June 14, 2010                LOEB & LOEB LLP
14                                 MICHAEL L. MALLOW
                                KAREN R. THORLAND
15                                 CHRISTINE M. REILLY

16                              By: /s/
                             Michael L. Mallow
17                              Attorneys for Defendants EDEBITPAY,
                             LLC, DALE PAUL CLEVELAND and
18                              WILLIAM RICHARD WILSON

19

20

21

22

23

24

25

26

27

28