# EXHIBIT G -- FTC COMPLAINT

WILLIAM BLUMENTHAL
General Counsel

RAYMOND E. MCKOWN, Bar # 150975
BARBARA Y. K. CHUN, Bar # 186907
Federal Trade Commission
10877 Wilshire Blvd., Ste. 700
Los Angeles, CA 90024
(310) 824-4343 (voice)
(310) 824-4380 (fax)
rmckown@ftc.gov
bchun@ftc.gov

ALBERTO RIVERA-FOURNIER
Federal Trade Commission
600 Pennsylvania Ave., N.W., N.J. 3158
Washington, D.C. 20580
(202) 326-2445 (voice)
(202) 326-3629 (fax)
ariverafournier@ftc.gov

Attorneys for Plaintiff FTC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>Plaintiff,<br><br>EDEBITPAY, LLC; EDP REPORTING, LLC; EDP TECHNOLOGIES CORPORATION; SECURE DEPOSIT CARD, INC.; and<br><br>DALE PAUL CLEVELAND and WILLIAM RICHARD WILSON;<br><br>Defendants. | CV.<br><br><br><br><br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission, through its undersigned attorneys, alleges as follows:

1. Plaintiff brings this action under Sections 5(a) and 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a) and 53(b), to secure temporary, preliminary, and permanent injunctive relief, rescission of contracts, restitution, disgorgement of ill-gotten monies, and other equitable relief from Defendants for engaging in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over the Federal Trade Commission's claims pursuant to 15 U.S.C. §§ 45(a) and 53(b), and 28 U.S.C. §§ 1331, 1337(a) and 1345.

3. Venue in the Central District of California is proper under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b) and (c).

## PLAINTIFF

4. Plaintiff, Federal Trade Commission ("FTC") is an independent agency of the United States government created by statute, 15 U.S.C. §§ 41 et seq. The FTC enforces the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC may initiate federal district court proceedings, through its own attorneys, to enjoin violations of the FTC Act and to secure such other equitable relief, including rescission of contracts, restitution, and disgorgement of ill-gotten monies, as may be appropriate in each case. 15 U.S.C. § 53(b).

## DEFENDANTS

5. Defendants EDebitPay, LLC ("EDP"), EDP Reporting, LLC ("EDP Reporting"), EDP Technologies Corporation ("EDP Technologies"), and Secure Deposit Card, Inc. ("SDC"), hereinafter the "Business Entity Defendants," are business entities created under Nevada law, with their principal places of business at 5301 Laurel Canyon Boulevard, Suite 132, Valley Village, California, 91607, and 10 Universal City Plaza, 20th Floor, Universal City, California, 91608. All the Business Entity Defendants transact or have transacted business in this district.

6. Defendant Dale Paul Cleveland is a member, manager, president, and the

1 majority owner of EDP; a managing member of EDP Reporting; a director and the president of EDP Technologies; and the president and treasurer of SDC. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the Business Entity Defendants alleged in this Complaint. Cleveland resides in and transacts or has transacted business in this district.

7. Defendant William Richard Wilson is the managing member of EDP; a managing member of EDP Reporting; the secretary and treasurer of EDP Technologies; and a director and the secretary of SDC. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the Business Entity Defendants alleged in this Complaint. Wilson resides in and transacts or has transacted business in this district.

## COMMON ENTERPRISE

8. EDP, EDP Reporting, EDP Technologies, and SDC have operated together as a common enterprise while engaging in the unfair and deceptive acts and practices alleged below. These Defendants have conducted the business practices described below through an interrelated network of companies with common ownership, officers, managers, employees, locations, and business functions. Individual Defendants Cleveland and Wilson have formulated, directed, and/or controlled, or had authority to control, or participated in the acts and practices of the Business Entity Defendants that comprise the common enterprise. Because the Business Entity Defendants have acted as a common enterprise, each of them is jointly and severally liable for the unfair and deceptive acts and practices alleged below. The common enterprise transacts or has transacted business in this district and a substantial part of the events or omissions giving rise to the claims asserted herein have occurred in this district.

\\
\\

## COMMERCE

9. At all times material to this Complaint, Defendants' course of business, including the acts and practices alleged herein, have been and are in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

### Introduction

10. Since early 2002, Defendants' core business operation has been online marketing of MasterCard- and Visa-branded reloadable prepaid cards and other financial services products, such as short-term loans, to consumers in the subprime market. Consumers may apply for prepaid cards marketed by Defendants by completing an online application.

