**EXHIBIT I -- FTC REPLY BRIEF**

1   WILLARD K. TOM
    General Counsel
2
    MARK MORELLI
3   mmorelli@ftc.gov, (202) 326-2601 (tel.)
    ELIZABETH TUCCI
4   etucci@ftc.gov, (202) 326-2402 (tel.)
    ZACHARY V. HUNTER
5   zhunter@ftc.gov, (202) 326-3235 (tel.)
    Federal Trade Commission
6   600 Pennsylvania Avenue, NW, Rm. M-8102B
    Washington, DC 20580
7   (202) 326-2558 (fax)

8   JOHN D. JACOBS, Bar No. 134154
    jjacobs@ftc.gov, (310) 824-4343 (tel.)
9   Federal Trade Commission
    10877 Wilshire Boulevard, Suite 700
10  Los Angeles, CA 90024
    (310) 824-4380 (fax)
11
    ATTORNEYS FOR PLAINTIFF
12  FEDERAL TRADE COMMISSION

13              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
14

15  **FEDERAL TRADE**              CV-07-4880 ODW (AJWx)
    **COMMISSION,**
16                                 **FEDERAL TRADE**
                      Plaintiff,   **COMMISSION'S REPLY**
17                                 **MEMORANDUM IN SUPPORT OF**
              v.                   **ITS APPLICATION FOR AN**
18                                 **ORDER TO SHOW CAUSE WHY**
    **EDEBITPAY, LLC, et al.,**    **DEFENDANTS SHOULD NOT BE**
19                                 **HELD IN CONTEMPT**
                      Defendants.
20                                 Hearing Date:  July 12, 2010
                                   Time:  1:30 pm
21                                 Courtroom 11
                                   Judge:  Hon. Otis D. Wright II
22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   Defendants Are in Contempt for Their Marketing of Starter Credit. . . . . . 1

    A.   Defendants' Marketing of Starter Credit Violated the Order. . . . . . 1

    B.   Defendants Cannot Evade Responsibility for Violating the Order by
Claiming that the Receiver and the FTC Approved Their Marketing of
Starter Credit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.   The FTC and the Receiver Did Not Approve the Starter Credit
Marketing Challenged in this Action. . . . . . . . . . . . . . . . . . 4

        2.   The Receiver's Allowing Defendants to Resume Operations
Provides No Legal Basis for Insulating Defendants from Their
Order Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.   Defendants Cannot Evade Responsibility for Deceptively Marketing a
Shopping Club Operated by a Third Party. . . . . . . . . . . . . . . . . . . 10

II.  Defendants Are in Contempt for Their Marketing of the "No Cost" Prepaid
Debit Card. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

TABLE OF AUTHORITIES

CASES

*In re Dual-Deck Video Cassette Recorder Anti-trust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Morgan v. Heckler*, 467 U.S. 51, 60 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Raz Imports, Inc. v. Target Stores, et al.*, No. CV-96-8658 WJR MCX, 1997 WL 889072 (C.D. Cal. Dec. 17, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Lansing*, 424 F.2d 225, 227 (9th Cir. 1970) . . . . . . . . . . . . . . 9

*United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109 (9th Cir. 2000) . . . . . . . 9

*United States v. Tallmadge*, 829 F.2d 767, 773 (9th Cir. 1987) . . . . . . . . . . . . . 8

*Watkins v. United States Army*, 875 F.2d 699, 706-07 (9th Cir. 1989) . . . . . . . 7, 8

OTHER AUTHORITY

21 Am. Jur.2d Criminal Law § 204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ii

1  **I.      Defendants Are in Contempt for Their Marketing of Starter Credit.[1]**

2          Not surprisingly, Defendants devote little of their Opposition to arguing that

3  their marketing of Starter Credit did not violate the Order.  Instead, they argue that

4  the actions of other parties should immunize them from responsibility for their

5  deceptive marketing.  First, Defendants argue that the Receiver and the FTC

6  purportedly authorized them to resume marketing Starter Credit, thereby insulating

7  them from contempt.  Second, they claim that they should not be held responsible

8  for misrepresentations and inadequate disclosures on their own website because

9  they did not actually operate the shopping club that they were selling.  These

10  attempts to avoid responsibility are completely without merit.

