**ATTACHMENT 1**

**TO REILLY DECL.**

**B. WILSON DEPO TRANSCRIPT**

1 UNITED STATES DISTRICT COURT

2 CENTRAL DISTRICT OF CALIFORNIA

3

4 Federal Trade Commission, )
           )
5    Plaintiff, )
           )
6   vs.     ) No. CV-07-4880
           )  ODW (AJWx)
7 EDebitPay, LLC, et al., )
           )
8    Defendants. )
           )

9

10

11

12 DEPOSITION OF BILL WILSON

13

14

15 DATE & TIME: Tuesday, November 17, 2009
         9:11 a.m. - 2:25 p.m.
16

17 LOCATION: 10877 Wilshire Boulevard
        Suite 700
18       Los Angeles, California

19

   REPORTER: Christina Kim-Campos, CSR
20       Certificate No. 12598

21

22

23

24

25

2

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4    Federal Trade Commission,        )
                                      )
5              Plaintiff,             )
                                      )
6         vs.                         )   No. CV-07-4880
                                      )        ODW (AJWx)
7    EDebitPay, LLC, et al.,          )
                                      )
8              Defendants.            )
                                      )

9

10

11

12

13

14

15         DEPOSITION OF BILL WILSON, taken on behalf

16    of the Plaintiff, at 10877 Wilshire Boulevard,

17    Suite 700, Los Angeles, California, commencing at

18    9:11 a.m., and concluding at 2:25 p.m., on Tuesday,

19    November 17, 2009, pursuant to Notice, before

20    CHRISTINA KIM-CAMPOS, CSR No. 12598, a Certified

21    Shorthand Reporter, in and for the State of

22    California.

23                        ***

24

25

1    will do -- describe later.

2        Q.   And I understand you don't have them now,

3    but do -- with you, but would EDebitPay have

4    examples of these pages that would appear in the

5    case of the -- would you have examples of thank you

6    pages?

7        A.   We -- we could provide.

8        Q.   Okay.

9        A.   We may have.  That's what I'm thinking.  We

10   may have provided in the box of information we

11   provided to you before.  I'm not sure.  I didn't

12   look at all of it.

13       Q.   And you're saying may have provided in

14   response to the July 23rd request; is that correct?

15       A.   Potentially.

16       Q.   Is there any other way that -- you've --

17   you've described one way in which EDebitPay

18   monetizes the consumer data, and that is via a

19   banner placed on the thank you page.

20            Is there any other way that EDebitPay

21   monetizes that consumer data?

22       A.   Yes.

23       Q.   Tell me about that.

24       A.   We may -- for example, we may pop a website.

25   For example, a person leaves the website, and we may

1    pop auto loan website and say, hey, are you

2    interested -- not are you interested.  Just pops.

3    They're called pops, exit pops.  So that's a

4    methodology.

5        Q.    So -- so for the consumer, it's almost -- it

6    will look like they're just jumping to another page?

7        A.    Yeah.  Totally separate product.

8        Q.    And again, would the consumer receive a

9    message saying that the consumer is leaving X

10   website and going to another website?

11       A.    Some browsers will have a pop locker and ask

12   you to allow or not allow for another product to

13   pop.  So it depends on the customer's computer.

14       Q.    So -- okay.  So you're saying sometimes it

15   won't pop at all?

16       A.    Sometimes they won't -- they won't see it,

17   or because all -- all people at their web -- at

18   their computers have different situations, so in

19   general, we -- if we pop the offer, we don't say

20   this is a different -- like you said, we're not

21   saying, hey, this isn't the same offer, but we're

22   popping an offer, let's say, of an auto loan for a

23   Paydayloan.  We're popping that offer, that website

24   URL in front of the customer.

25            Some customers may have a popup window that

1    says, hey, you have a pop; do you want to allow it?

2    And then others, they'll just get the pop.

3        Q.    Right.

4            So whether they get the message or not is

5    controlled by their computer; it's not content that

6    you provide?

7        A.    Correct.

8        Q.    That message, hey, here's something new;

9    here's another website --

10       A.    I would make an assumption.  Correct.  I

11   don't control the computer so -- yeah.

12       Q.    Right.

13           But EDebitPay does not -- does not

14   intentionally communicate that to consumers, that

15   they are leaving "X" website and going to another

16   website?

17           MS. REILLY:  Objection.  Vague.

18   BY MS. TUCCI:

19       Q.    We're going -- we're going back to the same

20   scenario, where the consumer has been rejected for

21   the loans and you're popping the consumer to another

22   website.

23       A.    Mm-hmm.

24       Q.    You've talked about scenarios in which,

25   depending on that person's computer, they may or may

1    not be able to see the popup.  They may want to be

2    asked if they want to view the popup.

3            What I want to talk about is what EDebitPay

4    pays does, if anything, to communicate that they're

5    going from one website to another.  They're going

6    from the thank you page or -- they're going from the

7    thank you page to the new popup.

8            Does EDebitPay tell the computer that?

9            MS. REILLY:  Objection.  Asked and answered,

10   but you can answer.

