# ATTACHMENT 3

# TO REILLY DECL.

# P. CLEVELAND DEPO TRANSCRIPT

```
1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   Federal Trade Commission,      )
                                   )
5              Plaintiff,          )
                                   )
6        vs.                       )  No. CV-07-4880
                                   )      ODW (AJWx)
7   EDebitPay, LLC, et al.,        )
                                   )
8              Defendants.         )
                                   )
9

10

11

12              DEPOSITION OF PAUL CLEVELAND

13

14

15   DATE & TIME:  Tuesday, November 17, 2009
                   2:30 p.m. - 5:18 p.m.
16

17   LOCATION:     10877 Wilshire Boulevard
                   Suite 700
18                 Los Angeles, California

19
     REPORTER:     Christina Kim-Campos, CSR
20                 Certificate No. 12598

21

22

23

24

25
```

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4   Federal Trade Commission,      )
                                    )
 5              Plaintiff,          )
                                    )
 6        vs.                       )   No. CV-07-4880
                                    )       ODW (AJWx)
 7   EDebitPay, LLC, et al.,        )
                                    )
 8              Defendants.         )
                                    )
 9
10
11
12
13
14
15        DEPOSITION OF PAUL CLEVELAND, taken on
16   behalf of the Plaintiff, at 10877 Wilshire
17   Boulevard, Suite 700, Los Angeles, California,
18   commencing at 2:30 p.m., and concluding at
19   5:18 p.m., on Tuesday, November 17, 2009, pursuant
20   to Notice, before CHRISTINA KIM-CAMPOS,
21   CSR No. 12598, a Certified Shorthand Reporter, in
22   and for the State of California.
23                        ***
24
25
```

