O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, ) | CV-07-4880 ODW (AJWx) |
| ) | |
| Plaintiff, ) | ORDER HOLDING DEFENDANTS |
| ) | IN CONTEMPT OF JANUARY 22, |
| v. ) | 2008 FINAL ORDER AND |
| ) | ORDERING SANCTIONS |
| **EDEBITPAY, LLC, et al.,** ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## I.  INTRODUCTION

Pursuant to the parties' stipulation, the Court issued a Final Order for Permanent Injunction and Monetary Relief ("Final Order") on January 22, 2008.  (Dkt. # 35.) Plaintiff, Federal Trade Commission ("FTC") brings the instant contempt action, alleging that Defendants, EDebitPay, LLC ("EDP"), Dale Paul Cleveland ("Cleveland"), and William Richard Wilson ("Wilson") (collectively, "Defendants") violated the Final Order with respect to their marketing of two products on various websites.  The Court has carefully considered the arguments and evidence proffered in connection with the contempt hearing conducted on November 19, 2010, December 2, 2010, and December 3, 2010, including exhibits, deposition testimony, hearing testimony, the parties' memoranda, and the proposed findings of fact and conclusions of law.  For the following

1

reasons, the Court finds by clear and convincing evidence that Defendants are in contempt of the Final Order.

## II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A. THE PARTIES

Defendant EDebitPay, LLC, is a California-based limited liability company that Defendants Cleveland and Wilson founded in 2002. (Joint Ex. 171 ¶ 3, Att. A; Hr'g Tr. (Cleveland) 41:18-24.)  EDP is "in the business of online marketing and advertising." (Joint Ex. 529 (Compliance Report) 4:13-14.)

Defendant Cleveland is EDP's Chief Executive Officer and one of its two managing members. (Hr'g Tr. (Cleveland) 41:11-19.)  Cleveland is responsible for EDP's "day-to-day operations as well as its general management." (Joint Ex. 529 (Compliance Report) 4:9-10.)  As CEO, Cleveland has participated in all aspects of EDP's operations, including revising the content of its website offers, (Hr'g Tr. (Cleveland) 153:21-154:17), reviewing consumer complaints, (*id.* at 104:18-109:21), and communicating with the Better Business Bureau (*id.* at 109:22-110:9).

Defendant Wilson is President of EDP and the other of its two managing members. (Hr'g Tr. (Cleveland) 41:18-24.)  Wilson is responsible for the company's "day-to-day sales and management of its advertising program." (Joint Ex. 529 (Compliance Report) 4:14-15.)  In this capacity, one of Wilson's responsibilities is to supervise website designers regarding disclosures on EDP websites that market the Netspend prepaid debit card. (Hr'g Tr. (Desa) 305:10-18.)

### B. THE PRIOR PROCEEDING

On July 30, 2007, the FTC filed a Complaint against Defendants, alleging that Defendants' marketing of certain prepaid debit cards violated the Federal Trade Commission Act, 15 U.S.C. § 45(a). (Dkt. # 1.)  Specifically, the FTC alleged that, in conjunction with the prepaid debit cards, Defendants debited consumer accounts without first obtaining express, informed consent; failed to clearly and conspicuously disclose material facts; and misrepresented that consumers were obligated to pay a fee when consumers either had not completed an application or had applied for the card without

knowing that there was a fee. (*Id.* ¶¶ 49-60.)  Concurrently with the Complaint, the FTC filed an *Ex Parte* Application for a Temporary Restraining Order ("TRO") freezing Defendants' assets and appointing a receiver.  (Dkt. ## 2, 12.)  The Court issued the TRO on July 30, 2007.  (*Id.*)  Pursuant to the TRO, the FTC and the Receiver accessed EDP's business premises, served copies of the TRO on Defendants, and the Receiver took control of the business.  (Dkt. # 28 at 3.)  EDP temporarily discontinued operations; however, pursuant to the Court's entry of a stipulation signed by the Receiver and Defendants, Defendants resumed certain business operations during the pendency of the TRO. (Dkt. # 16.)  During the receivership, the parties continued negotiations to resolve the Complaint and ultimately agreed upon and signed the Final Order, which the Court entered on January 22, 2008.  (Dkt. # 35.)  On January 23, 2008, Defendants Cleveland and Wilson executed declarations acknowledging receipt of the Final Order, both in their individual capacities and on behalf of EDP.  (Joint Exs. 150-51.)

### C. THE INSTANT CONTEMPT PROCEEDING

On May 27, 2010, the FTC submitted an Application for Order to Show Cause Why Defendants Should Not be Held in Contempt.  (Dkt. # 43.)  After considering Defendants' Opposition to the Application and the FTC's Reply, the Court granted the Application and set the contempt hearing for October 15, 2010. (Dkt. # 62.)  The hearing was subsequently continued to November 19, 2010.  (Dkt. # 68.)  The hearing was conducted over three days – November 19, 2010, December 2, 2010, and December 3, 2010 – during which the Court heard the testimony of various witnesses, discerned their credibility, and received several exhibits into evidence.  In making its determination in this matter, the Court has carefully considered the aforementioned evidence presented at the hearing, along with the papers filed in conjunction therewith.

## III.  LEGAL STANDARD

District courts have the inherent power to enforce their orders through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *Cal. Dep't. of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008); *see also Stone v. City and Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) ("The district court has 'wide latitude in

determining whether there has been a contemptuous defense of its order.'" ).  As a party to the original action, the FTC may invoke the Court's power by initiating a proceeding for civil contempt. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444-45 (1911).