11. Defendants charge a $159.95 one-time application and processing fee for their prepaid cards, which is inadequately disclosed in individual prepaid card websites and not disclosed at all in other online advertisements. Defendants debit, or cause to be debited, the $159.95 fee from consumers' bank accounts using the Automated Clearing House Network (ACH) and through remotely created checks (RCCs), also known as demand drafts.

12. Defendants have injured numerous consumers nationwide by debiting the $159.95 fee, and other fees such as $29.95 for a related offer, from consumers' bank accounts without their express informed consent. In particular, Defendants have debited the $159.95 fee from the bank accounts of consumers who have not applied for or requested Defendants' prepaid cards. Defendants have also injured consumers by failing to disclose, or to disclose clearly and prominently, that consumers who submit an application will have the $159.95 fee debited from their bank accounts. In addition, many consumers incurred bank penalties or overdraft fees for insufficient funds caused by Defendants' $159.95 debits.

### Defendants' Business Operation

13. Since at least April 2002, Defendants EDP, Cleveland, and Wilson began marketing Visa- or MasterCard- branded prepaid cards under a variety of names. In

4

July 2003, Defendant SDC began marketing Visa-branded prepaid cards to consumers under a variety of names. Both EDP and SDC have agreements with various banks who issue the Visa- or MasterCard-branded prepaid cards.

14. In November 2004, Defendant EDP Reporting began assisting EDP and SDC by providing customer service functions and making representations to consumers who complained of unauthorized withdrawals to convince consumers to halt efforts to obtain money refunds.

15. In June 2005, Defendant EDP Technologies began acting as the parent company for EDP, SDC, and EDP Reporting by supervising and coordinating the marketing efforts for the prepaid cards and other financial services products such as short-term loans.

16. Collectively, Defendants currently market at least 22 prepaid cards, including but not limited to the Acclaim Visa, Impact Visa, Sterling Visa, VIP Advantage Visa, Vue Visa, Elite Plus MasterCard, Impact MasterCard, Secure Deposit MasterCard, VIP MasterCard, and Vue MasterCard. Each card has its own individual website, examples of which are found at: https://superacclaim.com; https://builderimpact.com; www.sterlingcardnow.com; www.vipadvantagecard.com; https://eliteplusapp.com; https://execpluscard.com; https://sdcapp.com; https://vipcardnow.com; and https://instantvuecard.com.

17. Each individual website includes an application that can be submitted to obtain the particular prepaid card. Defendants charge $159.95 for their prepaid cards, which covers a $59.95 "application" fee, a $90 "processing" fee, and a "bonus rebate" of $10 (which is purportedly loaded to the prepaid card if consumers activate it within 30 days of receipt.) As part of the online application process, Defendants require that consumers provide personally identifiable information, including but not limited to name, address, and personal financial information such as bank account information. Defendants use this information to debit the fee from consumers' bank accounts by ACH or by RCCs. Defendant EDP has contracted with various payment processors to electronically debit consumers' bank accounts using the ACH network, and either

5

prints RCCs on its own or contracts with vendors to create RCCs.

18. Defendants have marketed their prepaid cards through Internet website, Internet pop-up, and email advertisements, each of which directs consumers to the cards' individual websites.

19. Defendants also market short-term loans online. The short-term loan offers and applications are found at Internet sites such as www.SuperAutoSource.com and www.SuperCashSource.com. These short-term loan sites require consumers to provide their bank account information, address, date of birth, employment information including income, social security number, and driver's license number to facilitate the consumer's request for the loan.

20. In numerous instances, Defendants have debited, or caused to be debited, a $159.95 fee from the bank accounts of consumers who have had no contact or transaction with Defendants.

21. In numerous instances, Defendants have debited, or caused to be debited, a $159.95 fee from the bank accounts of consumers who visited short-term loan websites and filled out online applications unrelated to Defendants' prepaid card offers. The sites do not indicate that the consumer is applying for a prepaid card and do not disclose the $159.95 prepaid card fee.

22. In numerous instances, Defendants have debited, or caused to be debited, a $159.95 fee from the bank accounts of consumers who partially completed but did not submit an online application for one of Defendants' prepaid cards.

23. In each of these instances, Defendants have debited, or caused to be debited, the $159.95 fee from consumers' bank accounts without obtaining the consumers' express informed consent. Consumers usually discover Defendants' unauthorized debits when they review their bank account statements, or when banks notify consumers of bank penalty fees or overdraft charges due to insufficient funds.

24. Defendants' email advertisements do not mention or disclose the $159.95 fee to obtain the card. In addition, many independent cafeteria-style websites (websites that promote different brands of credit or debit cards) also fail to disclose the

1 (websites that promote different brands of credit or debit cards) also fail to disclose the $159.95 fee.