11          **A.      Defendants' Marketing of Starter Credit Violated the Order.**

12          In its Memorandum in Support of Its Application for an Order to Show

13  Cause Why Defendants Should Not Be Held in Contempt ("FTC Memo"), the FTC

14  established by clear and convincing evidence that Defendants' marketing of Starter

15  Credit violated this Court's Order.[2]  Specifically, Defendants:  (1) misrepresented

16  that they were offering a general line of credit when, in fact, they were merely

17  offering "credit" that could be used only in an online shopping club (*see* FTC

18  Memo at 4-8, 13-14); (2) failed to clearly and conspicuously disclose material

19  terms and conditions about their "credit" offer (*see id*. at 4-8, 15-17); and (3) failed

20  to obtain consumers' express authorization before charging them for the shopping

21  club membership (*see id*. at 4-8, 19-20).  More than 900 consumers complained to

22

23          [1]Although, pursuant to L.R. 7-4, the FTC has noticed this motion for July 12, 2010, it is
   not necessary to hold a hearing before issuing an order to show cause. *See Raz Imports, Inc. v.*

24  *Target Stores, et al.*, No. CV-96-8658 WJR MCX, 1997 WL 889072 (C.D. Cal. Dec. 17, 1997)
   ("[N]o hearing is required to issue an OSC.  Rather, the Court simply issues an OSC, when

25  appropriate, setting a hearing date for argument on the subject matter of the Order issued.").

26          [2]Defendants do not contest that they are bound by the Order and that the provisions of the

27  Order are specific and definite.

28                                          1

1   Defendants that they did not know why they had been charged, did not authorize

2   the charges, or believed they had applied for another product.[3]  More than 99.75

3   percent of consumers who paid a fee – ostensibly for the right to order products

4   from the online shopping club – never actually ordered any products.[4]  Moreover,

5   because of the shopping club's exorbitant down payments and inflated prices, even

6   the limited shopping club "credit" was illusory. (*See id*. at 6-7.)  Thus, Defendants

7   also violated the Order by misrepresenting that they were offering credit at all and

8   by burying key disclosures, such as the down payment requirements. (*See id*. at

9   14, 17.)[5]  Starter Credit was simply a scam to extract fees from unwitting

10

11      [3]Defendants argue that such complaints should be "disregarded" because the same

12   consumer may have complained to both EDP and Insite or complained more than once.
     (Defendants' Opposition to the Federal Trade Commission's Application for an Order to Show

13   Cause Why Defendants Should Not Be Held in Contempt ("Opp'n") at 13-14.)  Defendants'
     concerns about double-counting are wildly overstated. After eliminating double-counting, the

14   total number of consumers who complained to Defendants that they did not know why they had
     been charged, did not authorize the charges, or believed they had applied for another product

15   falls only from 957 to 923, and the total number of consumers who made such complaints to
     either Defendants or Insite is 2,261 rather than 2,303. (FTC Ex. 9 ¶¶ 5, 7 at 287.)  Defendants

16   also claim that the number of complaints to Insite was exaggerated because it included
     complaints about the shopping club from all customers, not just those who enrolled through

17   Starter Credit.  However, eliminating the non-Starter Credit consumers reduces the number of
     complaints by only 3. (FTC Ex. 10 ¶ 7 at 291.)  Defendants also object that the FTC did not

18   provide them with copies of consumer complaints to Insite. (Opp'n at 14-15.)  The FTC,
     however, introduced these complaints to show that consumers did not know what they ordered or

19   why they were being charged, not as evidence that Defendants did not respond to consumer

20   complaints.

21

22      [4]Defendants claim that only about 6,000 consumers signed up for the shopping catalog
     through Starter Credit, not 34,000, so the percentage of Starter Credit customers who placed

23   orders is higher. (Opp'n at 15 n.15.)  Insite claims that all 34,000 customers signed up through
     Starter Credit (FTC Ex. 10, Att. A at 293-94), so this is a factual dispute that requires additional

24   discovery. Even if only 6,000 customers signed up through Starter Credit, more than 98 percent
     of those consumers never ordered products.