11           THE WITNESS:  We call something a general

12   pop, so if he we pop an auto loan off a cash

13   advance, we -- we don't usually.  It usually pops to

14   a whole new unique website with a whole new unique

15   URL.

16   BY MS. TUCCI:

17       Q.   And could one of the pops be

18   startercreditdirect.com?

19       A.   It could be.

20       Q.   Is that one that EDebitPay has used as a

21   pop?

22           MS. REILLY:  Objection.  Vague.

23   BY MS. TUCCI:

24       Q.   Is startercreditdirect a website that

25   EDebitPay has used as a pop, following a failed

1    application?

2        A.    Startercredit, I'm not sure about

3    startercredit, if we have.

4        Q.    And who would have that information?

5        A.    It -- it would still be me.  It would still

6    be just a matter of looking in affiliate tracking

7    software and seeing, potentially, where the offer

8    was popped from.

9        Q.    So is it -- is it information that EDebitPay

10   tracks, even though you don't know off the top of

11   your head?

12       A.    We -- we track how many visitors come to the

13   website and what the conversion rates are, what the

14   earnings per visitor are.  And at time to time we

15   pop different offers, third party product offers,

16   our offers of websites, whichever seem more relevant

17   to a customer visiting a website, whichever offers

18   do well.

19            So it it's always changing.  There's --

20   there's no consistent pop that we would place on a

21   website.

22       Q.    But it sounds -- is it correct that it's

23   automated; right?  That if the -- if the application

24   has certain features, it's -- you're going to send

25   it to one website, one popup, versus, another?

1    MS. REILLY:  Objection.  Vague.

2 BY MS. TUCCI:

3  Q. Well, you're saying you're trying to tailor

4 the popup to the applicant.

5  A. Mm-hmm.

6  Q. How do you do that?

7  A. Guessing.  Basically, it comes back to

8 monetizing.

9    So if somebody comes to an auto loan

10 website, for example, and you're thinking they're

11 looking to maybe buy a car, maybe you'll auto pop

12 auto insurance, third party auto insurance website.

13    So you're guessing, maybe, what the

14 relevancy is.  There's no magic knowledge of what

15 will do well or -- or what the customer exactly may

16 be interested in.

17    But -- so you test products from time to

18 time and see what seems most relevant to the

19 customer.  You don't always know.

20  Q. But who decides that applicant "A" is going

21 to get popup "B"?

22  A. That would probably be me.  Random --

23 randomly guessing what may be relevant to -- to pop

24 up and what may not be relevant to pop up.

25  Q. But this isn't being done on an individual

1    basis?

2             MS. REILLY:  Objection.  Vague.

3    BY MS. TUCCI:

4        Q.    Is -- is -- okay.  Let me ask you this:

5             You're not sitting -- are you sitting there

6    at your computer, and you see an applicant has been

7    turned down for a Paydayloan, and then you sit there

8    and decide to send that person a popup for

9    startercreditdirect?

10       A.    I don't individually decide to send the

11   customer anywhere.

12       Q.    Right.

13       A.    It has to do with, for -- going back, if

14   there's an auto loan website and we look for

15   products that we may feel that a customer looking

16   for an auto loan website may be interested in -- one

17   may be CashAdvance, one may be startercredit, maybe

18   it's purchasing power.  Another could be auto

19   insurance.

20             It's -- not every website is one-on-one set

21   up that way.  We build this site, and then we

22   basically take a look and see what products may be

23   the most appealing to a customer.

24       Q.    Is it correct to say that you program in

25   which popups are going to go to which types of

1      consumers?

2          A.   I would say correct.

3          Q.   And is there -- therefore, are there

4      computer records at EDebitPay that would indicate,

5      for example, when startercreditdirect would pop up?

6          A.   There should be.

7          Q.   And who would have access to those records?

8          A.   It would -- it would, again, be me or the

9      company in general.

10         Q.   And do I understand you to say that you --

11     you track the success of the popups, of different

12     popups?

13              MS. REILLY:   Objection.   Vague.

14     BY MS. TUCCI:

15         Q.   You've indicated that first you -- you have

16     a certain type of applicant, and you decide you're

17     going to try three different popups with that type

18     of rejected applicant; is that correct?

19         A.   Correct.

20         Q.   And you essentially program it in, that

21     applicants with these variables are going to get

22     these popups.   And it's -- and you've also indicated

23     that it's not just one popup that you will try on

24     "X" type of consumer; is that correct?

25         A.   Correct.

1    Q.    Then do you go back and look at the success

2  rate of the different popups you have tried on that

3  type of consumer?

4         MS. REILLY:   Objection.   Vague.

5         THE WITNESS:   I -- I do, from time to time,

6  take a look at the offers and how well they're

7  performing.

8  BY MS. TUCCI:

9    Q.    And then do you change the popups, based on

10  how well the popups are performing?

11   A.    I do from time to time.

12   Q.    And from time to time, roughly, how often do

13  you check on these things?