```
 1   understand my questions.  If -- if you don't -- if
 2   you go ahead and answer a question, I'll assume that
 3   you understood it.
 4         And as far as documents go, if I show you
 5   documents, please take whatever time you need to
 6   look at them and familiarize yourself with them.  If
 7   I ask you a question about a document after you've
 8   looked at it, I will assume, unless you let me know,
 9   that you've had enough time.
10         And as you've seen, we -- we take breaks,
11   and if you need a break, let me know, so that
12   Mr. Mallow doesn't see that pained expression on
13   everybody's face.  We can stop before that.
14         MR. MALLOW:  Very in tune with other
15   people's pain.
16         MS. TUCCI:  Yeah, you're all empathy.
17         I need Exhibit 1.
18         MR. MALLOW:  I have my copies.
19         MS. TUCCI:  All right.
20         MR. MALLOW:  But the officials are right
21   there (indicating).
22   BY MS. TUCCI:
23      Q.  Mr. Cleveland, do you recognize Exhibit 1?
24      A.  Yes, I do.
25      Q.  What is it?
```

1	A.	It's a description (sic) Notice of
2	EDebitPay, LLC, Dale Paul Cleveland, and William
3	Richard --
4	          MR. MALLOW:  Slow down.  Slow down.
5	          THE WITNESS:  -- Wilson.
6	     I'm a fast reader.
7	          MR. MALLOW:  Yeah, but somebody has to write
8	down everything you say, so you've got to talk
9	slowly.
10	          THE WITNESS:  It's a notice of deposition.
11	BY MS. TUCCI:
12	     Q.  Can you turn to page 3, Schedule A.
13	     In advance of this deposition I submitted
14	topics to EDebitPay, for Mr. Mallow and EDebitPay
15	designated you to testify about certain of those
16	topics, and I'd just like to run through them with
17	you.
18	     The first one is EDP's corporate structure.
19	     Are you prepared to testify about EDP's
20	corporate structure on behalf of EDP today?
21	     A.  I believe so.
22	          MR. MALLOW:  And let me just insert the --
23	there were objections that were served on the FTC.
24	Subject to those objections --
25	          MS. TUCCI:  Okay.

1     MR. MALLOW: -- as it relates to all --
2  wherever we objected. So I don't want to interrupt
3  again, but I just want to make the record clear that
4  there was a document provided regarding objections.
5     MS. TUCCI: Right.
6     MR. MALLOW: Okay.
7     MS. TUCCI: And I'll make the record clear
8  that the objection was untimely and meritless, but
9  we won't further discuss that.
10 BY MS. TUCCI:
11    Q.   The second one, EDP's revenue -- net income,
12 expenses and revenue sources since January 2008.
13 Are you prepared to testify about that today?
14    A.   I believe so.
15    Q.   Number 3, are you prepared to testify about
16 EDP's compliance with the Final Order?
17    A.   I am.
18    Q.   Are you prepared to testify about EDP's
19 responses to FTC's request for documents, as we
20 submitted in July of this year?
21    A.   I believe so.
22    Q.   Are you prepared to testify about EDP's 180
23 day report, which was produced pursuant to the Final
24 Order?
25    A.   Yes.

1     mean.  Startercredit.com is a website.
2          Q.    Right.  Startercreditdirect.com sells, if
3     I'm correct, it sells membership and a shopping
4     club, and it also promotes such things as an AIG
5     identity theft protection plan.
6          A.    Mm-hmm.
7          Q.    It's got some kind of cash advance offer.
8     But one of the things that it sells is -- is
9     catalogs --  I guess what you're calling catalog --
10         A.    It does.
11         Q.    -- membership.
12              And you also have other sites that sell
13    catalogs; right?
14              What of your -- what of your various sites
15    generates the most sales in terms of catalogs?
16         A.    The other one Mr. Wilson mentioned, was it
17    Ultimate Platinum?  I don't remember the name
18    exactly.  That's why I asked that he talk about the
19    websites.  But it's not startercreditdirect.  That's
20    pretty dismal right now.
21         Q.    Okay.  And has that changed?
22         A.    It's just gone -- it started mediocre to
23    low, and it's gone down ever since, but --
24         Q.    Okay.  And the other one is Ultimate
25    Platinum; is that right?

1    A.   Yes.

2    Q.   Or no? What's it called?

3    A.   You may not have gotten the words right, but
4   I think it has the words "Ultimate" and "Platinum"
5   in it.

6    Q.   Okay. We'll call it Ultimate Platinum right
7   now, and I'm not --

8    A.   He's not cringing at me over there.

9    Q.   Yeah, he's not cringing at you.

10    A.   I'm not supposed to be -- know all these
11   things. I'm the bean counter.

12    Q.   Has that site been more successful than
13   starterdirect?

14    A.   I think so.

15    Q.   I'm going to hand you what I'll ask the
16   court reporter to identify as Exhibit 16.

17       (Plaintiff's Exhibit 16 was marked
18       for identification by the court
19       reporter and is attached hereto.)

20   BY MS. TUCCI:

21    Q.   Do you recognize this document?

22    A.   I do.

23    Q.   Okay. What is it?

24    A.   It's a lead generation advertiser agreement,
25   or generally referred to as an insertion order.

1    It's advertisement type insertion order.

2    Q.    And is it correct that the product type is
3    StarterCreditDirect? I'm just looking at the first
4    page.

5    A.    I'm looking at the first page.

6    Q.    Okay. I see product type.

7    A.    That's correct.

8    Q.    Okay.

9    A.    StarterCreditDirect product.

10    Q.    Okay. And then it has -- further below, it
11    has a 50-50 net split beginning first month of
12    recurring revenues generated on monthly membership.

13    So just to be clear, the -- the monthly
14    membership for belonging to the Century Platinum
15    Club is split between EDP and Insight Marketing
16    Group?

17    A.    That's correct.

18    Q.    Okay. What about the -- is it correct that
19    it cost $99 to join the Century Platinum shopping
20    club?

21    A.    I believe so.

22    Q.    Okay. And does all of that revenue go to
23    EDebitPay?

24    A.    Yes. I'm not -- let me qualify. I'm not
25    sure if -- if we pay Insight Marketing a fee to --