To establish Defendants' liability for civil contempt, the FTC must show by clear and convincing evidence that Defendants have violated a specific and definite order of the Court.  *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999); *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992).  Upon such a showing, the burden then shifts to Defendants to demonstrate why they were unable to comply. *Affordable Media, LLC*, 179 F.3d at 1239.  While substantial compliance with a court order is a defense to civil contempt and is not vitiated by "a few technical violations," *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993), both good faith and intent in attempting to comply with a court order are irrelevant to the finding of civil contempt. *Stone*, 968 F.2d at 856-57.  Rather, "[the Ninth] Circuit's rule with regard to contempt has long been whether the defendants have performed 'all reasonable steps within their power to [e]nsure compliance'" with the court order. *Stone*, 968 F.2d at 856; *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695.

Upon a finding that Defendants are in contempt, sanctions may be imposed to coerce Defendants into compliance with the Court's Order, or to compensate the party pursuing the contempt action for losses sustained as a result of the contemptuous behavior, or both. *United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947); *United States. v. Bright*, 596 F.3d 683, 696-97 (9th Cir. 2010); *Whittaker Corp.*, 953 F.2d at 517.  When determining the proper amount of compensatory sanctions, the Court should consider evidence of the actual loss sustained by the harmed party. *Id.*

## IV.  DISCUSSION

The FTC alleges that Defendants violated the Final Order with respect to their marketing of two products: the Century Platinum shopping club and the NetSpend "No Cost" prepaid debit card.  The Court will begin its discussion with the Century Platinum

shopping club and the FTC's allegations that Defendants' marketing of this product violates subsections I.B, I.E.5, I.A, and I.F of the Final Order. *(See infra* Parts IV.A.1-3.)  Then, the Court will address the NetSpend "No Cost" prepaid debit card and the FTC's allegations that Defendants' marketing of this product violates subsection I.D. (*See infra* Part IV.B.)  Next, the Court will examine Defendants' affirmative defenses. (*See infra* Parts IV.C.1-2.)  Finally, the Court will discuss the appropriate sanctions. (*See infra* Part IV.D.)

### A. VIOLATIONS OF THE FINAL ORDER – THE CENTURY PLATINUM SHOPPING CLUB

With respect to the Century Platinum shopping club, the FTC contends that Defendants' marketing of this product on nine versions of www.startercreditdirect.com ("Starter Credit website" or "Starter Credit marketing") and eight versions of www.supereliteoffer.com ("Super Elite Offer website"), violates the Final Order.[1] (*See* Joint Exs. 137, 152.)  Specifically, the FTC claims that Defendants violate the Final Order by: (1) misrepresenting that they were offering a general line of credit in violation of subsection I.B; (2) failing to clearly and conspicuously disclose that they were actually offering a shopping club membership and that the line of credit could be used only to purchase items from the shopping club in violation of subsection I.E.5; and (3) failing to obtain consumers' express informed consent to be charged for the shopping club membership in violation of subsections I.A. and I.F.  (Pl.'s Trial Brief, Dkt. # 90 at 3.) The FTC also asserts that even the inadequately disclosed offer of a credit line for the shopping club violates subsection I.B of the Final Order because the shopping club's high down payment obligations rendered the "credit line" illusory.[2] (*Id.* at 4.)

---

[1] The FTC also alleges various additional violations with respect to emails, "exit pops," and banner advertisements used by Defendants to "lure" consumers to the Starter Credit website. (Pl.'s Trial Brief at 4-5.)  Overall, this marketing is essentially the same, if not more egregious than Defendants' marketing on the Starter Credit and Super Elite Offer websites.  Thus, these materials also violate the Final Order to the same extent that the websites violate the Final Order.  This finding, however, does not change the Court's award of sanctions, and as such, shall not be discussed at length.

[2] In support of its proposition that the "credit line" is "illusory," the FTC offers evidence and opinions of its expert, Dr. Kenneth Kelly.  (*See* Joint Ex. 109.)  After reviewing the arguments and exhibits, however, the Court concludes that the evidence presented on this issue does not demonstrate a clear and convincing violation of subsection I.B of the Final Order.  This conclusion is limited to the

1    As a threshold matter, the Court addresses Defendants' argument that the subject

2    provisions do not apply to their marketing of the Century Platinum shopping club, but

3    rather only to the type of conduct challenged in the underlying case, *i.e.*, Defendants'

4    marketing of prepaid cards, debit cards, and credit cards.  (Defs.' Trial Brief at 6-11.)

5    Defendants' argument is unavailing because the express language of the Final Order

6    contradicts their assertion.[3]  *See United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)

7    (stating that the "scope of a consent decree must be discerned within its four corners, and

8    not by reference to what might satisfy the purposes of one of the parties to it.").  Section

9    I of the Final Order imposes various restrictions on Defendants "in        connection with

10   the advertising, promotion, marketing, offering, or sale of goods or services by Internet

11   or otherwise . . . directly or indirectly."  (Final Order at 5.)   In contrast to other

12   subsections which impose obligations with regard to the marketing of prepaid cards, debit

13   cards, and credit cards,[4] each of the relevant subsections – I.B, I.E.5, I.A., and I.F. – either

14   explicitly apply to the marketing of **any product or service** or fail to impose limiting

15   language.  Thus, according to the plain language, the provisions at issue are not limited

16   to Defendants' marketing of prepaid cards, debit cards, and credit cards, but also apply

17   to Defendants' marketing of the Century Platinum shopping club.  Having reached this

18   conclusion, the Court will now discuss these provisions of the Final Order as they relate

19   to Defendants' marketing of the Century Platinum shopping club.