25. Defendants' email and online advertisements lead consumers to Defendants' individual prepaid card websites that fail to clearly and prominently disclose the $159.95 fee. Although the look of the prepaid card websites differ, the representations on each of the cards' individual websites are similar or identical. The individual card websites typically consist of two application webpages and links to other webpages. The websites' first webpages have a typical heading banner featuring a large picture of a MasterCard- or Visa-branded card.

26. None of the websites' first webpages discloses the $159.95 fee for the card.

27. The heading of the first webpage typically includes a Frequently Asked Questions ("FAQ") link. Although the FAQ discloses there are card usage fees and provides a link to the Terms and Conditions where these fees are disclosed, the FAQ does not disclose the $159.95 fee.

28. The websites' application webpages represent that consumers must provide personally identifiable information to apply for and obtain the card. The first webpage of the MasterCard or Visa prepaid card application requires, at a minimum, the applicant's name, address, phone number, and email address. After supplying the required information consumers advance to the second webpage of the application by clicking on a "Next" or "Continue" or "Receive Your Card" button.

29. The application's second webpage requires that consumers provide more sensitive personal information, including consumers' date of birth, social security number, and banking information. Some websites ask for additional information such as the maiden name of the consumer's mother. In many cases, the application's second webpage includes the same or similar heading banner as found on the first webpage. The banking information required, at a minimum, includes an account number, account type, and routing number, i.e., information sufficient to debit a consumer's bank account.

30. On most websites, after the information fields where consumers input their

7

bank account information, there are three check-off statements. The first check-off statement is automatically defaulted to "Yes," is not prominently distinguished or signaled, is in similar font size as the fee disclosure, and is followed by this language: "I am at least 18 years and a U.S. citizen or permanent resident of the U.S. (excluding Wisconsin), and I authorize you to debit my bank account for my one-time purchase cost." The section does not disclose the amount of the fee that will be debited.

31. There are two places on the individual websites where Defendants disclose the $159.95 fee, although the disclosures are not clearly and prominently displayed. The first is in an inconspicuous paragraph, usually on the middle of the second webpage of the application. In some instances the disclosure is cryptic. For example, "VIPCARD will appear on your account, $159.95 includes your new card and all handling or shipping fees or costs." In other instances the disclosure remains inconspicuous, but the language is more straight forward. In some instances the fee amount is in bold and in other instances it is not.

32. On a substantial number of websites, the inconspicuous paragraph is preceded by intervening offers for a product such as a cell phone or for a cash rebate, that are in large font size and usually highlighted by prominent pronouncements such as: "You Are Almost Finished: 2 Simple Questions: Would you like a FREE Audiovox 8912 Cellular Phone with color display from Sprint?" or "BONUS REBATE! We will deposit a $10 value to your card if you activate it within 30 days after you receive it." In addition, the inconspicuous paragraph is not highlighted or distinguished by any prominent representation concerning the fee. In some cases the fee disclosure paragraph appears after the "Click Here" button that submits the application and takes consumers to a different webpage.

33. The only other location on Defendants' websites where the $159.95 fee is disclosed is on an "Application and Processing" webpage that is inaccessible to consumers except indirectly through nondescript, small print "Terms and Conditions" ("T&C") links, which are found on the websites' first and second webpage. However, the T&C links do not take consumers directly to the "Application and Processing"

8

webpage where the fee is disclosed. Instead, clicking on a T&C link takes consumers to an intermediate webpage that displays icons for two to four different website sections, e.g., (1) "Prepaid Visa [or MasterCard] Debit Card" or "Cardholder Agreement"; (2) "The Executive Benefits Package"; (3) "Privacy Policy"; and (4) "Application and Processing."

34. None of the icon descriptions alerts or informs consumers that fee information can be found on these links, or that only the "Application and Processing" link contains information about the $159.95 fee. Indeed, none of the other sections, including the multi-page "Cardholder Agreement" (aka "Prepaid Visa [or MasterCard] Debit Card") or "Executive Benefits Package" sections disclose the $159.95 fee. Thus, Defendants' website format effectively conceals the $159.95 fee from consumers.

35. At the end of the second webpage, consumers must click a "Submit" button to finish the card application process. If consumers do not provide the required personally identifiable information, including social security number, date of birth, and banking information, and try to submit the application, a pop-up window alerts consumers that they need to provide the required information to apply for and obtain the card. A verification and confirmation page follows the end of the application process but it does not disclose the fee charged.