25

26      [5]The FTC also alleged that Defendants violated the Order by failing to clearly and
     conspicuously disclose a $15 processing fee. (FTC Memo at 17-18.)  The disclosure of this fee

27   was buried in "Terms and Conditions" accessible via hyperlink. (*See id*.)  Defendants, however,

28                                                      2

1    consumers.

2         Defendants muster only weak and cursory arguments that their Starter Credit

3    marketing actually complied with the Order.  They claim that the "Starter Credit

4    website clearly disclosed that it was offering a line of credit for a shopping club."

5    (Opp'n at 12.)  However, Defendants then acknowledge that this purportedly clear

6    disclosure was **in a footnote**.  (*Id.*)  Moreover, this footnote was buried at the

7    bottom of the webpage below the copyright notice and sandwiched in a large block

8    of text with the heading "Online Security," between information about the IP

9    address and the USA PATRIOT Act.  (*See* FTC Ex. 7, Att. D at 153.)  Defendants

10   do not even attempt to argue that this buried disclosure complies with the Order's

11   requirement that they disclose such material information "clearly and

12   conspicuously."  (FTC Ex. 3 at 49.)  To be clear and conspicuous, the Order

13   requires disclosures be "unavoidable" and of a "type size and location sufficiently

14   noticeable for an ordinary consumer to read and comprehend."  (*Id.* at 46-47.)  This

15   buried footnote obviously falls far short of this standard.

16        Defendants also cite two other statements on their website that they contend

17   put consumers on notice that they were offering membership in a shopping club.

18   The first was "a box containing prominent name brands such as Samsung, LG,

19   Sony and iPod stating 'Shop Major Brands and Products.'" (Opp'n at 13.)  The

20   second was a partially obscured banner stating "Finally a credit line that provides

21   me with the purchasing power towards great products."  (*Id.*)  Neither of these

22   statements actually informed consumers that they would be signing up for a

23   shopping club.

24        Finally, Defendants' notices to consumers do not demonstrate compliance

25

26   assert that the $15 fee was never charged to consumers.  (Opp'n at 17-18.)  If the FTC confirms

27   that the fee was not in fact charged, then the FTC will of course not pursue this allegation.

28                                    3

1  with the Order.  Defendants claim that after consumers were enrolled in the

2  shopping club, they were sent an electronic notice and a "welcome package" by

3  regular mail.  (Opp'n at 13.)  These post-purchase notices are insufficient because

4  Section I.E. of the Order requires that the disclosures must be made "prior to the

5  time when a consumer applies for or purchases any good or service."  (FTC Ex. 3

6  at 49.)  In any event, the 923 consumer complaints Defendants received show that

7  these notices did not adequately inform consumers about what they had ordered.

8  **B.     Defendants Cannot Evade Responsibility for Violating the Order**

9  **by Claiming that the Receiver and the FTC Approved Their**

10  **Marketing of Starter Credit.**

11  Unable to demonstrate that they actually complied with the Order,

12  Defendants instead argue that they should not be held in contempt because the

13  Receiver and the FTC purportedly approved their marketing of Starter Credit.

14  Defendants' argument distorts the relevant facts and has no legal basis.

15  **1.     The FTC and the Receiver Did Not Approve the Starter**

16  **Credit Marketing Challenged in this Action.**

17  Defendants'argument relies on two crucial assertions:  (1) the Starter Credit

18  marketing did not change after the Court entered the Order; and (2) the FTC and

19  the Receiver specifically approved the Starter Credit marketing.  Neither of these

20  assertions is true.

21  First, Defendants assert that the Starter Credit marketing purportedly

22  approved by the Receiver did not "meaningfully change after the Final Order was

23  signed by the Court" in January 2008.  (Opp'n at 22.)  In fact, Defendants modified

24  the Starter Credit marketing in October 2008 to bury the already limited and

25  inadequate disclosures.  The Starter Credit website included these inadequate

26  disclosures in August 2007 after the Court issued the TRO and the Receiver was in

27

28                                              4

1   place.  It contained a box with text advising consumers that they could get an

2   "Immediate Guaranteed $10,000 Credit Line.*"  (FTC Ex. 11, Att. C at 305.)  Just