14   A.    Sometimes it's daily, sometimes it's weekly,

15  sometimes it's monthly.   Usually we build a product,

16  we test offers, and we may just never change the pop

17  after we start testing an offer.

18        It -- try to help a little bit.   Maybe in

19  retail location, when you go to a counter, there's

20  all those products near the counter, all those

21  products are there.   That's not what you bought in

22  the store, but they're right there at the counter.

23  You may, from time to time, buy certain products

24  there.

25        The store looks and sees what products sell

1    the most there, and if certain products aren't

2    selling, they try a different product.

3         I'm just trying to use an offline, 'cause

4    affiliate marketing is difficult to understand.

5    It's that type of thing.

6         So from time to time you test a product to

7    see if it performs on a earnings per click, a

8    visitor, and whichever offer seems to be the most

9    relevant for that offer, meaning consumers seem to

10   have a desire to fill out the applications, is what

11   maybe you would present.

12        So it's -- there's no magic equation,

13   there's no form of automation.  It's really a trial

14   and error.

15   Q.   With Paydayloans, is there one type of popup

16   that is doing particularly well right now?

17   A.   Usually, Paydayloans -- other similar

18   Paydayloan websites.

19   Q.   The next sentence on Exhibit 4 says:

20        "Applications are accepted if

21        they are properly completed, the

22        consumers have sufficient funds, and

23        pass their EDebitPay security and

24        identity checks."

25        Did I read that correctly?

1        A.    Yes.

2        Q.    And the preceding sentence says that

3   EDebitPay can monetize consumer data, even if the

4   application is not accepted.

5              Is that correct?

6        A.    Correct.

7        Q.    So is it possible for EDebitPay to monetize

8   consumer data from an application that is not

9   completed?

10       A.    Yes.

11       Q.    Is it possible for a consumer to start

12   filling out an application, say, for a Paydayloan,

13   and decide not to complete that application, and

14   then the consumer gets a popup from EDebitPay?

15       A.    Can you be clear on that?

16       Q.    Sure.

17             You know, we were talking about how -- in

18   the -- in the past few minutes we were talking about

19   the scenario where the applicant is actually

20   rejected.

21       A.    Mm-hmm.

22       Q.    And -- and the no lead buyer wants that, so

23   then EDebitPay gives them one of several different

24   popups.

25             Now I'm talking about a situation where the

1    applicant, for whatever reason, does not complete

2    the application.

3            In that scenario, can the applicant then get

4    a popup from EDebitPay?

5    A.    If they don't complete the application, it

6    would mean that they didn't submit it.  They left

7    their -- meaning they don't submit the application.

8    So that means that their information hasn't been

9    obtained by us or we haven't begun the -- the

10   matching process with third party lenders.

11           If they leave that web page, yes, it goes

12   back to exit pops.  We may exit pop them, for

13   example, on auto loan website.  It goes right back

14   to exactly what we had discussed earlier on exit

15   pops and monetization.

16   Q.    Let me understand what you're saying.

17   You're saying if the consumer leaves the website,

18   you mean the consumer leaves the website before

19   hitting the submit button?

20   A.    Correct.

21   Q.    So they filled out the application.  They

22   don't hit submit.

23   A.    Okay.

24   Q.    And then EDP sends that person a popup?

25   A.    Okay.  Correct.

104

1     Q.    That happens?

2     A.    Correct.

3     Q.    Okay.

4     A.    They didn't submit it.  They left the web

5  page.  That's called an exit pop.  The consumer

6  exited the website.  We exit popped an offer, but

7  they didn't submit the application, so it didn't go.

8  None of that particular information -- for example,

9  we had talked about bank account information and

10 matching processes been started, so we -- we didn't

11 even collect that information.  The consumer left

12 the website.

13         So in general, it's exit pops.  Whenever you

14 leave the website, we call it an exit pop.

15    Q.    I'm sorry to be obtuse here, but with an

16 exit popup -- let me -- let me just try to think

17 about how it looks to the consumer.

18         So the consumer goes to the website, fills

19 out the application on page 1.  That applica- -- and

20 as I understand it, that application would not

21 include information such as bank account

22 information; is that correct?

23    A.    Correct.

24    Q.    But it could include the name, address,

25 e-mail address?

1      A.    Correct.

2      Q.    At that point, the applicant leaves the

3   website.

4            When you say leaves the website, do you mean

5   hits the "X" button to close it out?

6      A.    Either they hit the "X" button to close out

7   the browser or they go to the browser and enter a

8   new domain name.  So they're exiting the website.

9      Q.    And at the point that they do either of

10   those acts to exit the website, either by closing it

11   out or by putting in a new browser -- name of the

12   browser, that's the point at which the popup comes?

13      A.    It -- it may.  Not all of our websites have

14   exit pops, but based on the examples and the

15   description, yes, that's when the exit pop would --

16   would pop.

17      Q.    Okay.

18      A.    It's called the exit pop because -- it's a

19   general term that we use because when people are

20   exiting a website, we call it an exit pop.

21      Q.    And which EDP websites use exit pops?

22      A.    Most websites that EDP develops has exit

23   pops.