```
 1    from monetization from the Starter Credit Direct
 2    website in the last year?
 3        A.   No, I don't.
 4        Q.   And is that something that is tracked?
 5        A.   No, we don't track it.
 6        Q.   Okay.  Let's go to -- I'm going to give you
 7    what I'll ask the court reporter to mark as
 8    Exhibit 17.
 9        A.   Thank you.
10             (Plaintiff's Exhibit 17 was marked
11              for identification by the court
12              reporter and is attached hereto.)
13    BY MS. TUCCI:
14        Q.   Okay.  Do you recognize Exhibit 17?
15        A.   I do.
16        Q.   And what is it?
17        A.   It's our answer to your question of
18    July 23rd about how we comply with paragraph 1H of
19    the Final Order.
20        Q.   I'd like to look at the second paragraph of
21    the response.  It says:
22             "We design our own websites to
23              adhere to the principles outlined in
24              Paragraphs 1A through F of the Final
25              Order and also model all of our sites
```

1 on http://ultimateplatinumoffer.com.
2 This website was specifically
3 designed under the review and advice
4 of Mr. Raymond McKown of the Federal
5 Trade Commission. Under Mr. McKown's
6 guidance and direction, various
7 design elements were positioned,
8 designed, and scripted to comply with
9 Paragraphs 1A through F of the Final
10 Order."
11 Do you have any documents that show
12 Mr. McKown providing advice to EDebitPay regarding
13 website design?
14 A. Had I kept the marked up pages, I would, but
15 I did not.
16 Q. Were these pages that Mr. McKown marked up?
17 A. Yes, ma'am.
18 Q. And you didn't keep those?
19 A. No, ma'am.
20 Q. In the -- to go to the first paragraph, it
21 says:
22 "In compliance with Paragraph I.H
23 of the Final Order, EDebitPay require
24 the signed acknowledgement of receipt
25 and the acceptance from each

```
 1   as evidence of express informed consent provided by
 2   Mr. Brooks to sign up through the Starter Credit
 3   Direct website.
 4          Does that -- that's how we received it.
 5   A.     Including this back page (indicating)?
 6   Q.     Right.  Yes.  Including -- that's what
 7   EDebitPay provided to us.
 8   A.     Oh, I thought you said Mr. Brooks provided
 9   it.
10   Q.     No.
11   A.     I'm sorry.  I misunderstood.
12   Q.     Let me state it again.
13          We received this from EDebitPay --
14   A.     Okay.
15   Q.     -- as proof that Mr. Brooks provided express
16   informed consent --
17   A.     Okay.  Now I understand.
18   Q.     -- for signing up for Century Platinum.
19          And can you tell me whether this is exactly
20   how Mr. Brooks would have viewed the web page when
21   he signed up for it?
22   A.     Looks pretty much like the website.
23   Q.     Does EDebitPay know where he -- how he got
24   to this site, how he got to this page?
25   A.     He got to the page as a result of an e-mail
```