20

21

22

23   FTC's argument regarding the "illusory" nature of the "credit line."

24   [3] In construing the language of these subsections, Defendants ask the Court to consider extrinsic
     evidence, specifically, the negotiations during the drafting of the Final Order.  The language in the

25   sections of the Final Order at issue, however, is unambiguous.  If language is clear, the Court may not
     consider other evidence.  *See Armour & Co.*, 402 U.S. at 682.  Indeed, extrinsic evidence is "relevant

26   only to resolve ambiguity in the decree." *United States v. Asarco, Inc.*, 430 F.3d 972, 980 (9th Cir.
     2005).

27   [4] For example, Subsections I.C and I.D prohibit Defendants from failing to make certain

28   disclosures regarding a "prepaid card, debit card, or credit card."  (Final Order at 6.)  The FTC does not
     allege that the Defendants' marketing of the Century Platinum shopping club violates Subsections I.C
     or I.D.  Indeed, as the FTC contends, these subsections demonstrate that if the parties had intended to
     limit the scope of other provisions to prepaid cards, debit cards, or credit cards, they obviously knew
     how to do so.

### 1.   Defendants' Violation of Subsection I.B

Subsection I.B prohibits Defendants from "[m]isrepresenting . . . expressly or by implication, any fact material to a consumer's decision to apply for or purchase any product or service offered by any Defendant."[5]  (Final Order at 5.)  "Material" is defined in the Final Order as that which is "likely to affect a person's choice of, or conduct regarding, goods and services."  (*Id.*)  Clear and convincing evidence demonstrates that Defendants conveyed, on both the Starter Credit Direct website and the Super Elite Offer website, that they were offering a general line of credit, rather than membership to an online shopping club.  In doing so, Defendants violated subsection I.B.  The Court will address the Starter Credit Direct website and the Super Elite Offer website individually.

#### a.   *Starter Credit Direct Website*

With the exception of one version, the Starter Credit website consists of two web pages on which a consumer is required to fill out information to apply for the product. (*See* Joint Ex. 137.)  The first page requests consumers' contact information and has an "Apply Now" button, which when selected, directs consumers to the second page.  (*See* Joint Ex. 137; Hr'g Tr. (Cleveland) 47:17-49:23; Pl.'s Trial Brief at 5.)  The second page requests consumers' financial information and has an "Apply Now" button, which actually submits the application.  (*Id.*)

Prominently displayed at the top of the various versions of the Starter Credit website, in large font, are the phrases "Immediate Guaranteed $10,000 Credit Line" and "2,500 Account Advance."  (Joint Ex. 137; Pl.'s Trial Brief at 5; Hr'g Tr. (Cleveland) 49:24-51:7.)  Because there are no prominent disclosures to the contrary, these statements give the reader the impression that the "credit line" and the "account advance" are general forms of credit, *i.e.*, that consumers would receive cash.  In reality, however, consumers who enrolled in Century Platinum did not receive a general credit line, but rather funds that could be used only to purchase goods from an online shopping club.  (*See, e.g.*,

---

[5]  Subsections I.B.1 to I.B.6 provide six examples of the types of material facts that Defendants must not misrepresent, introducing them with the phrase "including but not limited to." (Final Order at 5-6.)

Defs.' Trial Brief at 11-12.) Such representations fall exceedingly short of the requirements of subsection I.B in that they misrepresent the product actually offered.

Notwithstanding the obvious inadequacy of these representations, Defendants argue that they provided adequate disclosures. (Defs.' Trial Brief at 11-12.) Specifically, they point to phrases such as "the credit line was '[t]o Purchase Brand Name Merchandise Exclusively From Our Online Mega-Store!,'" "[t]his is a membership program and not a debit or credit card," and "Century Platinum allows account holders to make merchandise purchases exclusively from its online shopping site." (*Id.* at 11.) All of these disclosures, however, appear in small font, in obscure locations on the website, and are not in proximity to the general representations. (*See* Joint Ex. 137.) Some appear in footnotes far below the application information and submit button, lodged between vast amounts of other information regarding the E-Sign Act and the Patriot Act, while others appear in hyperlinked terms and conditions. (*Id.*) Such disclosures, located where consumers are unlikely to notice and read them, do not overcome the overarching misrepresentation that consumers would receive a general line of credit. *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (finding that such "fine print" disclosures do not allow a marketer to escape liability for an otherwise misleading advertisement). Indeed, Defendants concede that the Starter Credit website was less than clear. (*See* Defs.' Trial Brief at 12; Hr'g Tr. (Defs.' Closing Arg.) 377:2-12.)

In light of the foregoing, the Court finds that the statements on the Starter Credit website were undeniably misleading. The representations were material because they involved the essential nature of what Defendants were offering and therefore were likely to affect a person's choice regarding whether to accept the offer. *See Cyberspace.com LLC*, 453 F.3d at 1201 (finding materiality where misleading solicitation made it more likely consumers would sign up for service); *see also FTC v. Pantron I. Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) (finding that "[e]xpress claims are presumed to be material"). Thus, the Court concludes that Defendants' advertising of the Century Platinum shopping club on the Starter Credit website violated subsection I.B of the Final

Order by clear and convincing evidence.  The Court will now address the Super Elite Offer website.

### b.     Super Elite Offer Website

The Super Elite Offer website is formatted in the same two-page style as the Starter Credit Direct website and advertises a "$10,000" credit line in bold, large font and an "Instant $2500 Advance" also in bold, slightly smaller font.  (Joint Ex. 137.)  In even smaller text below the "10,000" appears the phrase "Century Platinum Membership Credit Line."  (*Id.*)  Just like the Starter Credit Direct website, because there are no prominent disclosures to the contrary, these statements give the reader the impression that the "credit line" and the "instant advance" are general forms of credit, *i.e.*, that consumers would receive cash.  While the Super Elite Offer website arguably provides consumers with slightly more information, *i.e.*, that they would receive a "Century Platinum Membership Credit Line," this elaboration is ambiguous at best.  While this phrase alludes to a membership, it does not explain that the membership is for a shopping club, nor does it explain that the alleged "credit line" can be used only to purchase products from the shopping club.  Such a limited and obscure reference is not sufficient to correct the overarching misrepresentation that consumers will receive a general $10,000 line of credit.  *See FTC v. Removatron Int'l Corp.*, 884 F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression.").