36. In numerous instances, consumers provided the required personally identifiable information and applied for the cards because Defendants represent the information is required to apply for and obtain the card. This representation creates an impression on consumers that the personally identifiable information will only be used for application and approval purposes. Defendants' fail to clearly and conspicuously disclose, however, that they will use the information to debit a $159.95 fee. Accordingly, Defendants debit, or cause to be debited, the $159.95 fee from consumers' banks accounts without obtaining the consumers' express informed consent.

37. Defendants' email and online advertisements and individual card websites

9

also make representations about the cards that give the impression to consumers that they can apply for and obtain the card without cost.

38. For example, one email for Defendants' Acclaim Visa Card encourages consumers to apply with large, bold pronouncements of "Claim Your Card Today!" or "Guaranteed Approval!!" accompanied by other representations such as "No Annual Fees" and "No Credit Checks." Similarly, Defendants' cafeteria-style ads usually include representations encouraging consumers to apply including, among others, "Guaranteed Approval," "No Credit Checks," and "No Security Deposit."

39. The individual card websites' first pages feature a heading banner with prominent representations, such as the following:

"Approval Guaranteed, Executive Plus Prepaid MasterCard Card. No Credit Checks. No Annual Fees. No Security Deposit. No Employment Required." [Executive Plus MasterCard at https:execpluscard.com].

"All Approved. VIP Prepaid MasterCard Card. Get the Power of a MasterCard Today. No Credit Checks. No Turndowns. No Annual Fees. No Security Deposit. No Employment Required. Get Pre-approved in the next 3 minutes." [VIP MasterCard at https://vipcardnow.com/index.asp].

"Approved $10,000. Get the Power of Plastic. Everyone is Now 100% Approved! No Credit Checks. No Turndowns. No Security Deposit. No Employment Required. Bad Credit? Bankruptcy? Apply Now!" [Sterling VIP Visa at www.sterlingcardnow.com/index.asp].

"No Credit. No Credit Checks. No Turndowns. No Annual Fees. No Security Deposit. No Employment Required. No Credit? Bad Credit? Bankruptcy? No Problem! Apply Now!" [VIP Advantage Visa at www.vipadvantagecard.com].

40. Defendants' prominent representations concerning the costs that consumers will not have to pay up front for the card, including but not limited to "No Annual Fees" or "No Security Deposit," gives an impression to consumers that they can apply for and obtain the card without cost. Defendants fail to clearly and conspicuously disclose, however, that a $159.95 fee will be debited from consumers' bank accounts to apply for and obtain the card. Accordingly, Defendants debit, or cause to be debited, the $159.95 fee from consumers' banks accounts without obtaining the consumers' express informed consent.

41. When consumers ask for a refund of the $159.95 debits, Defendants misrepresent the consumers' obligation to pay the fee and ratify the withdrawal. Defendants insist, by email, telephone, or otherwise, that consumers must pay the $159.95 fee even if consumers assert they did not submit an application for one of Defendants' prepaid cards, and even if consumers assert they did not give their express informed consent.

42. Consumers who try to reach Defendant EDP Reporting by telephone to contest the debits face significant difficulty in reaching a customer service representative ("CSR"). Consumers are routinely placed on hold and are not connected to a CSR within any reasonable time period. Consumers also try to reach Defendant EDP Reporting by email.

43. Consumers who are able to reach Defendant EDP Reporting via telephone or email to request a refund for the $159.95 unauthorized debits because they did not apply for the prepaid cards are routinely denied refunds by CSRs who represent that consumers authorized the withdrawals by submitting an Internet application for one of

11

Defendants' prepaid debit cards, and assert that EDP Reporting has proof of authorization.

44. CSRs also deny refund requests to consumers who applied for the prepaid card believing it was free by asserting there are clear and adequate website disclosures regarding the $159.95 fee and that it was the consumer's fault for not seeing them.

45. EDP Reporting advises consumers who persistently complain that they would only consider a refund due to an unauthorized debit if the consumer completes a fraud package sent by EDP Reporting. As part of the fraud package, consumers must file a report with the police and the police must find fraud was involved. In such instances, EDP Reporting will allegedly issue a refund check but only <u>to the police</u>. Consumers rarely file such a report with the police. Based on these representations, some consumers simply abandon their efforts to obtain a refund from the company.

46. At that stage other consumers file complaints with the Better Business Bureau ("BBB"). EDP Reporting representatives routinely make the same assertions to the BBB and deny the refund requests. If this approach is not successful in deterring additional refund requests, EDP Reporting representatives state that they are willing to issue a "courtesy refund," <u>i.e.</u>, one that will not cover any bank penalty fee, but only if consumers forward bank statements that document Defendants' withdrawals. Of those who complained to the BBB, only those consumers who overcome their reluctance to turn over additional personal information to Defendants and submit the bank account records obtain partial or full refunds from Defendants.