3   below the box was the statement "* To Purchase Brand Name Merchandise

4   Exclusively From Our Online Mega-Store."  (*Id.*)  In addition, immediately below

5   was text explaining that "This is a membership program and not a debit or credit

6   card. . . .  Century Platinum allows account holder to make merchandise purchases

7   exclusively from its on-line shopping site.  Most purchases from online shopping

8   site will require a small downpayment."  (*Id.*)  The Court entered the Order in

9   January 2008, and the Receivership ended in February 2008.  In October 2008,

10  however, Defendants revised the Starter Credit website to further obscure these

11  disclosures.[6]  Specifically, as described above, Defendants buried these disclosures

12  in a footnote at the bottom of the landing page, sandwiched in the middle of

13  unrelated text.  Thus, even if the Receiver and the FTC could somehow be

14  interpreted as approving the Starter Credit marketing immediately after the Order

15  was entered, they never approved the marketing from October 2008 forward.

16       Second, the FTC and the Receiver never specifically approved any of the

17  Starter Credit marketing.  Defendants presented no evidence that the Receiver or

18  the FTC ever specifically reviewed and approved any of the Starter Credit

19  materials.  The FTC's original case had nothing to do with sites such as Starter

20  Credit that purportedly offered credit lines but actually sold memberships in online

21  shopping clubs.  Rather, as Defendants themselves concede, "[f]ees associated with

22  obtaining EDP's stored value debit card were the focus of the initial case against

23  EDP."  (Opp'n at 8 n.6.)  This understandably guided the focus of the Receiver,

24  and Defendants offer no evidence that they ever explicitly brought the Starter

25

26       ──────────────────────

27       [6]Defendants' modifying the website to bury the disclosures belies their claims that they
    "have been very conscientious about their obligations under the Final Order."  (Opp'n at 6.)

28                                        5

1   Credit marketing to the Receiver's attention.  Rather, at most they show that the

2   Receiver obtained an eight-page, single-spaced inventory of EDP office items,

3   which included, among its detailed listing of the contents of some 26 boxes, a

4   binder concerning Starter Credit.  (Leon Decl. ¶ 4, Ex. 20.)  Defendants point to

5   copies of financial reports provided to the Receiver, which show that Starter Credit

6   was generating revenue, but these documents do not show that the Receiver ever

7   reviewed and approved the specific Starter Credit website.  (*Id.* ¶ 3, Ex. 1-13.)

8   Similarly unconvincing is Defendants' reliance on an email chain sent to the

9   Receiver that contained links to the Starter Credit website.  (*Id.* ¶ 5, Ex. 21.)  The

10  email chain was forwarded to the Receiver with a specific question about payment

11  requests that did not refer back to the prior emails containing links to the Starter

12  Credit website.  Given the focus of the original case and the volume of materials,

13  Defendants' "evidence" proves that there was nothing to draw the Receiver's

14  attention to Starter Credit, much less that the Receiver specifically reviewed and

15  approved the website.[7]

16              2.      **The Receiver's Allowing Defendants to Resume Operations**

17                      **Provides No Legal Basis for Insulating Defendants from**

18                      **Their Order Violations.**

19          Defendants' argument takes two forms.  First, Defendants argue that because

20  the Receiver and the FTC allegedly approved their marketing of Starter Credit,

21  they must be in compliance with the Order.  (Opp'n at 10-12.)  Second, Defendants

22  argue that the FTC should be estopped from challenging the Starter Credit

23  marketing.  (Opp'n at 20-24.)  Both arguments are meritless.

24  _____

25      [7]Moreover, a facial review of the website would not have revealed that Defendants were
26  offering an illusory credit line.  The Receiver would have had to review the Century Platinum
    Direct catalog and the terms and conditions to discover that, because of the inflated prices and
27  exorbitant down payment requirements, Defendants were not really offering credit at all.

28                                          6

1    First, Defendants claim that their marketing did not violate the Order

2    because the Receiver, with the FTC's consent, allowed Defendants to resume

3    operations. This is a *non sequitur*. The fact that the Receiver allowed Defendants

4    to resume operations before the Order was entered has no relevance to whether

5    Defendants' subsequent marketing complied with the Order. Once Defendants

6    entered into the Order, they were obligated to comply with its provisions. In

7    determining whether Defendants violated the Order, the only relevant

8    considerations are the actual Order provisions and Defendants' conduct.