24      Q.    And again, in this scenario of an exit pop,

25   the consumer -- the EDP does not send that consumer

1    a message saying, "You are being directed to another

2    website"?

3        A.    On an exit pop, a general exit pop, no.

4        Q.    I'm going to stick with the same paragraph,

5    the business model paragraph on Exhibit 4, and back

6    up a couple of sentences to the one that starts with

7    "Targeted consumers."  And this sentence:

8                        "Targeted consumers are directed

9            to one of the Company's card websites

10           (landing pages) to complete an

11           application and purchase a card."

12           In this context, what is a card?

13       A.    A debit card.

14           This was written, I think, three years ago.

15       Q.    Is it still accurate today?

16       A.    I can't -- I can't say in detail 'cause I

17   haven't read all of it.

18       Q.    You can -- you can take a minute to read the

19   paragraph.

20       A.    Yeah, I can't say for sure.

21       Q.    Well, are targeted consumers still directed

22   to first -- let me strike that.

23           Does the company still have card websites?

24       A.    We have what we call catalog card websites,

25   mostly.

1        Q.    And is StarterCreditDirect an example of a
2    catalog website?
3        A.    Catalog website; correct.
4        Q.    Okay.  And are there other examples of
5    catalog websites?
6        A.    UltimateOffer.
7        Q.    UltimateOffer.
8              Any others?
9        A.    There's a few different brands.
10       Q.    What are the predominant ones?
11       A.    UltimateOffer is probably, and maybe
12    StarterCredit was one of them.  It's more of a brand
13    than as in just a website name -- more than the
14    catalog product itself.
15             So it may have -- the catalog product may be
16    a specific -- for example, it's a website.  We may
17    call it UltimateOffer, but the -- the card they
18    receive may be the ePlatinum program.  Membership
19    program.
20       Q.    Mm-hmm.
21       A.    But we call it a -- in this context, based
22    three years ago, they were talking about debit
23    cards.
24       Q.    Right.
25             But now you're saying what you're selling is

1    catalog programs, catalog cards?

2        A.    Memberships.   Memberships.

3        Q.    Memberships and catalog?

4        A.    Yeah.

5        Q.    And just to recap, is it also true that

6    targeted consumers are directed to the company's

7    Paydayloan websites?

8        A.    Can you be clear?

9        Q.    Sure.

10            This says -- to back up a sentence:

11                "The company estimates that it

12            reaches 50 million unique consumers

13            per month through its network.

14            Targeted consumers are directed to

15            one of the company's card websites

16            (landing pages) to complete an

17            application and purchase a card."

18            Are all of those 50 million consumers

19    directed to catalog card offers?

20        A.    No.

21        Q.    Where else are they directed?

22        A.    Cash advance, mostly.  It could have -- and

23    again, we have the auto loan websites is an example.

24    So it could be cash advance, auto loan, card

25    websites.

1     Q.    And then the sentence, the two sentences

2     following that:

3                    "Upon the submission of an

4                application, EDebitPay is immediately

5                able to monetize all consumer data

6                whether or not the application is

7                accepted."   And the next sentence:

8                "Applications are accepted if they

9                are properly completed, the consumers

10               have sufficient funds and pass

11               through EDebitPay security and

12               identity checks."

13                   Those two sentences, is it correct to say

14    those two sentences apply, regardless of whether the

15    landing site is for a cash advance loan, an auto

16    loan, or a catalog?

17          MS. REILLY:   Objection.   Vague.

18    BY MS. TUCCI:

19    Q.    We can -- we can break it down.

20    A.    Sure.

21    Q.    We're talking about the monetization

22    process, which includes exit pops.

23                   Does EDP employ exit pops with its cash

24    advance sites?

25    A.    Yes.

1      Q.    Does EDP employ exit pops with its auto loan

2    sites?

3      A.    Yes.

4      Q.    Does EDP employ exit pops with regard to its

5    catalog card sites?

6      A.    Yes.

7      Q.    I'm going to show you what the court

8    reporter will please mark as Exhibit 5.

9            (Plaintiff's Exhibit 5 was marked

10           for identification by the court

11           reporter and is attached hereto.)

12   BY MS. TUCCI:

13     Q.    Do you recognize this document?

14     A.    Yes.

15     Q.    What is Exhibit 5?

16     A.    It's a list of affiliate marketers.

17     Q.    And is it correct to say, again, that

18   affiliate marketers also means publishers?

19     A.    Yeah.  It's a list of affiliate marketers

20   and, also, lead buyers.  Again, sometimes the

21   vocabulary is -- we describe it the same way,

22   depending on how we work with them.  So some of the

23   lead buyers are also affiliate marketers and

24   publishers, but this seems to be a list that's mixed

25   with both lead marketers and lead buyers.

1   question is a waiver of an objection.