```
 1   directed to him.  Whether it was from our affiliate
 2   or from us, I'm not sure.
 3        Q.   Could it have been as a popup?  An exit
 4   popup?
 5        A.   It's possible.
 6        Q.   And do you -- do you track by consumer name
 7   or by anything else related with this purchase,
 8   whether it came from an exit popup, an e-mail, or
 9   any other means?
10        A.   If we do, I'm not aware of it.
11        Q.   If you look at the first page of Exhibit 18,
12   it has the pre-application.  And then -- and then on
13   that page, the individual is asked to put in name,
14   address, phone number, and e-mail address; is that
15   correct?
16        A.   Zip code as well.
17        Q.   Zip code; right.
18             And then the consumer checks the box and
19   then goes to the application page.
20             And my question is, simply, that the
21   application on this first page appears to have the
22   same information, appears to be a repeat?
23        A.   That's correct.
24        Q.   Right.
25             Is that pre-populated, or does he have to
```

1        MR. MALLOW: Last page of --
2        THE WITNESS: Would that be the
3    Congratulations page?
4    BY MS. TUCCI:
5        Q. No, I'm sorry. To go all the way back to
6    the customer assistance record, I guess. You can
7    call it that. And I can just read from this.
8    7/31/2008. It says:
9            "Customer called regarding a $99
10           charge to his bank account. Searched
11           by bank account number, verified all
12           info matches. Let him know what was
13           ordered and how. Customer said he
14           was applying for payday loans. I let
15           him know we do not support loans."
16           Does EDebitPay offer payday loans? Does it
17   promote payday loans?
18       A. Which question are you asking me?
19       Q. Does EDebitPay promote payday loans?
20       A. Yes.
21       Q. And is it possible that this individual went
22   to a payday loan site from -- from -- hosted by EDP,
23   and landed on Starter Credit Direct as an exit pop?
24       MR. MALLOW: Objection.
25       THE WITNESS: I have no idea if that's --

1      MR. MALLOW:  Calls for speculation.
2  BY MS. TUCCI:
3      Q.   So it is possible?
4      A.   It's possible.
5      Q.   And on the same final page of Exhibit 18,
6  the -- in the part that's relaying what the consumer
7  told EDP, he complains that his information was
8  already filled in and the check box for the Terms
9  and Conditions were already agreed to when he -- and
10 he did not submit it.
11          Is that possible?
12     A.   No.
13     Q.   And why is that not possible?
14     A.   Our websites are not built that way.
15     Q.   And is there someone at EDebitPay who could
16 explain to you how it's technically impossible for
17 that to happen?
18     A.   Well, believe I can give it a shot.
19     Q.   Go for it.
20     A.   The website is not scripted to be able to
21 collect information until the boxes are checked.
22 The boxes are not pre-checked, and until the submit
23 button has clicked -- you cannot click the submit
24 button unless the boxes are checked.
25     Q.   But you do have pre-population in some

1    instances?
2    A.   In some instances, but we don't pre-populate
3    exit pops.  You suggested that this may have been an
4    exit pop, in which case if it was, he would have had
5    to fill out the information all over again from
6    scratch.  The most -- the most we ever do to pre-pop
7    is -- is what we call nonsensitive information.  And
8    exit pops --
9    Q.   So what information would that be?
10   A.   -- are a whole new website.
11   Q.   So what information --
12   A.   Name and address.  Name and address, at the
13   most.
14   Q.   Okay.  So that could have been
15   pre-populated?  He could have come to the Starter
16   Credit Direct site.  I'm not saying he did, but I'm
17   talking about what is technically possible in terms
18   of how EDP operates.
19        He could have started at a loan site hosted
20   by EDP, and not completed the application, tried to
21   exit, been exit popped onto Starter Credit Direct
22   and had his name already filled in?
23   A.   I -- you know, I don't want to answer that
24   as a yes because I don't know that that's what
25   happened with this.

```
1      Q.   I understand.  I understand we don't know
2   what happened with this particular application, but
3   it's technically possible that that could happen?
4      A.   Technically, it's possible.  It's also
5   possible it didn't happen.
6      Q.   Let's go to -- may I have a moment?  Can we
7   just take a two minute break?  I just found a
8   document I want to make a copy of -- or we can take
9   a longer break.  That's fine.
10          Do you want to take a break?
11          MR. MALLOW:  Sure.
12          (Recess.)
13          (Ms. Reilly leaves the room.)
14          (Ms. Holden leaves the room.)
15          MS. TUCCI:  I'm going to give you what I'm
16   going to ask the court reporter to mark as 19
17   (indicating).
18             (Plaintiff's Exhibit 19 was marked
19             for identification by the court
20             reporter and is attached hereto.)
21   BY MS. TUCCI:
22      Q.   Do you recognize Exhibit 19?
23      A.   Not specifically, but I recognize what it
24   is.
25      Q.   Okay.  Can you tell me what generally it is?
```

```
 1
 2
 3        I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby
 5   certify:
 6        That the foregoing proceedings were taken
 7   before me at the time and place herein set forth; that
 8   any witnesses in the foregoing proceedings, prior to
 9   testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14        I further certify that I am neither
15   financially interested in the action nor a relative or
16   employee of any attorney of any of the parties.
17        IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated:  12/2/09
21
22
23                    _____
24                    CHRISTINA KIM-CAMPOS, CSR
25                    CERTIFICATE No. 12598
```