Rather than focusing on the FTC's substantive concerns with the Super Elite Offer website, Defendants argue that the website should be excluded from this contempt proceeding because the FTC failed to include it in the original contempt application, and consequently, Defendants are prejudiced by not being able to properly prepare a defense.  (Defs.' Trial Brief at 32-34.)  The Super Elite Offer website, however, is essentially identical to the Starter Credit Direct website.  In fact, both websites market the same product, the Century Platinum shopping club.  Thus, the potential arguments and defenses to contempt are similar.  Because Defendants were aware of the FTC's allegations with

respect to the Starter Credit Direct website, the Court finds that Defendants were able to properly prepare their defense with respect to both websites.  Therefore, including the Super Elite Offer website in this contempt proceeding does not prejudice Defendants.

Accordingly, the Court finds that, similar to the statements on the Starter Credit Direct website, the statements on the Super Elite Offer website are undeniably misleading and material.  Thus, the Court concludes that Defendants' advertising of the Century Platinum shopping club on the Super Elite Offer website violates subsection I.B of the Final Order by clear and convincing evidence.

### 2.    Defendants' Violation of Subsection I.E.5

Subsection I.E.5 prohibits Defendants from "[f]ailing to clearly and conspicuously disclose prior to the time when a consumer applies for or purchases any good or service offered by any Defendant . . . (5) the material attributes of the product or service offered or marketed, *e.g.*, that the product has the characteristics of a credit card, debit card, or stored value card."[6]  (Final Order at 5-6.)  The Final Order defines "clearly and conspicuously" as requiring disclosures to be of a "type size and location sufficiently noticeable for an ordinary consumer to read and comprehend."  (*Id.* at 3.)

Clear and convincing evidence demonstrates that Defendants violated subsection I.E.5 by failing to clearly and conspicuously disclose that they were offering a membership in an online shopping club.  In contrast to their prominent offer of a $10,000 credit line, Defendants bury the disclosures of what they were really offering – membership in a shopping club and a credit line that could be used only to purchase items from that shopping club.  As described above, the disclosures appear on both the Starter Credit website and the Super Elite Offer website in a small font in a footnote at the bottom of the webpage, below the "Apply Now" button, and below the copyright symbol and date. (*See* Joint Ex. 137.)  In many versions of the two websites, the disclosures

---

[6] To the extent that Defendants argue that the clause "e.g, that the product has the characteristics of a credit card, debit card, or stored value card" limits the scope of subsection I.E.5 to the marketing of credit cards, debit cards, and stored value cards, they are misguided.  The term "e.g." means for example.  Thus, this language simply provides examples of the type of material attributes that Defendants must disclose, but does not limit the application of subsection I.E.5 to Defendants' marketing of credit, debit, and stored value cards.

appear below, or in the middle of, other small-font disclosures regarding matters such as the E-Sign Act and the Patriot Act. (*Id.*) In some cases, Defendants also bury the disclosures in hyperlinked terms and conditions. (*See* Joint Ex. 162.) Consumers are not required to click on the "Terms and Conditions" hyperlink to accept Defendants' offer. (Hr'g Tr. (Desa) 304:10-18.) These disclosures are not in a "location sufficiently noticeable for an ordinary consumer to read and comprehend" and thus, the Court finds by clear and convincing evidence that Defendants are in violation of subsection I.E.5 of the Final Order.

### 3. Defendants Have Not Violated Subsections I.A and I.F by Clear and Convincing Evidence

Subsection I.A prohibits Defendants from "[d]ebiting . . . or assessing any fee or charge against consumers or their bank or financial accounts, without first obtaining the consumers' express informed consent for the debit, charge, or fee." (Final Order at 5.) Subsection I.F prohibits Defendants from "[d]irectly or indirectly causing billing information to be submitted for payment, in connection with the marketing or sale of any good or service, unless Defendants first obtain the express informed consent of the customer . . . and Defendants adhere to the requirements of [s]ection I.E." (*Id.* at 7.)

The FTC does not challenging the adequacy of Defendants' disclosure of the $99 application fee for the Century Platinum shopping club. (*See* Pl.'s Trial Brief at 22.) Rather, the FTC argues that, "as a result of Defendants' misrepresentations and inadequate disclosures, consumers did not understand what they were being charged for. . . . [and that [c]onsumers who do not know what they are buying cannot give their 'express informed consent.'" (*Id.*) Conversely, Defendants posit that "as long as a consumer was adequately informed that the consumer's account was going to be charged and the amount of the charge, there [is] no violation[.]" (Defs.' Trial Brief at 8.)

Subsection I.A requires "express informed consent **for the debit, charge, or fee.**" (Final Order at 5 (emphasis added).) Similarly, subsection I.F requires "express informed consent" before submitting "billing information . . . for payment[.]" The Court finds that

the language of these subsections requires express informed consent as to the charge itself, not the underlying product. Because consumers were informed of the charge itself and gave their consent, the FTC has failed to show, by clear and convincing evidence, a violation of either subsection I.A or subsection I.F. Thus, the Court does not find Defendants in contempt of these provisions of the Final Order. The Court will now shift its discussion to Defendants' marketing of the second product at issue, the NetSpend "No Cost" prepaid debit card.