47. Defendants' representations and conditions to those who directly or indirectly complain about the debits stave off providing many refunds, allowing defendants to retain much of their ill-gotten gains.

## THE FEDERAL TRADE COMMISSION ACT

48. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), provides that "unfair or deceptive acts or practices in or affecting commerce, are hereby unlawful." Misrepresentations or omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. Moreover, under Section 5(n) of the FTC

12

 

Act, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not outweighed by countervailing benefits to consumers or to competition and that consumers could not reasonably have avoided. 15 U.S.C. § 45(n).

## VIOLATIONS OF THE FTC ACT

### COUNT I - Unauthorized Bank Account Debiting

49. In numerous instances since April 2002, in connection with the marketing of prepaid cards and short-term loans, Defendants have debited, or caused to be debited, consumers' bank accounts without obtaining the consumers' express informed consent.

50. Defendants' practice of debiting, or causing to be debited, consumers' bank accounts without obtaining the consumers' express informed consent causes or is likely to cause substantial injury to consumers that is not outweighed by countervailing benefits to consumers or competition and that is not reasonably avoidable by the consumers.

51. Therefore, Defendants' practice as alleged in Paragraph 49 is unfair and in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT II - Failure to Disclose, or to Adequately Disclose, Material Facts

52. In numerous instances since April 2002, in connection with the marketing of prepaid cards, Defendants have represented to consumers in their online card applications, expressly or by implication, that consumers must provide personally identifiable information, including but not limited to name, address, date of birth, social security number, and personal banking information to apply for and obtain a card.

53. Defendants have failed to disclose clearly and conspicuously that Defendants will use the personally identifiable information to debit a $159.95 fee from the consumer's bank account for application and processing. This fact would be material to consumers in their decision whether to apply for and obtain Defendants' prepaid cards.

13

 

54. In light of the representation in Paragraph 52, Defendants' failure to disclose, or to disclose clearly and conspicuously, the material information set forth in Paragraph 53 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT III - Failure to Disclose, or to Adequately Disclose, Material Facts

55. In numerous instances since April 2002, in connection with the marketing of prepaid cards, Defendants have made various representations, including but not limited to "No Annual Fees" and "No Security Deposit," in their email, online advertisements, and individual card websites to encourage consumers to apply for and obtain Defendants' prepaid cards.

56. Defendants have failed to disclose, or to disclose clearly and conspicuously, in their email, online advertisements, and individual card websites that upon applying for Defendants' prepaid cards, Defendants will debit, or cause to be debited, a $159.95 fee from the consumer's bank account for application and processing.

57. In light of the representations set forth in Paragraph 55, Defendants' failure to disclose, or to disclose clearly and conspicuously, the material information set forth in Paragraph 56 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT IV - Misrepresentation of Material Facts

58. In numerous instances since April 2002, in connection with the debiting of consumers' bank accounts, Defendants have represented, expressly or by implication, that consumers are obligated to pay Defendants' $159.95 prepaid card fee.

59. In truth and in fact, in numerous instances, consumers were not obligated to pay Defendants' $159.95 prepaid card fee because:

(a) consumers did not complete or submit an application for a prepaid card and therefore did not give their express informed consent to pay a fee to acquire a prepaid card; or

(b) consumers who did complete and submit an application for a prepaid card




did not give their express informed consent to pay a fee to acquire a prepaid card due to Defendants' failure to clearly and conspicuously disclose the fee.

60. Therefore, the representation set forth in Paragraph 58 is false and deceptive and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

61. Numerous consumers throughout the United States have suffered and continue to suffer substantial monetary loss as a result of Defendants' unlawful acts or practices. In addition, Defendants have been unjustly enriched as a result of their unlawful practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

62. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief, including rescission of contracts, restitution, and the disgorgement of ill-gotten monies, to prevent and remedy violations of any provision of law enforced by the Commission.

## PRAYER FOR INJUNCTIVE AND MONETARY RELIEF

WHEREFORE, Plaintiff Federal Trade Commission, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

1. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access to business premises, expedited discovery of assets and documents, and the appointment of a receiver;

2. Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

3. Award such relief as the Court finds necessary to redress injury to

consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

    4. Award Plaintiff the costs of bringing this action, as well as such other additional relief as the Court may determine to be just and proper.

Dated: July 17, 2007

Respectfully submitted,

Raymond E. McKown
Alberto Rivera-Fournier
Barbara Y. K. Chun
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

16