9    Second, Defendants assert an entrapment by estoppel defense, but that

10   defense applies in criminal cases, not in civil proceedings.[8] Defendants fail to

11   identify any case in any jurisdiction in which entrapment by estoppel was applied

12   against the government in a civil case; they cite only criminal cases. (Opp'n at 20-

13   21.) Moreover, the FTC has not found any cases in which the entrapment by

14   estoppel defense was applied against the government in a civil case. Simply put,

15   there is no basis for importing a criminal law defense into this civil proceeding.

16   Indeed, recognizing entrapment by estoppel in civil cases would have bizarre

17   consequences and would disrupt well-established law. First, it would render

18   obsolete the defense of equitable estoppel against the government. The Ninth

19   Circuit has specifically recognized that equitable estoppel may be invoked against

20   the government in civil cases.[9] However, it is far easier to prove entrapment by

21

22   [8]*See also* 21 Am. Jur.2d Criminal Law § 204 (noting that entrapment by estoppel may

23   apply when "government official has told the defendant that certain **criminal** conduct is legal")
     (emphasis added).

24
     [9]*See Watkins v. United States Army*, 875 F.2d 699, 706-07 (9th Cir. 1989). Defendants

25   have expressly stated that they are not relying on an equitable estoppel defense (Opp'n at 21, n.
     18). This is not surprising because Defendants clearly cannot satisfy the standard for

26   establishing equitable estoppel against the government, which includes the traditional elements

27   of equitable estoppel: (1) The party to be estopped must know the facts; (2) he must intend that

28                                                7

1   estoppel,[10] so any defendant would be foolish to take on the heavier burden of

2   proving equitable estoppel against the government.[11]  Thus, importing the criminal

3   law defense of entrapment by estoppel into a civil proceeding would eviscerate the

4   recognized doctrine of equitable estoppel against the government.  Second, because

5   the entrapment by estoppel standard is comparable to the standard for equitable

6   estoppel against a private litigant, permitting defendants in civil cases to employ

7   entrapment by estoppel would make it no more difficult to estop the government

8   than a private litigant.  This would be contrary to Supreme Court decisions holding

9   that, if estoppel against the government is permitted at all, defendants face a

10  heavier burden estopping the government as opposed to a private party.  *See*

11  *Morgan v. Heckler*, 467 U.S. 51, 60 (1984) ("[I]t is well settled that the

12  Government may not be estopped on the same terms as any other litigant.").

13          However, even if Defendants were permitted to raise an entrapment by

14  estoppel defense, they cannot satisfy its elements.  To establish entrapment by

15

16  _____

17  his conduct shall be acted on or must so act that the party asserting the estoppel has a right to
    believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on

18  the former's conduct to his injury. *Watkins*, 875 F.2d at 709 (citations omitted).  In addition, a
    defendant must satisfy two more elements:  (1) "affirmative misconduct going beyond mere

19  negligence"; and (2) "the government's wrongful act will cause a serious injustice, and the
    public's interest will not suffer undue damage by imposition of the liability." *Id.* at 707

20  (quotations omitted).  Even if Defendants could establish the traditional elements of equitable
    estoppel, they certainly cannot prove affirmative government misconduct and that the public

21  interest would be served by estopping the government.

22      [10]It is not surprising that the criminal law defense of entrapment by estoppel is easier to

23  establish than equitable estoppel against the government.  Entrapment by estoppel is based on
    due process, *see United States v. Tallmadge*, 829 F.2d 767, 773 (9th Cir. 1987), and defendants

24  are entitled to greater due process in criminal cases, *see, e.g., In re Winship*, 397 U.S. 358, 361-
    62 (1970) (noting that due process requires proof beyond reasonable doubt in criminal cases).

25

26      [11]Indeed, because the elements of equitable estoppel against the government overlap
    those of entrapment by estoppel, a defendant who could prove an equitable estoppel defense

27  against the government could also prove an entrapment by estoppel defense.