2   BY MS. TUCCI:

3      Q.   Let me ask you about QuickerAutoloans.com.

4   Is that an EDebitPay site?

5      A.   Yes, it is.

6      Q.   What about DebtStopsnow?

7      A.   Yes, it is.

8      Q.   Supereliteoffer?

9      A.   Yes, it is.

10     Q.   Did you say that was a -- what did -- I'm

11  sorry.  What does that site sell?

12     A.   That's a membership program.

13     Q.   A catalog?

14     A.   Yes.

15     Q.   I see StarterCreditDirect.com/blue and

16  StarterCreditDirect.com without the "blue."

17          What's the difference?

18     A.   The color tone.  Sometimes, based on when

19  you build a website, certain colors have higher

20  conversions on earnings per visit.  So we may build

21  a website and try different variables of color tones

22  to see which is more appealing to a consumer.  So

23  they may have labeled it blue.

24     Q.   And -- but those sites are EDP sites?

25     A.   Correct.

1      Q.    What about FirstMutualCard?

2      A.    That was an EDebitPay website that we

3   discontinued a while ago.

4      Q.    And what was that selling?

5      A.    That was specifically selling a debit card.

6      Q.    Okay.  What about VIPCardNow now?

7      A.    It was a debit card.

8      Q.    And has that also been discontinued?

9      A.    Correct.

10     Q.    MyFutureCard.com --

11     A.    Correct.

12     Q.    -- is a discontinued debit card?  Is it a

13   discontinued debit card?

14     A.    Correct.

15     Q.    What about SupremeSpender.com; what is that?

16     A.    Debit card, discontinued.

17     Q.    What is Builderimpact.com?

18     A.    Debit card, discontinued.

19     Q.    What is LibertyUnionCards.com?

20     A.    Debit card, discontinued.

21     Q.    And all of these discontinued debit card

22   sites were EDP sites; correct?

23     A.    Correct.

24     Q.    Okay.  Let's jump down then to

25   Vue3source.com.  What is that?

1       A.   A catalog site.

2       Q.   Is that current?

3       A.   It's current.

4       Q.   Ultimateplatinumoffer.com?

5       A.   Catalog.

6       Q.   That's a current EDP catalog site?

7       A.   Correct.

8       Q.   What is Monetizedit.info?

9       A.   Catalog card.

10      Q.   And that's an EDP site?

11      A.   Correct.

12      Q.   And it's current?

13      A.   I'm not sure.  We discontinued marketing

14   that site, so it -- it may be active, it may not.

15   We may have brought it down, or it may still be

16   there.

17      Q.   But you're saying EDP is not actively

18   marketing it at this time?

19      A.   We're not actively marketing it, no.

20      Q.   What is Homelandbenefits.com?

21      A.   Catalog.

22      Q.   That's an EDP catalog site?

23      A.   Yes.

24      Q.   And are you actively marketing that site?

25      A.   Very minimally, meaning there may not even

1    be anybody filling it out, but there may be visitors

2    going to it.

3            So I don't want to say that it's not active,

4    but it doesn't have -- I don't think there's

5    applications being completed by consumers.  It's not

6    actively being marketed, basically.

7        Q.    GasSaverAutoloans.com, is that an EDebitPay

8    site?

9        A.    EDebitPay.

10       Q.    EDebitPay.  Thanks.

11           And what type of site is that?

12       A.    It's an auto loan lead generating website,

13   like earlier described.

14       Q.    Is that active?

15       A.    Yes.  Very minimally.  But it's -- it's

16   actively available for marketers to market, but not

17   many marketers are marketing it.

18       Q.    Okay.  Ultimateplatinumoffer.com (Short),

19   that's just a different version of the

20   Ultimateplatinumoffer.com site?

21       A.    It's just a term.  It's the same exact

22   Ultimateoffer website, but we pay commission on the

23   first step, meaning there's two steps to the site.

24   We're paying commission on the first step.

25           So it's just a term we call "short."

1          And the "short," again, means?  I'm still

2   missing that.

3      A.   The "short" could be that, again, we're

4   really just -- instead of tracking a completed

5   application, we call it short because in our -- in

6   our mind it's a lead.  So we may just get name,

7   phone number, and e-mail.  So we call it a short.

8          A short just doesn't mean we collect social

9   security numbers, date of birth, things of that

10  nature, bank account info.  So we call it a short.

11     Q.   So it's basically the amount of information

12  in the lead; the short vs. long?

13     A.   Basic information.

14     Q.   Is ePlatinumDirect.com an EDebitPay site?

15     A.   Correct.

16     Q.   And is it active?

17     A.   Yes.

18     Q.   And what does it sell?

19     A.   Catalog product.  Catalog membership, the

20  catalog membership.

21     Q.   We've already gone over

22  AcademyCreditCenter.com.

23          What about PrimaryCashCard.com?  Is that an

24  EDP site?

25     A.   It is a website that we own.

1    Q.    I'm sorry.  A website that you --

2    A.    That we own.

3    Q.    That you own?

4    A.    Yes.

5    Q.    Thank you.

6          And what does it sell?

7    A.    It doesn't sell.  It -- it is an old website

8    that is inactive, that we marketed to provide a

9    debit card to consumers.  We didn't -- we don't

10   charge a fee.  We actually send them the card.