## B.   VIOLATION OF THE FINAL ORDER – THE NETSPEND "NO COST" PREPAID DEBIT CARD

With respect to the NetSpend "No Cost" prepaid debit card (the "NetSpend card"), the FTC contends that Defendants' marketing of this product on three websites, including, simplecreditmatch.com, supereliteoffer.com, and eplatinumdirect.com (collectively, "Debit Card websites" or "Debit Card marketing"), violates subsection I.D of the Final Order. (Pl.'s Trial Brief at 15-18.) The FTC specifically alleges that this marketing violates the Final Order because, while Defendants identified the NetSpend card as "No Cost" in various versions of their marketing, they failed to clearly and conspicuously disclose fees to use and obtain the NetSpend card, including a $9.95 monthly service fee, a "PIN Purchase Convenience" fee, a "Signature Purchase Convenience" fee, an "ATM Withdrawal" fee, and an "Account-to-Account Transfer" fee. (*Id.* at 15.)

Subsection I.D prohibits Defendants from "[f]ailing to clearly and conspicuously disclose the costs, fees, or charges to obtain and use any prepaid card, debit card, or credit card, in close proximity to statements such as 'No Annual Fees' or 'No Security Deposit' that represent that a prepaid card, debit card or credit card can be obtained [for] 'free,' without obligation, or at a reduced cost." (Final Order at 6.) As noted above, the Final Order requires clear and conspicuous disclosures to be "unavoidable" and in a "type size and location sufficiently noticeable for an ordinary consumer to read and comprehend." (*Id.* at 3-4.) In addition, the Final Order defines "in close proximity" to mean "on the

1   same webpage . . . proximate to the triggering representation . . . and . . . not . . . accessed

2   or displayed through hyperlinks."  (*Id.* at 4.)

3       On every version of Defendants' websites marketing the NetSpend card, the

4   phrase, "Get a Prepaid Visa Debit Card at NO COST!" appears in red font.  (Joint Exs.

5   137, 157.)  However, there are fees to use the "NO COST" debit card.  After contacting

6   NetSpend, the card operator, to activate their card, consumers can potentially incur a

7   $9.95 monthly service fee, a "PIN Purchase Convenience" fee, a "Signature Purchase

8   Convenience" fee, an "ATM Withdrawal" fee, and an "Account-to-Account Transfer"

9   fee.  (Joint Exs. 131, 133; Hr'g Tr. (Cleveland) 219:3-10.)  Defendants do not disclose

10  the abovementioned fees on the same webpage as the "NO COST" offer.  Rather,

11  Defendants disclose those fees only in the middle of a separate 4,720-word "Terms &

12  Conditions" page, available via hyperlink.  Defendants do not require consumers to click

13  on the Terms and Conditions hyperlink to apply for the card.  (Hr'g Tr. (Cleveland)

14  95:5-11.)  Such disclosures are not clear and conspicuous, nor are they in close proximity

15  to the triggering representation of "No Cost."  Consequently, Defendants' marketing of

16  the NetSpend debit card is a clear violation of subsection I.D of the Final Order.

17      Indeed, Defendants admit that their marketing of the NetSpend card violates

18  subsection I.D.  (*See* Defs.' Trial Brief at 15; *see also* Hr'g Tr. (Defs.' Closing Arg.)

19  373:15-19 ("the Netspend marketing that failed to provide consumer notice of the [$]9.99

20  monthly fee . . . is a violation of the final order.").)  In spite of this, however, Defendants

21  present several arguments in an attempt to discharge or mitigate their liability.

22      First, Defendants claim that they "neither sold nor charged consumers for the

23  Netspend debit card, [but rather,] . . . simply generated leads for Netspend[.]" (Defs.'

24  Trial Brief at 15.)  Subsection I.D requires clear and conspicuous **disclosure** of any fees

25  in close proximity to statements such as "No Cost."  Thus, whether Defendants directly

26  sold the product to consumers or directly charged consumers is irrelevant.  It is

27  Defendants' disclosure, or lack thereof, that is at issue.  Moreover, Defendants cannot

28

attempt to shift liability to NetSpend, for it is Defendants, not NetSpend, who are bound by the Final Order.[7]

Second, Defendants allege that only after a consumer received the NetSpend card, activated it, decided on a fee option plan, and funded the card, would that consumer be charged.  (Defs.' Trial Brief at 15.)  It is irrelevant, however, that certain fees may have been explained to consumers when they contacted NetSpend after receiving the NetSpend card, or that consumers were not charged immediately when on Defendants' website.  Subsection I.D requires clear and conspicuous disclosure of any fees **in close proximity** to statements such as "No Cost."  Explaining fees after-the-fact clearly does not equate to being "in close proximity."

Third, Defendants argue that because consumers were allegedly never charged by EDP for the NetSpend card and because EDP received only minimal revenue from NetSpend in connection with the card, their violation of the Final Order is merely technical.   (Defs.' Trial Brief at 15.)  The characterization of the violation, however, cannot be determined based on the amount of revenue generated, but rather on the nature of the violation itself.  Rather than disclosing fees and costs on the same page as, or in close proximity to, the triggering representation of "NO COST," Defendants bury their fee disclosures in a hyperlinked document.  This action is not technical, but flatly defiant of the Final Order, which requires clear and conspicuous disclosures in close proximity.  Defendants' arguments in this respect are disingenuous.  In light of the foregoing, the Court finds that Defendants have violated subsection I.D by clear and convincing evidence.