28                                                        8

1 │ estoppel, Defendants must show that: (1) "the government affirmatively told

2 │ [them] the proscribed conduct was permissible"; and (2) they "reasonably relied on

3 │ the government's statement." *United States v. Ramirez-Valencia*, 202 F.3d 1106,

4 │ 1109 (9th Cir. 2000). To prove reasonable reliance, Defendants must establish that

5 │ "a person sincerely desirous of obeying the law would have accepted the

6 │ information as true and would not have been put on notice to make further

7 │ inquiries." *Id.* (quoting *United States v. Lansing*, 424 F.2d 225, 227 (9th Cir. 1970).

8 │ Defendants cannot establish either of these elements.

9 │     First, as noted above, neither the Receiver nor the FTC ever affirmatively

10 │ told Defendants that their marketing of Starter Credit did not violate the Order.[12]

11 │ In addition, Defendants clearly cannot show that the Receiver or the FTC ever

12 │ approved the Starter Credit marketing that Defendants revised in October 2008,

13 │ which further buried the disclosures.

14 │     Second, Defendants cannot establish the other element of entrapment by

15 │ estoppel – that they reasonably relied on any statement by the government that

16 │ their conduct was lawful. As an initial matter, Defendants could not reasonably

17 │ conclude that their marketing complied with the Order. For example, their buried

18 │ disclosures about the true nature of the "credit" being offered obviously did not

19 │ comply with the Order's specific requirements to "clearly and conspicuously"

20 │ disclose such material information. (*See* FTC Memo at 4-8, 15-17.) Moreover,

21 │ Defendants' purported reliance was no longer reasonable when they began

22 │

23 │ _____

24 │     [12]In addition to the Receiver's allowing Defendants to resume operations after the entry of the TRO, Defendants also point to a handful of communications between the FTC and Defendants about Defendants' marketing and consumer complaints. (Opp'n at 22-23.) None of

25 │ these communications could even remotely be construed as affirmative statements that the Starter Credit website does not violate the Order. Indeed, the complaints the FTC forwarded

26 │ about Starter Credit (*see* Opp'n at 23; Mallow Decl., ¶ 14, Ex. 20-24) put Defendants on notice

27 │ of potential Order violations.

28 │                                     9

1   receiving hundreds of consumer complaints about Starter Credit.  Finally,

2   Defendants' purported reliance was not reasonable as of October 2008 after they

3   changed their website to bury their disclosures about Starter Credit.

4       **C.    Defendants Cannot Evade Responsibility for Deceptively**

5                 **Marketing a Shopping Club Operated by a Third Party.**

6       Defendants cannot avoid a contempt finding for their marketing of Starter

7   Credit by claiming that they did not operate the shopping club.  Defendants assert

8   that the FTC seeks to hold them liable for marketing a third-party product that is a

9   "bad deal" for consumers.  This is simply not true.  Rather, Defendants are

10  responsible for their own misrepresentations and inadequate disclosures on their

11  own website.  Specifically, Defendants misrepresented that consumers would

12  receive "credit" when in fact the exorbitant down payment requirements and high

13  prices rendered the offer of credit illusory.  Consumers on average had to pay a

14  down payment that was far higher than the market price for catalog items, so they

15  were not really receiving credit at all.  (*See* FTC Memo at 6-7.)  Thus, the FTC is

16  not bringing this action because the shopping club was a bad deal.[13]  Rather the

17  FTC is bringing this action because Defendants misrepresented and inadequately

18  disclosed what they were offering consumers.

19      Defendants' purported reliance on "the information received from Insite

20  about the service" (Opp'n at 16) does not establish substantial compliance with the

21  Order.  To succeed on a substantial compliance defense, Defendants must show

22  that they took "all reasonable steps" to comply with the Court's Order.  *In re Dual-*

23  *Deck Video Cassette Recorder Anti-trust Litigation*, 10 F.3d 693, 695 (9th Cir.

24  1993).  Here, Defendants provide no evidence of any due diligence to ensure that

25  _____

26      [13]Indeed, if these terms were accurately represented and adequately disclosed, there likely would be no need for FTC action.  Consumers could readily determine that such offers are lousy

27  deals and would simply not buy them.

28                                        10

1   their website was not misrepresenting or inadequately disclosing the offer.  In fact,

2   they acknowledge that they did not obtain and review the online catalog, did not

3   review customer complaints, and did not review customer activity.  (Opp'n at 16.)