11   Q.    Do you --

12   A.    It's like generating a lead.

13   Q.    Okay.  And are there servicing fees

14   associated with the card?

15   A.    If the person uses the card, there's fees

16   affiliated.

17   Q.    What about EasyandsimpleCash.com?

18   A.    EDebitPay hosted, owned.

19   Q.    Owned.

20         And is it active?

21         MS. REILLY:  Objection as to "active."

22   Vague.

23         MS. TUCCI:  Your witness has been using it

24   throughout this deposition.

25         MS. REILLY:  Just want to be clear that

1     A.   Yes.

2     Q.   And this is at least one site that is

3   marketed through telemarketing, among other means --

4     A.   Correct.

5     Q.   -- is that correct?

6          What is ETrustCredit.com?

7     A.   Catalog site by EDebitPay.

8     Q.   Is it actively marketed by EDebitPay?

9     A.   Yes.

10    Q.   And what about FirstFinancialChoice.com?

11    A.   EDebitPay website.

12    Q.   Is it being actively marked by EDebitPay?

13    A.   Yes.

14    Q.   And Sterlingcardapp.com?

15    A.   No longer -- EDebitPay owned URL, but no

16   longer being marketed.

17    Q.   Was it some type of debit card?

18    A.   It was a debit card, yes.

19    Q.   What is 19Communications?

20    A.   They are an e-mail marketer.

21    Q.   And what is EDebitPay's relationship with

22   19Communications?

23    A.   They are an affiliate publisher.

24    Q.   What about Ennovate Group, E-n-n-o-v-a-t-e

25   Group, Incorporated?

1      looking for a Payday loan?"

2      Q.   Will it say from --

3      A.   That would just be an example.

4      Q.   Will it say from

5    EverybodyGetsCreditNews.com?

6      A.   Not always.  I'm currently not sure if this

7    is active or not, this URL for e-mailing.  I just

8    know that when they looked at this, what they found

9    is that was the reason it was placed.  I don't even

10   know if it's even there currently or not, but -- and

11   I don't know if we actively e-mail from that URL or

12   not.

13     Q.   To go back to the exit popups that you

14   discussed before the lunch break, are those popups

15   full size, full screen size?

16     A.   Sometimes they're full screen; sometimes

17   they're partial screen.

18     Q.   And what determines that?

19     A.   Just like before, it depends on how well the

20   websites do, meaning is there an interest of the

21   customer.  It really -- it really de- -- it's random

22   on if we do a full size pop or a medium size pop.

23   It's just -- it's just real random.  No real reason.

24     Q.   And do you track whether you're sending out

25   a full size or a mid-size exit popup?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

153

1     A.   No.  To us it's the same thing.  It's just a

2   pop, and it's just an exit pop, in general.

3     Q.   And with the exit pops, is there an -- is

4   there a redirection?  Is the person redirected to

5   another site?

6     A.   On an exit pop it's -- you could call it a

7   redirect, but we call it an exit pop, which means

8   the customer, like I stated before, if they close

9   the browser or if they change a different name -- an

10   exit pop, in general, you could say redirects the

11   customer.  We call it a pop, exit pop, pops the

12   customer a different website URL and brand.

13     Q.   And so I know I'm being obtuse on this, but

14   let's say I'm working on my home, unprotected

15   consume- -- laptop that has no popup blockers or

16   anything.

17     A.   Mm-hmm.

18     Q.   And I fill out part of an application for

19   startercreditdirect.com; then I decide to go to

20   CNN.com.  The next thing I see after I put in

21   CNN.com, enter, will be the exit pop?

22     A.   Depending on the offer that you go to, not

23   all of our websites have exit pops.

24     Q.   Right.

25        But in the exit pop scenario, that's what it

1   would look like?

2      A.   What would happen is when you go to leave

3   the website, we would pop an offer, an exit pop,

4   meaning you're leaving the website.  You're exiting

5   the website you're looking at, and we would exit pop

6   and show you another offer.

7      Q.   And there -- but there would be no message,

8   that I was exiting the other website?

9      A.   Some websites, I think we do have where

10  we're saying, hey, we're going to show you some more

11  offers and other websites.  In general, it's just an

12  exit pop, so we don't say, hey, you're at

13  startercredit and you're leaving, and now we're

14  going to show you an auto loan website.  So now they

15  see an auto loan website.

16       It's a different brand; it's a different

17  URL.  But now it went from -- this is just an

18  example.  It would go from StarterCredit to auto

19  loan website.

20       So again, the term "exit pop" is just that

21  person exits that website and the customer gets

22  popped an offering or -- yeah, more or less a --

23  another type of product.  It could be a similar type

24  of product.

25       Like you said, CashAdvance for example,

1    would -- exit pop would be the CashAdvance.

2    CashAdvance may pop up.

3        Q.    What percentage of -- what percentage of

4    exits from EDebitPay hosted websites lead to exit

5    pops?