## C.    DEFENDANTS' AFFIRMATIVE DEFENSES

---

[7] To the extent that Defendants argue that they lacked knowledge of NetSpend's activity with regard to the NetSpend card, the Court finds that it is Defendants' responsibility to make necessary inquiries.  Defendants, being bound by an injunctive order, must take every reasonable step to comply, including undertaking proper investigation to ensure that their representations comport with the actual characteristics of the product they are marketing.  *See Stone*, 968 F.2d at 856; *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d at 695.

In addition to their assertions that they complied with the provisions of the Final Order, Defendants set forth two affirmative defenses, estoppel and substantial compliance, which the Court will address in turn.

### 1.    Estoppel Against the FTC and the Receiver[8]

Defendants allege that the FTC is estopped from pursuing contempt for both the Starter Credit marketing and the NetSpend card because the FTC and the Court-appointed Receiver knew of Defendants' marketing and did not raise any objections.[9]   In essence, Defendants argue that the FTC and the Receiver impliedly approved their marketing.  To prove equitable estoppel, Defendants must show that: (1) the FTC knew the facts; (2) the FTC intended that its conduct be acted on, or acted so that Defendants had a right to believe it is so intended; (3) Defendants were ignorant of the true facts; and (4) Defendants relied on the FTC's conduct to their injury.[10]  *See Watkins v. U.S. Army*, 875 F.2d 699, 709 (9th Cir. 1989).  Moreover, "the government may not be estopped on the same terms as any other litigant."  *United States v. Bell*, 602 F.3d 1074, 1082 (9th. Cir. 2010) (citing *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984)).  Hence, Defendants must satisfy two additional elements: (1) that the FTC

---

[8]  While asserting their estoppel defense, Defendants seemingly attempt to raise the separate defense of good faith, *i.e.*, that their "belief that the Starter Credit marketing was compliant with the Final Order was based on a reasonable and good faith interpretation of the Final Order, as seen through the eyes and actions of the FTC and Receiver." (Defs.' Trial Brief at 17.)  However, Defendants have not offered any reasonable and good faith interpretation of the Final Order that would excuse their violations.  As explained above, their interpretation that the Final Order does not apply to their marketing of the Century Platinum shopping club contradicts the plain language of the Order.  Thus, this interpretation cannot be reasonable.  Moreover, Defendants' assertion that the FTC failed to alert them of possible violations does not relieve them of their independent obligation to comply with the Order.   The Court will reiterate that it is Defendants, not InSite, not NetSpend, not the FTC, nor the Receiver, who were charged with complying with the Final Order. According to Defendant Cleveland's testimony, Defendants were in control of their own marketing. (Hr'g Tr. (Cleveland) 201:21-23) (Defendants, not InSite, hosted the Starter Credit website); 201:24-25, 202:1 (Defendants, not InSite, input the content onto the Starter Credit website); 202:2-8 (Defendants, not InSite, made changes to the Starter Credit website); 202:12-20 (Defendants changed several things, such as footnotes and size of disclosures on the Super Elite Offer website). Thus, there is no reason that Defendants could not ensure compliance.  Defendants' attempt to place liability for their shortcomings on other parties is unpersuasive.

[9]  Defendants do not assert estoppel with respect to the Super Elite Offer website.

[10]  While Defendants cite case law applying estoppel by entrapment, the FTC correctly points out that the proper doctrine to apply in civil cases is equitable estoppel.  Entrapment by estoppel is a criminal defense and Defendants fail to identify a single case in which entrapment by estoppel was applied against the government in a civil case.  (*See* Defs.' Trial Brief at 17-18.)

15

engaged in affirmative misconduct beyond mere negligence, and (2) that the FTC's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability.  *Id.* (citing *Watkins*, 875 F.2d at 707); *Morgan v. Gonzales*, 495 F.3d 1084, 1092 (9th Cir. 2007).  Because the FTC's knowledge regarding the Starter Credit Direct website is factually different from its knowledge as to the NetSpend "No Cost" prepaid debit card, the Court will address each piece of Defendants' marketing separately.

### a.       *Estoppel as to the Starter Credit Website*

With respect to the Starter Credit website marketing, Defendants allege that the following pieces of evidence establish the FTC's knowledge of the Starter Credit Direct marketing: (1) inventory listings of material seized by the FTC referencing the Century Platinum shopping club and Starter Credit Direct website; (2) financial spreadsheets in possession of the Receiver showing revenue from the Starter Credit Direct marketing; and (3) a September 2007 email sent to the Receiver containing a link to the Starter Credit Direct website.  (Defs.' Trial Brief at 16.)  Defendants essentially argue that because the FTC was in possession of these documents, with mere one-line references to the Starter Credit marketing, it had knowledge that the Starter Credit marketing violated the Final Order.  This assumption is illogical.  The sheer volume of the documents and the obscure references to the Starter Credit website contained therein do not even establish that the FTC was aware that the Starter Credit website existed, let alone that it violated the Final Order.

Defendants fail to provide any other evidence that the FTC had the requisite knowledge regarding the Starter Credit marketing.  (*See* Hr'g Tr. (Cleveland) 207:17-19 (the proposed business plan did not discuss shopping clubs); 102:15-21 (shopping clubs were not discussed at the meeting to resume business operations); 103:2-20 (the FTC never informed Defendants that their marketing of the Century Platinum shopping club complied with the TRO or the Final Order); 104:3-12 (the Receiver never informed Defendants that their marketing of the Century Platinum shopping club complied with the TRO or the Final Order); (McKown) 255:3-6 (Defendants never asked FTC counsel to

16

review their marketing of the Century Platinum shopping club); 255:10-16 (FTC counsel never approved the Century Platinum shopping club marketing).)