4   **II.    Defendants Are in Contempt for Their Marketing of the "No Cost"**

5   **Prepaid Debit Card.**

6           Defendants first argue they did not misrepresent that the card was available

7   at "no cost" or fail to disclose fees because consumers did not incur fees to obtain

8   the card.  This argument ignores the Order's explicit requirement that Defendants

9   clearly and conspicuously disclose fees "to obtain **and use**" the card.[14]

10          Second, Defendants argue that while they may not have disclosed a $9.95

11  monthly fee for a period of two months, other versions of the "no cost" card

12  marketing disclosed this fee, rendering any violation technical and anomalous.[15]

13  (Opp'n at 19; Desa Decl., Exs. 3, 6.)   However, the card's hyperlinked "Terms and

14  Conditions" page indicates that consumers were charged for a host of additional

15  fees to use the card – account maintenance fees for inactive accounts, account-to-

16  account transfer fees, ATM cash withdrawal fees, as well as PIN and signature

17  purchase convenience fees for "Pay-As-You-Go Customers."  (FTC Ex. 7, Att. M

18  _____

19          [14]Specifically, Section I.D. requires that Defendants "clearly and conspicuously disclose
    the costs, fees, or charges **to obtain and use** any prepaid card, debit card, or credit card in close

20  **proximity** to statements . . . that represent that . . . [the card] can be obtained 'free,' without
    obligation, or at a reduced cost."  (FTC Ex. 3 at 49.) (emphasis added)  The Order defines "in

21  close proximity" to mean "**on the same webpage . . . [and not] accessed or displayed through
    hyperlinks.**" (*Id.* at 47.) (emphasis added)

22

23          [15]Defendants contend that FTC's version of the debit card marketing, which did not
    include the $9.95 monthly fee disclosure, was an "anomaly" because it was only live on internet

24  for two months and "accessible to consumers only if a consumer was specifically looking for the
    site (like the FTC did)."  (Opp'n at 8, 19.)  However, Defendants identified the website's specific

25  URL when, in a July 23, 2009 request for information, the FTC asked Defendants to "[i]dentify
    any and all websites/business entities through which EDP has promoted 'free' debit cards at any

26  time in the past twelve months."  (FTC Ex. 11, Att. E at 312.)  Moreover, Defendants admitted
    that they received applications for the card during this two-month period.  (Opp'n at 3.)

27

28                                      11

1  at 179-80.)  Defendants did not clearly and conspicuously disclose these fees in

2  any of the websites they provided with "no cost" marketing.[16]  (*See* Desa Decl.,

3  Exs. 3-4, 6.)  These extensive violations establish that Defendants did not

4  substantially comply with the Order.  *See In re Dual-Deck*, 10 F.3d at 695.

5       In any event, for all of the "no cost" marketing provided by Defendants, only

6  the Terms and Conditions contained the buried disclosure that consumers would be

7  charged a $9.95 shipping and handling fee to obtain the card, despite Defendants'

8  representation that consumers could "Get a Prepaid Visa Card at NO COST."

9  (FTC Ex. 7, Att. M at 179-80; Desa Decl., Exs. 3-4, 6.)  Therefore, Defendants not

10  only failed to clearly and conspicuously disclose this fee, but they misrepresented

11  that the card could be obtained at no cost.

12  **III.   Conclusion**

13       The Court should grant the FTC's Application to issue a Show Cause

14  Order.[17]

15

16  Date Submitted: June 28, 2010        Respectfully submitted,

17

18                       /s/

19                       Mark Morelli

20                       Elizabeth Tucci
                     Zachary V. Hunter

21                       John D. Jacobs
                     Attorneys for Plaintiff

22                       FEDERAL TRADE COMMISSION

23

24  [16]Determining the full breadth of Defendants' violations is hampered by their violations
of Section VII.E, which required them to maintain complete records of their website offers. (See

25  Desa Decl. ¶ 2 (acknowledging failure to preserve copies of all unique websites).)

26  [17]In their Opposition, Defendants identify several types of discovery that they claim will
be necessary for their defense.  The FTC does not waive its right to oppose any discovery that is

27  contrary to the Federal Rules of Civil Procedure.

28