6        A.    Can you -- can you be a little clear?

7        Q.    Well, I'm trying to figure out how common it

8    is for EDP to use the exit pop.  So we're talking

9    about -- it's my understanding that they're only

10   used on EDP hosted websites.  Maybe that's an

11   incorrect assumption right there.  I'm talking about

12   what EDP is doing, not what somebody else is doing.

13       A.    Okay.

14       Q.    So we're at an EDP website, you know, for

15   car loans, and when I exit that site after not

16   completing an application, how likely is it --

17   another way, how likely is it that I will get an

18   exit pop?

19       A.    I'm going to estimate.

20             MR. MALLOW:  You can estimate.  I mean,

21   don't guess, but estimate.

22             THE WITNESS:  Yeah, I'm going to estimate

23   that 70 percent of our websites, if we have a

24   visitor on the landing page and they shut the

25   website, that will exit pop, for example, an auto

1    loan off the CashAdvanceLoan website -- exit pops.

2    BY MS. TUCCI:

3        Q.    To go back to exit -- Exhibit 9 -- no, let

4    me go back one more.  I'm sorry.  Sorry.  Let me go

5    all the way back to 5.

6            Okay.  You talked before about shorts as a

7    type of lead; is that correct?

8        A.    Yes.

9        Q.    Okay.  And, in general, a short lead

10   contains fewer categories of information than a full

11   lead?

12       A.    Correct.

13       Q.    Can a -- can you generate a short lead from

14   someone who fills out -- does EDP ever generate

15   short leads from someone who fills out the first

16   page of an application, but doesn't submit?

17       A.    Can you be clear?

18       Q.    Yeah.  For example, on startercreditdirect,

19   you go to the first page, you enter information;

20   then click next.  Second page asks for more detailed

21   information --

22       A.    Mm-hmm.

23       Q.    -- you know, bank information.

24            That first page, could that -- if someone

25   just did the first page, could that become a short?

1      A.   No.

2      Q.   Okay.   Now, I'd like to go to EDebitPay in

3   terms of any efforts that you have personally made

4   on the compliance side.   And with this I'm referring

5   to the stipulated order that was entered in 2008 in

6   the -- in the action brought by the FTC, in which

7   you signed.

8           I -- and I understand that that's not your

9   primary responsibility, but I just want to know, is

10   there any things that you have personally done since

11   entry of the order, things that you've changed in

12   how you do business because of the order?

13      A.   Can you be more specific?

14      Q.   Sure.

15           For example, have you -- you do contracts

16   with all of these companies.

17           Have you revised your contracts to comply

18   with the order?

19      A.   Oh, I'm pretty sure we have, to the best of

20   our abilities, added terminology provided by, I'd

21   say, our legal, to present to marketing groups that

22   we work with.

23      Q.   To present to marketing groups that you work

24   with.

25           And you don't need to get into any

1    conversations you've had with Mr. Mallow.  I just

2    want to talk about things that you've done, so --

3        A.    No, no, I know that that's where it came

4    from.

5        Q.    Yeah.

6        A.    So I just look at him, 'cause I'm trying to

7    think of what's changed.

8        Q.    Right.

9        A.    I'm just, like, trying to think through.

10            MR. MALLOW:  And just to make sure the

11   question is clear, what she's asking is what have

12   you done personally -- tell me if I'm wrong -- have

13   you personally done things differently as a result

14   of the order, to comply with the order?

15            So don't worry about the company, generally.

16   Just tell what you know about things you've done.

17   That's what she's asking -- unless I've missed the

18   question.

19            MS. TUCCI:  No, that's right.

20            THE WITNESS:  Boy, what have we done?  This

21   is -- I don't know how to answer it because we

22   weren't doing anything wrong in the first place, so

23   we basically, to the best of our abilities, tried --

24   I mean, whatever we signed, it's what we do.  We do

25   our best to, no matter what, do business with the

1    best of our capa- -- you know, best of our ability.

2        I don't know how to answer the question

3    because have our agreements changed?  Maybe line

4    items in our contracts have changed, but I'm not --

5    I can't -- I don't know -- I don't know specifically

6    what's changed in our agreements.  We may have added

7    terminology to our privacy policy.  Instead of

8    saying -- well, we may have added some terminology

9    compliance, has added maybe some terms or words to

10    our websites.  We may have bolded some of our

11    fonts -- not fonts -- bolded some of our terms, just

12    to overly make it clear and make it stand out.

13        And I think, on a regular basis, I know that

14    I communicate and let people know that if you're

15    going to work with us, as in, you know, marketing

16    partners, you need to do things in a compliant

17    manner and -- and that we're concerned about it.  .

18        So we're very concerned about who we work

19    with in general, but to the best of our abilities.

20    Q.   Have you -- have you had -- personally

21    worked with marketing affiliates, to bring them in

22    compliance with the order in terms of the

23    disclosures made by marketing affiliates?

24        MR. MALLOW:  Objection.  Vague.  But go

25    ahead.