Instead of providing direct evidence of FTC approval, Defendants claim that the FTC reviewed and approved "creatives" for another website called Ultimate Platinum and that Defendants made changes to the Starter Credit marketing based on the FTC's comments with respect to the Ultimate Platinum website. (Defs.' Trial Brief at 19.) Therefore, Defendants conclude that the Starter Credit marketing is "modeled after a marketing template sanctioned by the FTC." (*Id.*) At the contempt hearing, the Court heard testimony and received exhibits regarding this issue. (*See* Hr'g Tr. (Cleveland) 89:12-92:8.) After reviewing the evidence presented, the Court finds that there are significant differences between the Ultimate Platinum website and the Starter Credit website, such that the FTC's alleged approval of Ultimate Platinum does not constitute such approval of Starter Credit. (*See* Hr'g Tr. (Cleveland) 89:19-92:8 (the Ultimate Platinum marketing prominently stated that it was for a "shopping credit line").) In light of the foregoing, Defendants have failed to prove the first element of equitable estoppel.

Defendants also fail to establish the remaining elements. As to the second element, Defendants argue that because the FTC knew of the violations and failed to raise objections, "the FTC led Defendants to reasonably believe that the Starter Credit marketing posed no issues or concerns." (Defs.' Trial Brief at 17.) It follows, however, that because Defendants have failed to show that the FTC had the requisite knowledge, they cannot establish that the FTC or the Receiver approved the Starter Credit marketing or led Defendants to believe that the Starter Credit marketing complied with the Final Order. As to the third element, Defendants cannot, in good faith, assert that they were ignorant of the true facts. Defendants developed their own marketing and were bound by the Final Order; therefore, Defendants were responsible to ensure that their marketing complied with the terms of the Final Order. As to the fourth element, without evidence of any statement or any conduct by the FTC or the Receiver, Defendants cannot establish that they relied to their detriment.

With regard to the additional elements necessary to pursue estoppel against the government, Defendants fail to prove, as described above, any affirmative government

17

misconduct, *i.e.*, "an affirmative misrepresentation or affirmative concealment of a material fact," by the FTC or the Receiver. *See Carrillo v. United States*, 5 F.3d 1302, 1306 (9th Cir. 1993). Further, Defendants have not shown that the public interest would be served by estopping the FTC in this case. On the contrary, allowing the FTC to enforce the Final Order, and thereby compensate consumers for Defendants' conduct, serves the public interest. The Court will now address estoppel as to the second product at issue, the NetSpend prepaid debit card.

### b. Estoppel as to the NetSpend Prepaid Debit Card

Defendants contend that during the receivership, they worked with the FTC and the Receiver to modify their debit card advertising. (Defs.' Trial Brief at 18.) Specifically, Defendants allege that the FTC approved revised debit card marketing material, which placed all other fees in a terms and conditions hyperlink. (*Id.*) Thus, Defendants claim that the FTC should now be estopped from asserting that Defendants' use of a hyperlink violates the Final Order. According to the hearing testimony, the FTC actually worked with Defendants on a product called the Sterling VIP prepaid debit card (the "Sterling card"). (Joint Exs. 36, 40.) The Sterling card, however, is markedly different from the NetSpend card. The Sterling card lists an application fee of $49.95 and does not represent that it can be obtained for free, at no obligation, or at a reduced cost. (Hr. Transcript (Cleveland) 210:5-8.) Thus, any alleged approval of the Sterling card marketing cannot constitute approval of the NetSpend card marketing. In fact, at no time, did Defendants present to the FTC any marketing of a prepaid card that could be obtained for free, at no obligation, or at reduced cost. (*Id.* at 210:9-12.) Therefore, Defendants cannot establish the first element of knowledge or the second element regarding the FTC's alleged conduct. The analysis for the third and fourth elements of traditional equitable estoppel, as well as the two additional elements required for estoppel against the government, is the same as above.

In light of the foregoing, the Court finds that, as to both the Starter Credit marketing and the NetSpend card marketing, Defendants have failed to establish the four traditional elements of equitable estoppel and the two additional elements required for claims against the government.

## 2.      Substantial Compliance with the Final Order

Defendants allege that they have substantially complied with the Final Order.  To succeed on a defense of substantial compliance, Defendants must show both that (1) they made "every reasonable effort" to comply with the Final Order; and (2) that their violations were merely technical.  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695.  Defendants fail to allege that they fulfilled either of these requirements, and instead, rely solely on an irrelevant factual position.  Defendants argue that they have substantially complied with the Final Order because their violative marketing accounts for a nominal amount of their business – one percent of their gross revenues. (Defs.' Trial Brief at 19.)  Without any legal basis, Defendants essentially ask the Court to leap to the conclusion that, because the instant contempt action only relates to a small percentage of their business, the rest of their operation must be in compliance.  Defendants miss the mark.  The defense of substantial compliance bears no relationship to Defendants' overall revenue production, but rather focuses on their conduct.  Viewed in this light, the evidence overwhelmingly demonstrates that Defendants did not make "every reasonable effort" to comply with the Final Order.  In fact, with very little effort, Defendants could have modified their marketing so that it complied with the Final Order.  Defendants could have easily clarified what products they were actually offering and disclosed the costs and fees associated with those products.  Moreover, as discussed above, Defendants' violations of the Final Order are not merely technical.  On the contrary, Defendants' marketing violates the most fundamental purposes of the Final Order.  Indeed, consumers, through no fault of their own, continue to be misinformed about what they are buying and how much it will cost.