1          THE WITNESS:  I know that at one time we

2     found a product that we didn't want marketed to our

3     e-mail list, like with -- like, for example, the

4     contract you showed us of a list manager that we

5     provided our list, and we let them know that we

6     didn't want them to market a -- a specific product.

7     BY MS. TUCCI:

8          Q.   What was the product?

9          A.   It was a -- it was a catalog product.  And

10    it was -- I think the group that owned it was

11    Vantex.  It was called Goldcashcard or something.

12    And based upon our review, we felt that it wasn't

13    compliant in the manner of our product we wanted

14    marketed to our data.

15          So we e-mailed all of our affiliates and we

16    let them know that we didn't want them marketing

17    that product with our data.  We felt like -- we just

18    felt like the website wasn't set up in a manner that

19    was clear with the customer on the fees they were

20    being charged.

21          Q.   Any other examples like that?

22          A.   Oh, that's -- that's a very good example

23    'cause it's one that -- give you an example -- why I

24    use that is we -- we sent the letter out and they

25    had their legal counsel contact us to try to prevent

1    us from telling people not to market the products

2    with our data, and I think we had to turn that over

3    to the FTC.  We actually turned that information

4    over.

5            But that's a -- a good example of a product

6    that we saw, that if you look at compliancy, we

7    didn't tell them how to change their websites, but

8    we did tell the marketers we didn't want to be

9    affiliated with that product in any manner.

10   Q.    And can you think of any other examples that

11   you're personally aware of?

12   A.    Not that I can think of right now.

13   Q.    Have you -- you've talked about the fact

14   that you used the terms "marketing affiliate,"

15   "publisher," "affiliate network" pretty much

16   interchangeably.  So I'm going to use marketing

17   affiliate as a generic term here.

18           Have you ever personally given a marketing

19   affiliate a hard copy of the stipulated order in

20   this case?

21   A.    What do you mean by hard copy?  As in

22   printed and handed to them?

23   Q.    Correct, or mailed to them.

24   A.    Yes.  We've mailed the hard copy and have

25   had -- as in -- do you mean our actual full

1    settlement of the FTC, or do you mean attached to

2    our agreement the stipulation that we've added to

3    our agreements that we do with customers, 'cause

4    that's all hard copy.

5        Q.   We can break it down.  We can break it down.

6    Hold on.

7            Okay.  Let me show you what I'm going to

8    mark as -- ask the court reporter to mark as

9    Exhibit 10 (indicating).

10           (Plaintiff's Exhibit 10 was marked

11           for identification by the court

12           reporter and is attached hereto.)

13   BY MS. TUCCI:

14       Q.   Do you recognize this document?

15       A.   Yes.

16       Q.   Okay.  What is it?

17       A.   It's a general insertion order that we

18   provide to either lead buyers or affiliate

19   marketers.  It's a contractual agreement, based on a

20   term of relationship.

21       Q.   And is this first page that says "Lead

22   Generation Advertiser Agreement," is this what you

23   refer to as the insertion order?

24       A.   Yeah.  This specific one is a Lead

25   Generation Advertising Agreement --

1     Q.   Okay.

2     A.   -- but again, terminology-wise, we call it a

3 general insertion order.

4     Q.   It's a form of an insertion order?

5     A.   Form of, yes.

6     Q.   And the pages that follow are the master

7 contract?

8     A.   Yes.

9     Q.   Okay.  And if you look at page 4 in

10 paragraph 19 --

11     A.   Yes.

12     Q.   -- what is paragraph 19?

13     A.   I think it's a stipulation based on our

14 agreement with the FTC, that we would provide in our

15 contractual agreement, make awareness of, that we

16 had a settlement with the FTC.

17     Q.   And when you talk about providing a hard

18 copy -- mailed or physical paper copy, I should

19 say -- when you talk about providing a physical copy

20 of notice of the order to marketing affiliates, is

21 this what you're talking about?

22     A.   This contract here in entirety, if I e-mail

23 them, it's a hard copy --

24     Q.   Right.

25     A.   -- with my terminology.

1          So I've provided this (indicating) as a hard

2     copy to affiliates.

3          Q.    Right.

4          And so when you say you have provided notice

5     of the agreement to marketing affiliates, you're

6     talking about providing them a document like this

7     (indicating), that has language such as in

8     paragraph 19?

9          A.    Yes.

10         Q.    All right.  And the -- if I can just show

11    you Exhibit 11 (indicating).

12             (Plaintiff's Exhibit 11 was marked

13             for identification by the court

14             reporter and is attached hereto.)

15    BY MS. TUCCI:

16         Q.    Do you recognize Exhibit 11?

17         A.    Yes.

18         Q.    Okay.  And this is the stipulated final

19    order entered in this case; is that correct?

20         A.    Correct.

21         Q.    And on page 19 is your signature; is that

22    correct?

23         A.    Correct.

24         Q.    Have you ever provided this document to a

25    marketing affiliate?

1

2

3      I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, do hereby

5  certify:

6          That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14          I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: ___12/2/09_____

21

22

23          _____

24          CHRISTINA KIM-CAMPOS, CSR

25          CERTIFICATE No. 12598