## D.      THE COURT'S AWARD OF MONETARY SANCTIONS

The parties dispute whether monetary sanctions should be assessed based on the amount of Defendants' profits or the amount of consumer loss.  In determining such sanctions in the context of civil contempt under the FTC Act, the district court has broad authority to "'grant ancillary relief as necessary to accomplish complete justice,' including the power to order restitution." *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009).  Indeed, the Ninth Circuit has found that "because the FTC Act is designed to

19

protect consumers from economic injuries, courts have often awarded the full amount lost by consumers rather than limiting damages to a defendant's profits." *Id.* Moreover, "[e]quity may require a defendant to restore his victims to the status quo where the loss suffered is greater than the defendant's unjust enrichment." *Id.* (citing *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606-07 (9th Cir. 1993). Here, Defendants' actions are not isolated incidents. Rather, Defendants disregarded core provisions of the Final Order in their marketing of two products through various websites for several months. As a result of Defendants' actions, tens of thousands of consumers collectively lost over three million dollars. Accordingly, the Court finds consumer loss to be the appropriate measure of sanctions in this case.

Defendants advocate for a reduction of sanctions by asserting several arguments, none of which are persuasive. First, Defendants argue that, with respect to the Starter Credit Direct marketing, the fees should be calculated from October 2008 rather than January 2008. Defendants contend that, in an attempt to avoid estoppel, the FTC stated that the Starter Credit Direct marketing became "worse" in October 2008. (Defs.' Trial Brief at 29.) This is irrelevant. The relevant date is January 22, 2008, when the Final Order was entered. Any violative marketing in existence after the Final Order is properly considered in calculating fees. Second, Defendants argue that they should be charged only one-half of the recurring monthly fees because the other half went to InSite. However, as previously stated, "[e]quity may require a defendant to restore his victims to the status quo where the loss suffered is greater than the defendant's unjust enrichment." *Stefanchik*, 559 F.3d at 931. For the reasons stated above, the Court finds that Defendants should be held responsible for the entire amount of consumers injury. Third, Defendants argue that sanctions should be limited to amounts received from consumers who actually complained to Defendants. (Defs.' Trial Brief at 29.) In measuring consumer loss, however, the FTC is not required to prove that each individual consumer relied on and was injured by Defendants' marketing, or that each consumer was dissatisfied. *Stefanchik*, 559 F.3d at 929 n.12. Thus, consumer loss is not limited only to those consumers who complained about Defendants' marketing. Having found Defendants' arguments deficient, the Court now turns to calculating consumer injury.

20

Consumer injury relating to marketing of the Century Platinum shopping club can be calculated based upon the total amount of fees paid by consumers, minus refunds, which equals $3,778,315.06.[11]  (*See* Pl.'s Proposed Findings of Fact ¶ 100.)  The FTC, however, ultimately asks for consumer loss in the amount of $3,713,927.96.  (*See* Pl.'s Proposed Conclusions of Law ¶ 118; Pl.'s Trial Brief at 32, 33.)  While the Court has not been apprised of the FTC's reasoning for the reduction, it will use the FTC's adjusted figure of $3,713,927.96.  Consumer injury from Defendants' marketing of the NetSpend card can be calculated from the total fees consumers paid to use the debit card, which equal $6,846.54.  (Joint Exs. 131, 133.)  The FTC has "show[n] that its calculations reasonably approximated the amount of customers' net losses . . ." and Defendants have not shown that these calculations are inaccurate.  *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997); FTC v. Inc.21.com, Corp., — F. Supp. 2d —, No. C 10-00022 WHA, 2010 WL 3789103, at *30 (N.D. Cal. Sept., 21, 2010).   Accordingly, the Court **ORDERS** judgment in favor of the FTC against Defendants in the amount of $3,720,774.50 ($3,713,927.96 plus $6,846.54).  The FTC is directed to use the funds paid by Defendants for equitable relief, including but not limited to, consumer redress and any attendant expenses for the administration of such redress.  In the event that direct redress to consumers is wholly or partially impracticable or that funds remain after redress is completed, such funds shall be deposited to the United States Treasury as disgorgement.

---

[11]  This amount is calculated by adding the application fees and recurring monthly fees paid by consumers who enrolled in the Century Platinum shopping club through the Starter Credit Direct website and the Super Elite Offer website.  For the Starter Credit Direct website, the application fees are $454,608.00, minus refunds of $35,541.00, for a total amount of $419,067.00.  The recurring monthly fees are $187,013.87 (one half distributed to EDP and one half distributed to InSite).  Thus, the total amount of revenue attributable to Starter Credit Direct is $606,080.20.  For the Super Elite Offer website, the application fees are $2,386,296.00, minus refunds of $199,584.00, for a total amount of $2,186,712.00.  The recurring monthly fees are $985,522.86 (one half distributed to EDP and one half distributed to InSite).  Thus, the total amount of revenue attributable to Super Elite Offer is $3,172,234.86.  The Court notes that these figures do not include indirect costs, such as non-sufficient fund charges from banks, that consumers may also have incurred.  (*See* Hr'g Tr. (Cleveland) 87:6-10.)  The total amount of revenue attributable to Starter Credit Direct, $606,080.20, plus the total amount of revenue attributable to Super Elite Offer, $3,172,234.86, equals $3,778,315.06.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.   CONCLUSION

For the foregoing reasons, the Court finds by clear and convincing evidence that Defendants are in contempt of the Court's January 22, 2008 Final Order.  Defendants are jointly and severally liable for compensatory sanctions in the amount of $3,720,774.50 and Defendants are ordered to pay this sum to the FTC for compensation to injured consumers.[12]

**IT IS SO ORDERED.**

February 3, 2011

_____
HON. OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE

---

[12]  In its memorandum in support of its Application for an Order to Show Cause and at the contempt hearing, the FTC stated that it intended to submit a motion to modify the Final Order pursuant to Rule 60(b)(5) if Defendants were held in contempt. In light of this Court's decision, the FTC is directed to file its motion to modify within 21 days of this Order.

22